JUDGE BAER

'09 CIV 6925

Robert Weigel (RW 0163)
Howard S. Hogan (HH 7995)
Jennifer C. Halter (JH 7032)
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiff Gucci America, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                  :

GUCCI AMERICA, INC.              :

          Plaintiff,           :

      -against-             :

FRONTLINE PROCESSING CORPORATION; :
WOODFOREST NATIONAL BANK; DURANGO  :
MERCHANT SERVICES LLC d/b/a NATIONAL :
BANKCARD SYSTEMS OF DURANGO; ABC   :
COMPANIES; and JOHN DOES,         :

          Defendants.          :

                                    :

------------------------------------------------------------x



09 Civ. _____

**COMPLAINT**

Plaintiff Gucci America, Inc. ("Gucci" or "Plaintiff"), by its attorneys, Gibson, Dunn &

Crutcher, LLP, for its complaint against Defendants Frontline Processing Corporation;

Woodforest National Bank; Durango Merchant Services LLC d/b/a National Bankcard Systems

of Durango; ABC Companies; and John Does (collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      Consumers instantly recognize the various trademarks used to identify the luxury

items merchandised or manufactured by or under licenses from Gucci (collectively, the "Gucci

Marks"). For decades, these famous, arbitrary, and fanciful Gucci Marks have received enormous exposure in the marketplace. Over the years, millions of consumers have been exposed to the Gucci Marks through extensive advertising campaigns, in mainstream and fashion magazines and other periodicals, as depicted on television and in motion pictures, on the Internet, and in other forms of unsolicited media coverage. As a result, the Gucci Marks are among the most widely-recognized trademarks in the United States, as well as among the most popular with consumers, which adds enormous value to the authentic products that the bear the Gucci Marks ("Gucci Products").

2.      The Internet has provided an additional marketplace in which Gucci can, through its authorized dealers, reach a wide range of consumers. However, the Internet has also opened the door for unauthorized merchants to reach a similarly wide range of consumers in their efforts to sell counterfeit versions of the Gucci Products (the "Counterfeit Products"). To ensure that consumers make the association between the Counterfeit Products and the Gucci Products from which they were copied, the sellers of such products not only copy the designs, patterns, and color schemes associated with Plaintiff, but also expressly identify the Counterfeit Products as "Gucci" products.

3.      Many, if not most, consumers, however, either cannot or will not purchase Counterfeit Products over the Internet if they are not able to use credit or debit cards to effect the purchase of Counterfeit Products. Alternative means of payment, such as cash, checks, money orders, bank wire transfer, or other forms of monetary transfers are not as convenient for many consumers, and they involve greater risk that the transaction will not be completed. As a result, many counterfeiters could not operate as a going concern were it not for the financial institutions that process credit card and debit card orders for them. Defendant Durango Merchant Services

LLC asserts on its website, http://www.durango-direct.com, that "credit card processing analysts estimate 9 out of 10 people use a credit card for their online orders." On information and belief, the fact that consumers are able to purchase Counterfeit Products by using a well-known credit or debit card informally communicates to consumers that the Counterfeit Products are authorized by Gucci or are otherwise lawful.

4.      Defendants are in the business of providing credit card processing services for websites and other merchants selling counterfeit products, sometimes referred to a "replica products." Defendants actively solicit, directly or through agents, "high risk" merchants, including merchants selling counterfeit products. By processing counterfeiting transactions, Defendants not only supply the necessary marketplace for such transactions, they are full partners in these counterfeiting activities, and certainly profit by processing credit and debit card transactions for counterfeiters.

5.      On June 3, 2008, Plaintiff initiated litigation in this District against one such unauthorized internet merchant who sold Counterfeit Products through the website http://www.TheBagAddiction.com ("TheBagAddiction.com"). That action was captioned Gucci America, Inc. et al. v. Laurette Company, Inc. et al., 08 Civ. 5065 (LAK) (the "Laurette Case").

6.      The named defendants in the Laurette Case – Laurette Company, Inc., Jennifer Kirk, and Patrick Kirk, all of whom were doing business as TheBagAddiction.com (collectively, the "Laurette Counterfeiters") – consented to the entry of a judgment admitting to liability for their counterfeiting activities. On December 15, 2008, Judge Lewis Kaplan so-ordered a Final Order and Judgment on Consent in the Laurette Case in the amount of $5.2 million.

7.      Defendants provided the credit and debit card processing services that allowed the Laurette Counterfeiters to sell Counterfeit Products through their website. Defendants either

knew that the sole purpose of the Laurette Counterfeiters' business was to sell counterfeit goods, or were willfully blind to their counterfeiting activities, all while profiting from and participating in such counterfeiting activities.  The Defendants therefore became a knowing and indispensable participant and agent in the Laurette Counterfeiters' operation.

8.      On information and belief, Defendants, with actual and/or constructive notice of the merchants' illegal conduct, continue to process credit and debit card others for other sellers of Counterfeit Products.  Through these activities, Defendants, who have no affiliation with the Plaintiff, have attempted to capitalize on the popularity of the Gucci Marks and have supported the manufacturing, marketing, and sale of products specifically designed to confuse consumers into believing that they are buying authentic versions of the Gucci Products or to otherwise compete directly with the Gucci Products.

9.      Defendants have participated in the sale of Counterfeit Products without the permission, authorization, or approval of Gucci.  Their conduct is likely to cause, and has caused, consumers mistakenly to believe that the Counterfeit Products sold and promoted with Defendants' assistance either are authentic Gucci Products; are produced under a license, agreement, joint venture or other form of authorization by the Plaintiff; or are otherwise endorsed by or affiliated with the Plaintiff, either at the point of sale or when consumers and potential consumers see the Counterfeit Products in use.

10.     For these and other reasons, Defendants have caused, and unless enjoined, will continue to cause, Plaintiff irreparable harm and an incalculable loss of goodwill and damages.

## PARTIES

11.     Gucci is organized and exists under the laws of New York, with its principal place of business located at 685 Fifth Avenue, New York, New York 10022.  Gucci is the sole and

exclusive distributor in the United States of items bearing the Gucci Marks (as defined herein) on leather goods, clothing, jewelry, accessories, home products, and related items (collectively, "Gucci Products").

12.     Frontline Processing Corporation ("Frontline") is a Nevada corporation, with a business address of 3701 Trakker Trail, Suite 1F, Bozeman, Montana 59718.

13.     Woodforest National Bank ("Woodforest") is a bank that is organized and exists under the laws of United States, with a business address of 25231 Grogan's Mill Road, Suite 175, The Woodlands, Texas 77380.

14.     Woodforest provides certain credit card processing services to internet merchants through its affiliate, Merchants' Choice Card Services Corporation ("MCCS"), with a business address of 25231 Grogan's Mill Road, 6th Floor, The Woodlands, Texas 77380, and satellite offices throughout the country, including New York State.

15.     Durango Merchant Services LLC d/b/a National Bankcard Systems of Durango ("Durango") is a Wyoming corporation, with a business address of 2885 Main Avenue, Suite B-105, Durango, Colorado 81301.

16.     Defendants Frontline, Woodforest and Durango are collectively referred to herein as the "Defendants."

17.     On information and belief, ABC Companies are companies engaged with the Defendants in the manufacture, distribution, sale, and advertisement of Counterfeit Products, but whose identity and number are presently unknown.

18.     On information and belief, John Does are individuals who are consciously engaged with the Defendants in directing, controlling, ratifying, facilitating, or otherwise

participating in the manufacture, distribution, sale, and advertisement of Counterfeit Products, or who consciously and directly benefit financially from the manufacture, distribution, sale, and advertisement of Counterfeit Products, but whose identity and number are presently unknown.

## JURISDICTION AND VENUE

19.     This is an action arising under the Trademark Act of 1946, 15 U.S.C. § 1051, et seq. (the "Lanham Act") and under the laws of the State of New York.

20.     This Court has jurisdiction under 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331, 1338(a) and 1338(b).  This Court has supplemental jurisdiction over all other claims asserted herein under 28 U.S.C. § 1367(a).

21.     Personal jurisdiction is proper over all Defendants pursuant to N.Y.C.P.L.R. § 302(a) because the unlawful conduct complained of herein caused and continues to cause injury to Plaintiff within this District; because Defendants regularly conduct or solicit business within this District, engage in other persistent courses of conduct and/or derive substantial revenue from goods and/or services used or consumed within this District; and because Defendants regularly and systematically direct electronic activity into the State of New York with the manifested intent of engaging in business within this District.

22.     By way of example, at least the following facts make the exercise of personal jurisdiction in New York proper:

    (a) Defendants derive substantial revenue from interstate commerce in the form of the revenues that they receive in return for the services they provide to legitimate and illegitimate internet merchants.  During the time the Laurette Counterfeiters utilized the Defendants' services, over 15,000 orders for counterfeit goods were received by the Laurette Counterfeiters.  Payment for each of these orders, which totaled over $2,000,000, was processed or facilitated by one or more of the Defendants.  On information and belief, Defendants enjoyed a substantial financial benefit from these illegal transactions.

(b) At least 1,500 of the orders placed on TheBagAddiction.com, payment for which was processed or facilitated by the Defendants, resulted in the shipment of counterfeit items to customers located in New York State. On information and belief, a substantial number of the items billed or shipped to New York State residents were counterfeit Gucci Products.

(c) On information and belief, Defendants further transact business in New York State by knowingly providing credit card processing services to internet merchants located within New York State and actively soliciting such business. For example:

   (i) MCCS claims on its website, http://www.mccs-corp.com, to "serve[] over 45,000 clients, processing more than $3.5 billion in credit card volume."

   (ii) Woodforest offers merchant account services to New York residents through its fully interactive website, http://www.woodforest.com.

   (iii) Frontline describes itself on its fully interactive website, http://www.frontlineprocessing.com, as "a nationwide provider of credit card processing and electronic payment services for Merchants, Banks, and Sales Agents" whose "principle bank is HSBC Bank NA (Buffalo, New York)."

(d) Defendants further transact business in New York by way of their relationship with MasterCard, which has its principle place of business at 2000 Purchase Street, Purchase, New York 10577, American Express, which has its principle place of business at the World Financial Center, 200 Vesey St, New York, New York 10285, and MCCS which has offices at 775 Park Avenue, Huntington, New York 11743.

(e) The Laurette Counterfeiters and other "high risk" clients of Defendants have caused confusion among consumers in New York.

(f) Defendants engaged in the tortious conduct set forth herein knowing that such conduct would cause harm to Gucci in New York, its principle place of business.

(g) On information and belief, discovery will show that Defendants have entered into additional contracts with New York residents, contracted to provide services related to transactions with New York residents from which they obtained substantial additional revenues, or engaged in other persistent courses of conduct making the exercise of personal jurisdiction in New York proper.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims arose in this District.

## FACTUAL BACKGROUND

### Gucci's Business and Marks

24.     The Gucci brand of luxury products are enormously popular with the general

public.  Plaintiff's advertising, promotional, and marketing efforts have resulted in widespread

and favorable public acceptance and recognition of the Gucci brand of luxury products.  As a

result, the Gucci Marks have become famous and highly valuable marks, possessing strong

secondary meaning among consumers.

25.     Gucci is the owner of the right, title and interest in and to, inter alia, the following

federally registered trademarks and/or service marks:

| Mark | Reg./Serial No. | Date of Registration |
|------|-----------------|----------------------|
| GUCCI | 876,292<br>959,338<br>972,078<br>1,168,477<br>1,321,864 | 09/09/69<br>5/22/73<br>10/30/73<br>09/08/81<br>02/26/85 |
| NON-INTERLOCKING GG MONOGRAM  | 1,106,722 | 11/21/78 |
| GUCCI CREST | 1,112,601 | 02/06/79 |

|  | | |
| --- | --- | --- |
| GREEN-RED-GREEN STRIPE  | 1,122,780<br>1,483,526 | 07/24/79<br>04/05/88 |
| SQUARE G  | 2,042,805<br>2,234,272 | 03/11/97<br>03/23/99 |
| REPEATING GG DESIGN  | 3,072,549 | 03/28/06 |

      26.     Annexed hereto as Exhibit 1 are true and correct copies of United States Patent and Trademark Office ("PTO") registration certificates evidencing Gucci's ownership of these trademarks and printouts from the PTO's website setting forth the status of Gucci Marks.  All of the registrations set forth in Exhibit 1 are valid, subsisting, unrevoked, and uncancelled. Additionally, many of these registrations are incontestable.  Gucci also owns common law rights

in the above and other marks for use in connection with the Gucci Products. These registered and common law trademarks are collectively referred to as the "Gucci Marks."

27.    The Gucci Marks have been widely promoted, both in the United States and throughout the world. The Gucci Marks are among the world's most famous and widely recognized, and the public and consumers have come to recognize that the Gucci Products originate exclusively with Plaintiff.

28.    Plaintiff maintains strict quality control standards for all Gucci Products. Customers, potential customers, and other members of the public and industry associate the Gucci Products with exceptional materials, style, and workmanship. On information and belief, many consumers purchase Gucci Products because of Plaintiff's reputation for quality. On information and belief, Gucci Products are among the most popular luxury products offered for sale in the United States.

29.    Plaintiff displays the Gucci Products in its advertising and promotional materials. To date, Plaintiff has spent hundreds of millions of dollars in advertising and promoting the Gucci Marks and Gucci Products, and Plaintiff, its predecessors-in-interest and its affiliated companies have enjoyed billions of dollars in sales.

30.    Plaintiff's continuous and broad use of the Gucci Marks has expanded its renown and enabled Plaintiff to achieve fame and celebrity in its various product markets. Plaintiff's reputation is a direct result of its extensive advertising and promotion, and concomitant widespread sales, the care and skill utilized in the manufacture of Gucci Products, the uniform high quality of such products sold under, or in connection with the Gucci Marks, and the public acceptance thereof. Plaintiff has created invaluable goodwill throughout the United States and elsewhere by selling products of dependable quality. Based on the extensive sales of the Gucci

Products and such products' wide popularity, the Gucci Marks have developed a secondary meaning and significance in the minds of the purchasing public, and the services and products utilizing and/or bearing such marks and names are immediately identified by the purchasing public with Plaintiff.

**The Laurette Counterfeiters' Sale of Counterfeit Products through TheBagAddiction.com**

31.    The Laurette Counterfeiters admitted in a consent judgment that, without authorization or license from Plaintiff, they willfully and intentionally used, reproduced and/or copied the Gucci Marks in connection with their manufacturing, distributing, exporting, importing, advertising, marketing, selling and/or offering to sell their Counterfeit Products.  The Laurette Counterfeiters shipped a substantial percentage of the Counterfeit Products to New York.

32.    Before TheBagAddiction.com website was shut down permanently pursuant to Court order, it openly boasted that the Counterfeit Products were not authentic, but rather were "mirror image[s]" of Gucci Products.  Below is a true and accurate screen shot of TheBagAddiction.com website's disclosure of the fact that it offered Counterfeit Products.



33.    For example, shown below is an image of an authentic Gucci "Horsebit Nail" Boston bag.  The product displayed below bears Gucci's federally registered GUCCI trademark name, non-interlocking "GG" monogram, and repeating "GG" design.  See Ex. 1 (U.S. Reg. Nos. 876,292; 959,338; 972,078; 1,106,722; 1,168,477; 1,321,864; 3,072,549).



34.     Set forth below is an image of a Counterfeit Product offered for sale to the public through TheBagAddiction.com website.  The handbag displayed below has handles and ornamentation that are designed to appear like the handles and ornamentation on the authentic Gucci handbag shown above.  The overall effect of the design of this Counterfeit Product is not only confusingly similar to the design of the authentic Gucci product shown above, it also bears an exact copy of Gucci's federally registered trademark name, non-interlocking "GG" monogram, and repeating "GG" design.



35.     Further, shown below is an image of an authentic Gucci "Chain Large Hobo" handbag.  The product displayed below bears Gucci's federally registered GUCCI trademark name, non-interlocking "GG" monogram, and repeating "GG" design.  See Ex. 1 (U.S. Reg. Nos. 876,292; 959,338, 972,078; 1,106,722; 1,168,477; 1,321,864; 3,072,549).



36.     Set forth below is an image of a Counterfeit Product offered for sale to the public through TheBagAddiction.com website.  The handbag displayed below is designed to appear like the authentic Gucci handbag shown above.  The overall effect of the design of this Counterfeit Product is not only confusingly similar to the design of the authentic Gucci product shown above, it also bears an exact copy of Gucci's federally registered trademark name, non-interlocking "GG" monogram, and repeating "GG" design.



37.     All of the Counterfeit Products offered for sale on TheBagAddiction.com followed this pattern – each used the color scheme, pattern, and design of one of the Gucci Products and bore an exact duplicate of at least one of the Gucci Marks.

38.     Even though they are of inferior quality and workmanship, the Counterfeit Products appear superficially similar, and in some cases superficially identical, to genuine Gucci Products.  The design of the Counterfeit Products and the display of the Gucci Marks communicate to consumers, and consumers are therefore likely to be confused into believing, that the Counterfeit Products were manufactured, licensed, approved or sponsored by, or otherwise affiliated with, the Plaintiff.

39.     The Laurette Counterfeiters have admitted that they offered these Counterfeit Products for sale without permission, authority or license from Plaintiff and such actions were taken in bad faith with full knowledge of the Plaintiff's ownership of and/or exclusive rights to use and license the Gucci Marks.  At all relevant times, and in furtherance of their infringing activities, the Laurette Counterfeiters willfully and intentionally used the Gucci Marks on Counterfeit Products.

40.     The result of the Laurette Counterfeiters manufacturing, advertisement, distribution, and sale of Counterfeit Products was to deceive and mislead consumers into believing that the products sold by the Laurette Counterfeiters on TheBagAddiction.com were authorized or sponsored by the Plaintiff or to cause mistake or to deceive.

41.     In particular, TheBagAddiction.com website made liberal use of the Gucci Marks to make an explicit connection between the Counterfeit Products offered for sale by the Laurette Counterfeiters and Gucci Products.  For example, set forth below is a true and accurate image of TheBagAddiction.com website describing the Counterfeit Products as "Gucci."



42.    The Counterfeit Products were not genuine Gucci Products bearing the Gucci Marks.  Plaintiff did not manufacture, inspect, or package the Counterfeit Products, and did not approve the Counterfeit Products for sale and/or distribution.  Plaintiff examined samples of the Counterfeit Products and determined them to be counterfeit.  The Laurette Counterfeiters offered these Counterfeit Products directly to consumers through TheBagAddiction.com.

43.    The Laurette Counterfeiters have admitted that they infringed at least 6 Gucci Marks by collectively selling, offering to sell, and/or distributing at least 20 different types of goods bearing counterfeits of Gucci Marks, including, but not limited to:  (1) totes; (2) satchels; (3) top handle bags; (4) shoulder bags; (5) hobos; (6) clutches; (7) evening bags; (8) exotic bags; (9) wristlets; (10) belt bags; (11) watches; (12) passport covers; (13) business card holders; (14) belts; (15) women's wallets; (16) men's wallets; (17) diaper bags; (18) sunglasses; (19) cosmetic pouches; and (20) messenger bags.

**Defendants Are an Indispensable Part of the Enterprise to Sell Counterfeit Gucci Products, Resulting in Consumer Confusion and Harm to Gucci**

44.     The Laurette Counterfeiters could not have sold such a significant volume of Counterfeit Products through their website but for the merchant services provided by the Defendants in processing credit and debit card orders for Counterfeit Products.  Indeed, the Laurette Counterfeiters sold over $500,000 worth of Counterfeit Products during the time they utilized Defendants' merchant bankcard services.

45.     Defendants have explicitly accepted and, on information and belief, continue to accept business from merchants that they designated as "high risk," including merchants of Counterfeit Products like the Laurette Counterfeiters, because such merchants engage in unauthorized or unlawful activities, such as selling Counterfeit Products or providing escort services.

46.     On information and belief, Defendants were indispensable participants in the Laurette Counterfeiters' sale of Counterfeit Products, provided the marketplace for the sale of Counterfeit Products, and facilitated the financing and commercial operations of the Laurette Counterfeiters by providing them with merchant bankcard services in connection with their operation of TheBagAddiction.com website and otherwise processing credit and debit card orders for Counterfeit Products.

47.     Defendants knew they were facilitating the Laurette Counterfeiters' sale of Counterfeit Products and/or were willfully blind to the Laurette Counterfeiters' unlawful activities.

48.     Durango's website states that it services "High Risk Merchant Accounts," including merchants who sell "Replica Products."  Set forth below is a true and accurate image

of the Durango website stating that they provide services to merchants in the "Replica" business,

as well as "High Risk" and "Escort Merchants."



49.     Durango acts as an agent for the Defendant credit card processing agencies to

locate potential customers, including "High Risk" Internet merchants like the Laurette

Counterfeiters who will use the services of the Defendant credit card processing agencies to

process credit card transactions for orders placed on the merchants' websites.  Durango collects a

referral fee from the credit card processing agencies for bringing the Defendant credit card

processing agencies and the Internet merchants together.

50.     In or around September 2006, Laurette Counterfeiter Patrick B. Kirk entered into

a Merchant Services Agreement with Durango on behalf of TheBagAddiction.com.  Nathan

Counley was the Durango sales representative in charge of TheBagAddiction.com account.  On

information and belief, Mr. Counley is or was employed as a Senior Sales Manager at Durango. Annexed hereto as Exhibit 2 is a true and correct copy of the Laurette Counterfeiters' Durango Merchant Services Agreement, bates stamped LAU 00639-00640.

51.     Durango, by and through Mr. Counley, assisted the Laurette Counterfeiters in procuring merchant accounts with credit card processing agencies, including Defendants Frontline and Woodforest, for the purpose of processing payments for Counterfeit Products sold on TheBagAddiction.com website.

52.     During the course of the Laurette Case, the Laurette Counterfeiters produced e-mail communications between themselves and Mr. Counley, acting in his role as Durango's sales representative.  The e-mail communications produced by the Laurette Counterfeiters confirm that Mr. Counley knew the Laurette Counterfeiters were selling counterfeit products through TheBagAddiction.com.

53.     In an e-mail dated September 11, 2006, Mr. Counley wrote to Laurette Counterfeiter Jennifer Kirk to advise her that he had "an offshore bank that is willing to accept startup or lower volume (less than $100,000/mo) replica merchants."  In response to Mr. Counley's question regarding TheBagAddiction.com's processing history, Jennifer Kirk stated that the website's "processing history is fine.  [W]e had to close because we were selling replicas."  Annexed hereto as Exhibit 3 is a true and correct copy of the September 11, 2006 e-mail exchange, bates stamped LAU 00641-00645.

54.     In an e-mail dated September 14, 2006, Mr. Counley again wrote to Jennifer Kirk, stating: "Good news!  I just found out that our US bank can do replica accounts now!"  See Ex. 3 (LAU 00642).

55.     Just one day after receiving Mr. Counley's e-mail, Laurette Counterfeiter Patrick Kirk completed an application for a merchant account with Frontline.  Mr. Counley was listed as Defendant Frontline's sales agent on the Laurette Counterfeiters' Frontline merchant account application.  Annexed hereto as Exhibit 4 is a true and correct copy of the Laurette Counterfeiters' Frontline Merchant Account Application Checklist, bates stamped LAU 00630. Annexed hereto as Exhibit 5 is a true and correct copy of the Laurette Counterfeiters Merchant Account contract with Frontline, dated September 15, 2006.

56.     Mr. Counley acted as Frontline's agent in soliciting and directing credit card processing business from replica merchants like the Laurette Counterfeiters.  Frontline is charged with the knowledge of its agent, Mr. Counley, that the Laurette Counterfeiters were selling counterfeit goods.

57.     That the bank referenced in Counley's e-mail "can do replica accounts now" suggests a business decision by Frontline to provide credit card processing services to Internet merchants selling counterfeit items.  Indeed, Frontline states on its website that it "provides payment services for most merchant categories without the usual restrictions."

58.     Frontline is a nationwide provider of credit card processing and electronic payment services for merchants, banks, and sales agents.  Frontline is an Independent Service Organization (ISO) with Visa USA Inc. ("Visa") and a Merchant Service Provider ("MSP") with MasterCard International, Inc. ("MasterCard").

59.     Frontline employs the use of a back-end processor, Global Payments Direct, Inc. ("Global Payments"), to assist with its electronic transaction processing service.

60.     Frontline began providing credit card processing services to the Laurette Counterfeiters in September 2006.  Frontline processed Visa, MasterCard, Discover, and

American Express payments for goods sold by the Laurette Counterfeiters on

TheBagAddiction.com website.  In exchange for providing such services to the Laurette

Counterfeiters, Frontline deducted a fee from each transaction it processed.

61.      Frontline also investigated and resolved any chargeback claims made in

connection with orders for items offered for sale on TheBagAddiction.com and paid for by credit

card.  A chargeback may occur, for example, when a cardholder disputes a charge that appears

on his or her credit card statement.

62.      To account for the possibility of chargebacks, Frontline required the Laurette

Counterfeiters to create and maintain funds in a "reserve account" which, at the time the Laurette

Counterfeiters' website was shut down pursuant to Court order, totaled in excess of $40,000.

The Laurette Counterfeiters' reserve account was funded solely through proceeds from

counterfeit goods sold on TheBagAddiction.com.  Frontline took possession of the funds in the

reserve account as a "termination fee" when the Laurette Counterfeiters' website was shut down

pursuant to Court order.

63.      On information and belief, when chargebacks occurred on their Frontline account,

the Laurette Counterfeiters submitted documentation to Frontline to support the initial credit card

charge.  This documentation generally included a printed confirmation of the customer's order.

The printed confirmation also included a description of the item purchased by the customer and

the price paid for that item on TheBagAddiction.com.

64.      On information and belief, Frontline's process for investigating chargebacks

included a review of the supporting documentation submitted by the Laurette Counterfeiters,

including the amount charged to a customer for specific items.  The fact that the items sold on

TheBagAddiction.com are listed at a fraction of the retail price should have alerted Frontline to

the fact that the Laurette Counterfeiters were selling Counterfeit Products.  On information and belief, at least some of the customer comments submitted in connection with chargeback requests further put Frontline on notice that the Laurette Counterfeiters were selling substandard and counterfeit goods.

65.     Frontline benefited from doing business with replica merchants by charging a higher transaction fee, known as a "discount rate," for processing credit cards associated with these high risk Internet merchants.  For the Laurette Counterfeiters' account, Frontline used a discount rate of 3.95%.

66.     On information and belief, Frontline not only considered TheBagAddiction.com to be a high risk Internet merchant, it had specific knowledge that the Laurette Counterfeiters and/or other merchants associated with Frontline were selling and intended to use Frontline's merchant services to facilitate the sale of and to sell Counterfeit Products.

67.     On information and belief, Frontline was the only credit card processing agency utilized by the Laurette Counterfeiters to process credit card purchases made on TheBagAddiction.com from late-September 2006 until mid-November 2006.

68.     The Laurette Counterfeiters received over 100 orders for counterfeit Gucci Products during the month of October 2006 alone.  Based on the Laurette Counterfeiters list price for these items, sales of counterfeit Gucci Products alone totaled nearly $20,000 in October 2006.  From September 2006 through June 2008, the Laurette Counterfeiters' sales of counterfeit Gucci Products totaled in excess of $500,000.

69.     On information and belief, the Laurette Counterfeiters sought a second merchant account due to the high discount rate charged by Frontline as well as Frontline's requirement that the Laurette Counterfeiters maintain a reserve account.

70.    The Laurette Counterfeiters continued to use Frontline to process their sales of Counterfeit Products until their website was shut down pursuant to Court order in June 2008.

71.    In November 2006, Mr. Counley assisted the Laurette Counterfeiters in obtaining a merchant services account with Woodforest.

72.    Mr. Counley acted as Woodforest's agent in soliciting and directing credit card processing business from replica merchants like the Laurette Counterfeiters.  Mr. Counley is listed as Defendant Woodforest's sales agent on the Laurette Counterfeiters' Woodforest merchant bankcard account application.  Annexed hereto as Exhibit 6 is a true and correct copy of the Laurette Counterfeiters' Woodforest Merchant Bankcard Application, dated November 13, 2006.  Woodforest is charged with the knowledge of its agent, Mr. Counley, that the Laurette Counterfeiters were selling counterfeit goods.

73.    The Laurette Counterfeiters' Woodforest merchant bankcard account application stated that TheBagAddiction.com was a wholesale/retail designer bag business.  The Laurette Counterfeiters explicitly disclosed in the application that the supplier of their goods was Suijian Liao Wholesale Bags Company in Guangzhou City, China and not Gucci.  Woodforest knew that TheBagAddiction.com website purported to sell Gucci products.

74.    On information and belief, Woodforest not only considered TheBagAddiction.com to be a high risk Internet merchant, it had specific knowledge that the Laurette Counterfeiters were selling and intended to use Woodforest's merchant services to facilitate the sale of and to sell Counterfeit Products.

75.    In reviewing the Laurette Counterfeiters' merchant bankcard application, a Woodforest employee or agent completed an "Internet Merchant Review Checklist."  Completion of the checklist was required prior to approving an Internet merchant account and

involved a Woodforest employee or agent reviewing and confirming certain information regarding TheBagAddiction.com website. One of the items Woodforest marked as confirmed on TheBagAddiction.com's Internet Merchant Review Checklist was that the website contained a "[c]omplete description of the services or goods offered." TheBagAddiction.com website plainly stated that the items being offered for sale that bore Gucci's trademarks were not authentic.

76.     In completing the Internet Merchant Review Checklist for the TheBagAddiction.com website, Woodforest printed a number of pages from the website that displayed the goods offered for sale on the website. These printouts, which were produced by Woodforest in response to a subpoena issued in the Laurette Case, included several pages of handbags labeled "Gucci" being sold for a fraction of the retail price. See Ex. 6.

77.     One of the handbags offered for sale on TheBagAddiction.com that appears in the printout provided by Woodforest is listed as a "Gucci Horsebit Hobo in Black Signature." According to Woodforest's printout from TheBagAddiction.com, the retail value of this handbag is $1,280.00, yet it was offered for sale by the Laurette Counterfeiters for only $180.00. When taken in combination with the information provided by the Laurette Counterfeiters on their Woodforest application (e.g., listing the supplier of their handbags as a wholesaler in China), this pricing information either alerted or should have alerted Woodforest to the fact that the Laurette Counterfeiters were engaged in the sale of Counterfeit Products.

78.     Nonetheless, Woodforest approved the Laurette Counterfeiters' merchant bankcard account application and began providing credit card processing services for TheBagAddiction.com website in November 2006. On information and belief, Woodforest

continued to provide these services to TheBagAddiction.com until the Laurette Case commenced in June 2008.

79.     Woodforest's Internet Merchant Review Checklist also required a second level review of TheBagAddiction.com website after the account was approved.  In this second level review, a Woodforest employee or agent was required to complete a purchase on TheBagAddiction.com and then request a refund.  According to Woodforest's own documentation, these second level reviews were to be completed after the merchant's "first week" of processing with Woodforest, "once per quarter," and "annually as the merchant's registrations are due."

80.     Between these numerous visits to TheBagAddiction.com website between 2006 and 2008 – where the "FAQ" section of the website contained an explicit admission from the Laurette Counterfeiters that they were selling "mirror image" Counterfeit Products – and the information disclosed to Woodforest by the Laurette Counterfeiters in their merchant account application, Woodforest knew or was willfully blind to the fact that the Laurette Counterfeiters were selling Counterfeit Products.

81.     Like Frontline, Woodforest also received and investigated requests for chargebacks received in connection with purchases made on TheBagAddiction.com website. Woodforest's affiliate, MCCS, was responsible for processing any such chargeback requests. Documents produced by Woodforest in the Laurette Case included monthly merchant account statements that were issued to the Laurette Counterfeiters.  These monthly account statements, titled "Summary of Bankcard Deposits," which detailed the credits to the Laurette Counterfeiters' account as well as any debits associated with returns and chargebacks, directed

the Laurette Counterfeiters to contact MCCS regarding any inquiries, either by phone or on MCCS's interactive website.

82.     On information and belief, the basis for cardholders' requests for chargebacks suggests that Woodforest was willfully blind to the Laurette Counterfeiters' sale of counterfeit items on TheBagAddiction.com website.  As just one example, in a 2007 letter from MCCS's Retrieval and Chargeback Department to the Laurette Counterfeiters regarding a request for a chargeback, MCCS stated that "the cardholder's bank is continuing with this dispute. . . .  The cardholder claims the merchandise received was not as described.  The bag was suppose[d] to be genuine leather but was not."  Annexed hereto as Exhibit 7 is a true and correct copy of the letter from MCCS's Retrieval and Chargeback Department.

83.     The customer comments received by Woodforest's affiliate, MCCS, in connection with chargeback requests further put Woodforest on notice that the Laurette Counterfeiters and/or other of Woodforest's associates were selling substandard and counterfeit goods.

84.     Woodforest processed Visa, MasterCard and American Express payments for goods sold on TheBagAddiction.com website.  From November 2006 through June 2008, Woodforest processed over $1,000,000 in transactions for counterfeit items purchased on TheBagAddiction.com.   In exchange for providing such services to the Laurette Counterfeiters, Woodforest deducted a fee from each transaction it processed.  On information and belief, Woodforest profited over $30,000 from the sale of counterfeit items by the Laurette Counterfeiters.

85.     Woodforest benefited from doing business with replica merchants like Laurette Counterfeiters by charging a higher transaction fee, or "discount rate," for processing credit cards associated with these high risk Internet merchants.  For TheBagAddiction.com account,

Woodforest used a discount rate of 3.75%. The discount rate that Woodforest charged the Laurette Counterfeiters is higher than advertised rates.

86.     On information and belief, Woodforest's affiliate, MCCS, services other internet merchants doing business in New York, where MCCS itself maintains offices. Indeed, MCCS states on its website that it "serves over 45,000 clients, processing more than $3.5 billion in credit card volume. In fact, MCCS is one of the top-ranked Merchant Service Providers in the industry."

87.     The services provided Defendants facilitated the Laurette Counterfeiters ability to quickly and efficiently transact sales for Counterfeit Products through their website by enabling customers to use personal credit cards to pay for purchases on TheBagAddiction.com.

88.     After the Laurette Counterfeiters accepted payment from a customer for a Counterfeit Product, the transaction was presented contemporaneously to either Frontline or Woodforest for authorization. Once Frontline or Woodforest authorized the transaction, the processing agency deducted its transaction fee and transferred the net proceeds from the customer's purchase to the Laurette Counterfeiters' merchant account.

89.     Websites such as TheBagAddiction.com could not exist profitably without the participation of credit card processing agencies like Defendants. Indeed, the credit card processing services provided by the Defendants are what make the sale of counterfeit goods over the Internet such a lucrative business. As Durango admits on its website, "[a]ccepting credit cards with a merchant account can increase your sales potential by 75 million customers in the U.S. alone! Credit card processing analysts estimate that 9 out of 10 people use a credit card for their online orders . . . ."

90.     On information and belief, discovery in this case will show that Defendants have also supplied and continue to supply their credit card processing services to other Internet merchants engaged in the sale of Counterfeit Products.  Defendants' actions have caused, and will continue to cause, irreparable harm to Plaintiff and an incalculable loss of goodwill and damages.

## FIRST CAUSE OF ACTION

(Trademark Infringement Under Sections 32 and 43(a)
of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a))

91.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

92.     The Gucci Marks and the goodwill of the businesses associated with them in the United States and throughout the world are of great and significant value, are highly distinctive and arbitrary, and have become universally associated in the public mind with the products and services of the very highest quality and reputation.

93.     Defendants were knowing and willful participants and co-venturers in the marketing and sale of Counterfeit Products described above, making them jointly and severally liable for the marketing and sale of such Counterfeit Products.

94.     Defendants' actions described above have caused and are likely to cause confusion and mistake and to deceive potential customers and the general purchasing public as to the source, origin, or sponsorship of their Counterfeit Products, and are likely to deceive the public into believing that the Counterfeit Products sold by the Laurette Counterfeiters and other counterfeiters who operated in conjunction with the Defendants originate from, are associated

with, or are otherwise authorized by Plaintiff, all to the damage and detriment of Plaintiff's reputation, goodwill and sales.

95.    Defendants' participation in the unauthorized use of the Gucci Marks constitutes trademark infringement of federally-registered Gucci Marks, the full extent of which is presently unknown but the known amount is substantial. This has caused damage to Gucci and the substantial business and goodwill symbolized by the Gucci Marks in violation of Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a).

96.    Defendants' actions described above, including the unauthorized use of the Gucci Marks in interstate commerce, have caused, and unless restrained will continue to cause, great and irreparable injury to Gucci, to the Gucci Marks, and to the business and goodwill represented thereby, leaving Gucci with no adequate remedy at law.

## SECOND CAUSE OF ACTION

(Trademark Counterfeiting Under Sections 32, 34 and 35,
of the Lanham Act, 15 U.S.C. §§ 1114(1)(b), 1116(d), & 1117(b)-(c))

97.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

98.    Without Gucci's authorization or consent, and having knowledge of Gucci's well-known and prior rights in the Gucci Marks, Defendants have knowingly and willfully facilitated, financed, and participated in the distribution, advertisement, offering for sale and/or sale of Counterfeit Products to the consuming public in direct competition with Plaintiff, in or affecting interstate commerce, and/or acted with reckless disregard to the rights of Gucci in the Gucci Marks in participating in such activities.

99.     The Counterfeit Products that are offered and sold to the public by way of Defendants' merchant services reproduce, counterfeit, copy, and colorably imitate the Gucci Marks or display spurious designations that are identical with, or substantially indistinguishable from the Gucci Marks. Defendants have thus caused reproductions, counterfeits, copies, and colorable imitations of the Gucci marks to be applied to labels and advertisements to be used in commerce in connection with the sale and distribution of Counterfeit Products, which is likely to cause confusion, or to cause mistake, or to deceive.

100.    Defendants' participation, financing and/or facilitation of this unauthorized use of the Gucci Marks on or in connection with the Counterfeit Products was done with notice and full knowledge that such use was not authorized or licensed by Gucci. Defendants' actions constitute willful counterfeiting of Plaintiff's Marks in violation of 15 U.S.C. §§ 1114, 1116(d), and 1117(b)-(c).

101.    As a direct and proximate result of Defendants' conduct, Gucci has suffered damage to its valuable Gucci Marks, and other damages in an amount to be proved at trial.

102.    Gucci does not have an adequate remedy at law, and will continue to be damaged by Defendants' facilitation of and participation in the sale of Counterfeit Products unless this Court enjoins Defendants from such fraudulent business practices.

## THIRD CAUSE OF ACTION

(Contributory Trademark Infringement and Counterfeiting Under the Lanham Act)

103.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

104.    The Gucci Marks are valid, federally registered trademark entitled to protection under the Lanham Act.

105.   The Gucci Marks and the goodwill of the businesses associated with them in the United States and throughout the world are of great and significant value, are highly distinctive and arbitrary, and have become universally associated in the public mind with the products and services of the very highest quality and reputation.

106.   With full knowledge of Plaintiff's rights in the Gucci Marks, Defendants have provided their credit card processing services to, and generated income from, internet merchants, such as the Laurette Counterfeiters, who sell Counterfeit Products bearing the Gucci Marks.

107.   Defendants, by offering credit card services to "high risk" Internet merchants such as the Laurette Counterfeiters either induced such Internet merchants to infringe upon the Gucci Marks and/or aided, facilitated, participated in, and materially contributed to the sale of Counterfeit Products in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1116(d), 1117(b)-(c), and 1125(a).  Among other acts, Defendants Woodforest and Frontline participated in the sales of Counterfeit Products by accepting the credit card numbers for the sales transactions of Counterfeit Products, processing the transactions, and paying the proceeds of the sales of the Counterfeit Products to the Laurette Counterfeiters and, on information and belief, to other counterfeiters.

108.   By providing critical credit card processing services to Internet merchants of Counterfeit Products such as the Laurette Counterfeiters, Defendants supplied the necessary marketplace for the sake of such Counterfeit Products, and Defendants received a direct financial benefit for providing such services.

109.   Defendants exercised control over the means of the infringement and counterfeiting described above.  Defendants explicitly accepted business from replica merchants like the Laurette Counterfeiters and provided them with services that made it lucrative to sell

Counterfeit Products over the Internet.  Defendants Woodforest and Frontline handled the money for the infringing sales.  Knowing that replica merchants like the Laurette Counterfeiters used Defendants' credit card processing services to facilitate the sale of Counterfeit Products and that many if not most of such merchants could not sell Counterfeit Products or could not sell sufficient numbers of Counterfeit Products without the Defendants' services, Defendants nonetheless continued to provide them with these necessary services.

110.    Defendants' actions described above have caused and are likely to cause confusion and mistake and to deceive potential customers and the general purchasing public as to the source, origin, or sponsorship of the Counterfeit Products, and are likely to deceive the public into believing that the Counterfeit Products sold by websites receiving merchant account services from the Defendants originate from, are associated with, or are otherwise authorized by Plaintiff, all to the damage and detriment of Plaintiff's reputation, goodwill and sales.

111.    Defendants are therefore contributorily liable for the infringement and counterfeit use of the Gucci Marks by the Laurette Counterfeiters and other Internet merchants who operate by means of Defendants' credit card processing services in connection with their sale of Counterfeit Products.

112.    Plaintiff has been damaged by Defendants' contributory infringement in an amount to be determined at trial.  For example, and without limitation, Defendants have been unjustly enriched through its merchants' unlawful and unauthorized sales of Counterfeit Products, for which Defendants' receive income and/or transaction fees.

113.    Plaintiff has been, and absent injunctive relief, will continue to be, irreparably harmed by Defendants' actions.

114.    Plaintiff has no adequate remedy at law for the foregoing wrongful conduct.

## FOURTH CAUSE OF ACTION

(Vicarious Trademark Infringement and Counterfeiting Under the Lanham Act)

115.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

116.    Defendants exercised control over the means of the infringement and counterfeiting described above.  Defendants explicitly accepted business from replica merchants like the Laurette Counterfeiters and provided them with services that made it lucrative to sell Counterfeit Products over the Internet.  Knowing that replica merchants like the Laurette Counterfeiters used Defendants' credit card processing services to facilitate the sale of Counterfeit Products and that many if not most of such merchants could not sell Counterfeit Products or could not sell sufficient numbers of Counterfeit Products without the Defendants' services, Defendants nonetheless continued to provide them with these necessary services. Defendants Woodforest and Frontline handled the money for the sales of the Counterfeit Products.

117.    Defendants had, on information and belief, actual knowledge its "high risk" Internet merchants such as the Laurette Counterfeiters were making unauthorized use of the Gucci Marks or were otherwise infringing Gucci's rights through the sale of Counterfeit Products, had constructive knowledge of such infringement and counterfeiting of the Gucci Marks, and/or acted with reckless disregard to their participation in such infringement and counterfeiting of the Gucci Marks.

118.    Defendants received a direct financial benefit from the unauthorized use of the Gucci Marks by the Laurette Counterfeiters and other Internet replica merchants, by receiving remuneration in the form of per-transaction percentages of the amount paid for Counterfeit

Products bearing the Gucci Marks and/or other fees associated with the use of Defendants' credit card processing services in connection with the sale of Counterfeit Products.

119.   Defendants' actions described above have made them agents of and co-participants in the infringement and counterfeiting described above.

120.   Defendants' actions described above have caused and are likely to cause confusion and mistake and to deceive potential customers and the general purchasing public as to the source, origin, or sponsorship of the Counterfeit Products, and are likely to deceive the public into believing that the Counterfeit Products sold by websites receiving merchant account services from the Defendants originate from, are associated with, or are otherwise authorized by Plaintiff, all to the damage and detriment of Plaintiff's reputation, goodwill and sales.

121.   Defendants are therefore vicariously liable for the infringing use of the Gucci Marks by the Laurette Counterfeiters and other Internet merchants selling Counterfeit Products.

122.   Plaintiff has been damaged by Defendants' vicarious trademark infringement in an amount to be determined at trial.  For example, and without limitation, Defendants have been unjustly enriched through its merchants' unlawful and unauthorized sales of Counterfeit Products, for which Defendants receive income and/or transaction fees.

123.   Plaintiff has been, and absent injunctive relief, will continue to be, irreparably harmed by Defendants' actions.

124.   Plaintiff has no adequate remedy at law for the foregoing wrongful conduct.

### FIFTH CAUSE OF ACTION

(Trademark Infringement Under New York Law)

125.   Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

126.    Defendants' acts as described above constitute direct, contributory, and or vicarious trademark infringement under New York common and/or statutory law. N.Y. Gen. Bus. Law §§ 360-k, 360-o.

## SIXTH CAUSE OF ACTION

(Unfair Competition Under New York Law)

127.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

128.    Defendants' acts as described above constitute unfair competition under New York State common law, as preserved by N.Y. Gen. Bus. Law § 360-o.

WHEREFORE, Plaintiff respectfully requests that this Court:

1.    Enjoin all Defendants, their officers, directors, agents, representatives, successors or assigns, and all persons acting in concert or in participation with any of them from directly or indirectly contributing to, aiding, or abetting the marketing, promotion, or sale of Counterfeit Products or any unauthorized or counterfeit products that bear, contain, display, or utilize any of the Gucci Marks, any derivation or colorable imitation thereof, or any mark confusingly similar thereto or likely to dilute or detract from the Gucci Marks, including but not limited to by processing credit card transactions or by otherwise facilitating the sales of such products;

2.    Direct Defendants to account to Gucci for their profits and order that Gucci recover their damages arising out of the acts of deception and infringement described above, and a sum equal to three times such profits or damages (whichever is greater), pursuant to 15 U.S.C. § 1117(a) and (b);

3.     Award Gucci statutory damages in an amount to be determined at trial, representing $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed by the Laurette Counterfeiters in concert or participation with Defendants and/or through the merchant services offered by Defendants with full knowledge that that such merchant services were being used to facilitate and cause the sale Counterfeit Products, pursuant to 15 U.S.C. § 1117(c);

4.     Award Gucci statutory damages in an amount to be determined at trial representing $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed by other counterfeiters in concert or participation with Defendants and/or through the merchant services offered by Defendants with full knowledge that such merchant services are or were being used to facilitate and cause the sale Counterfeit Products, pursuant to 15 U.S.C. § 1117(c);

5.     Award Gucci punitive damages pursuant to New York State common law (as preserved by N.Y. Gen. Bus. Law § 360-o) on account of Defendants' gross, wanton, willful, and malicious conduct in an amount sufficient to deter other and future similar conduct by Defendants and others;

6.     Awarding Gucci treble the amount of its damages, together with the costs of this suit, including the reasonable statutory attorneys' fees and expenses and prejudgment interest, pursuant to 15 U.S.C. § 1117 and all other applicable provisions of federal and New York law; and

7.     Granting Gucci such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        August 5, 2009

                              Respectfully submitted,

                              GIBSON, DUNN & CRUTCHER

                              By: _____
                                  Robert Weigel (RW 0163)
                                  Howard S. Hogan (HH 7995)
                                  Jennifer C. Halter (JH 7032)

                              200 Park Avenue
                              New York, New York 10166
                              (212) 351-4000

                              *Attorneys for Plaintiff Gucci America, Inc.*