**Document Filed Electronically**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| GUCCI AMERICA, INC. | : | |
| | : | Civil Action No. 09-6925-HB |
| Plaintiff, | : | |
| v. | : | District Judge Harold Baer, Jr. |
| | : | |
| FRONTLINE PROCESSING CORPORATION; | : | |
| WOODFOREST NATIONAL BANK; | : | |
| DURANGO MERCHANT SERVICES LLC d/b/a | : | |
| NATIONAL BANKCARD SYSTEMS OF | : | |
| DURANGO; ABC COMPANIES; and JOHN | : | |
| DOES, | : | |
| | : | |
| Defendants. | : | |
| | x | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION**
**UNDER FED. R. CIV. P. 12 (b)(6) TO DISMISS PLAINTIFF'S CLAIMS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ ii

I.    INTRODUCTION AND SUMMARY OF ARGUMENT .................................................1

II.   BACKGROUND FACTS...........................................................................................4

III.  STATEMENT OF PERTINENT LAW ........................................................................6

      A.    The Standard For A Motion To Dismiss..........................................................6

      B.    Direct Trademark Infringement And Counterfeiting ............................................7

      C.    Contributory Trademark Infringement And Counterfeiting .................................8

      D.    Vicarious Trademark Infringement.......................................................................11

IV.   ARGUMENT.............................................................................................................12

      A.    Plaintiff Has Not Stated A Cause Of Action For Direct
            Trademark Infringement Or Trademark Counterfeiting ..........................................12

      B.    Plaintiff Has Not Stated A Cause Of Action For
            Contributory Trademark Infringement .................................................................13

            1.    Plaintiff Has Not Alleged Facts Supporting
                  Intentional Inducement ............................................................................13

            2.    Plaintiff Has Not Alleged Facts That Defendants
                  Exercised Direct Control Over The Instrumentality
                  Used By The Laurette Defendants To Infringe
                  Gucci's Marks ..........................................................................................14

            3.    Plaintiff Has Not Alleged Facts That Defendants
                  Knew TBA Was An Infringer And Continued To
                  Provide Services........................................................................................17

      B.    Plaintiff Has Not Stated A Cause Of Action For Vicarious
            Trademark Infringement .......................................................................................22

      C.    Plaintiff Has Not Stated A Cause of Action For Trademark
            Infringement And Unfair Competition Under New York
            Law .........................................................................................................................23

IV.   CONCLUSION...........................................................................................................24

1075745_1.DOC

i

# TABLE OF AUTHORITIES

Page(s)

*CNOOC Se. Asia Ltd. v. Paladin Res. (Sunda) Ltd.*,
    222 S.W.3d 889 (Tex. App. Dallas 2007)...................................................19

*Cortec Indus. Inc. v. Sum Holding, L.P.*,
    949 F.2d 42 (2d Cir. 1991)...................................................................6

*Davey v. Jones*,
    No. 06 Civ. 4206, 2007 WL 1378428 (S.D.N.Y. May 11, 2007)................................6

*David Berg & Co. v. Gatto Int'l Trading Co.*,
    884 F.2d 306, 311 (7th Cir. 1989) ....................................................11, 22

*Fernandez v. Chertoff*,
    471 F.3d 45 (2d Cir. 2006).................................................................6

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) .............................................................8, 9

*Gucci Am., Inc. v. Hall & Assocs.*,
    135 F. Supp. 2d 409 (S.D.N.Y. 2001).......................................................10

*Hard Rock Caf Licensing Corp. v. Concession Servs., Inc.*,
    955 F.2d 1143 (7th Cir. 1992) ..................................................... *passim*

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009)..................................................................6

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
    456 U.S. 844 (1982)............................................................... *passim*

*Lockheed Martin Corp. v. Network Solutions, Inc.*,
    194 F.3d 980 (9th Cir. 1999) .......................................................9, 10, 13

*Nielson v. Scott*,
    53 P.3d 777 (Colo. App. Ct. 2002) .........................................................20

*In re NYSE Specialists Sec. Litig.*,
    503 F.3d 89 (2d Cir. 2007), *cert. denied*, 128 S. Ct. 1707 (2008)......................6, 17

*Otor, S.A. v. Credit Lyonnais, S.A.*,
    No. 04 Civ. 6978, 2006 WL 2613775 (S.D.N.Y. Sept. 11, 2006) ...............................6

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
    494 F.3d 788 (9th Cir. 2007),
    *cert. denied,* 128 S. Ct. 2871 (2008) .............................................. *passim*

*Polland & Cook v. Lehman*,
    832 S.W.2d 729 (Tex. App. Houston 1st Dist. 1992)..........................................20

*Rapoport v. Asia Elecs. Holding Co.*,
    88 F. Supp. 2d 179 (S.D.N.Y. 2000).........................................................7

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    494 U.S. 417 (1984) ................................................................................22

*St. Joseph Hosp. v. Wolff*,
    94 S.W.3d 513 (Tex. 2002) ...................................................................19

*Standard & Poor's Corp. v. Commodity Exch.  Inc.*,
    683 F.2d 704 (2d Cir. 1982) .................................................................23

*Stanford v. Dairy Queen Prods.*,
    623 S.W.2d 797 (Tex. App. Austin 1981) ............................................19

*Tiffany (NJ) Inc. v. eBay, Inc.*,
    576 F. Supp. 2d 463 (S.D.N.Y. 2008) .........................................9, 16, 24

*W. Fire Truck, Inc. v. Emergency One, Inc.*,
    134 P.3d 570 (Colo. Ct. App. 2006) ....................................................19

*Weingart v. C & W Taylor P'ship*,
    248 Mont. 76, 809 P.2d 576 (1991) ....................................................19

*Wolfe v. Schulz Refrigeration*,
    188 Mont. 511, 614 P.2d 1015 (1979) .................................................19

## Statues, Rules & Other Authorities

15 U.S.C. § 1114(1) ..................................................................................7, 12

15 U.S.C. § 1125(a)(1) ..............................................................................7, 12

Mont. Code Ann. § 28-10-601 .......................................................................20

Restatement (Second) of Agency § 1(1) (1957) .............................................19

Restatement (Second) of Agency § 1 (1957) .................................................19

*Webster's Third New International Dictionary* (2002) ...............................18, 19

## I.    <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

In this action alleging trademark infringement and counterfeiting, plaintiff Gucci America, Inc. ("Gucci") — which has already obtained a consent judgment against the actual culpable parties ("the Laurette Defendants"), which operated the Web site "www.TheBagAddiction.com" ("TBA") to market and sell allegedly counterfeit or otherwise infringing Gucci handbags — seeks to extend liability into territory where no court has previously ventured.    Specifically, Gucci seeks to impose responsibility on the present defendants, Frontline Processing Corporation ("Frontline"), Woodforest National Bank ("WNB"), and Durango Merchant Services LLC ("Durango"), which are not alleged to have manufactured, sold, or had any dealings in or contact with the allegedly infringing and counterfeit goods.    Rather, the sole basis for this suit is an allegation that Frontline, WNB, and Durango were involved in processing credit card transactions among the Laurette Defendants, cardholders who made purchases, and their banks, *after* the actual purchase and sale of the allegedly infringing goods was completed.

Gucci's complaint attempts to parrot language from cases that found liability for trademark infringement and/or counterfeiting by entities having a far more direct and intimate relationship with the actual culpable infringers.    But when this self-serving and factually unsupported verbiage is stripped away, what remains is only an assertion that the defendants here were supposedly "indispensable" to the Laurette Defendants' alleged infringing and counterfeiting activities; and accordingly, these defendants now should be held accountable for those activities.

Gucci's "indispensability" theory finds no support in any state or federal statute, or in any precedent that is binding on or should be persuasive to this Court.    Moreover, it is a theory of liability that — if left unchecked — would have no limits.    If the these defendants can be held

liable for trademark infringement and/or counterfeiting by virtue of doing nothing more than processing credit card transactions, then any person or entity that provides critical support for, and could be considered "indispensible" to, the real infringers' activities, could be liable as well. Indeed, under Gucci's theory, the present defendants are indistinguishable from the electric company, the phone company, countless equipment suppliers, or even a janitorial service, without which the real infringers could not operate.

Six causes of action are asserted against the present defendants. As to each, however, the complaint fails to state a claim upon which relief can be granted within the meaning of Fed. R. Civ. P. 12(b)(6), because threadbare recitals of the elements of a cause of action supported only by conclusory statements are legally insufficient. Simply stated, the requirement that a complaint state a *plausible* claim leads to but one conclusion here: Gucci's claims should be dismissed.

While certain of Gucci's claims assert "direct" trademark infringement and counterfeiting by the present defendants, direct infringement requires a showing that these defendants engaged in the actual marketing and sale of the infringing goods. Gucci's complaint, however, alleges nothing of the sort. To the contrary, it alleges only that these defendants participated in the processing of payments for sales transactions between customers and sellers of the products advertised on the TBA Web site, *after* the transactions were completed. Thus, Gucci's "direct" infringement claims lack any factual foundation and should be dismissed.

Gucci also alleges "contributory" trademark infringement and counterfeiting. But as a matter of law, contributory trademark infringement requires that a company providing services to an infringer either *intentionally induced* another to infringe a trademark, or had *direct control over the instrumentality used to infringe* and continued to provide goods or services to one whom

it knew, or had reason to know, was engaging in infringement.  Gucci's complaint, however, fails to allege that the defendants intentionally induced infringement, nor could it.  It also contains no properly pleaded facts that these defendants had direct control over the "instrumentality" used by the Laurette Defendants or the TBA Web site to infringe Gucci's trademarks, *i.e.*, the Web site itself, or the infringing goods.

While Gucci's complaint also asserts that the defendants supplied the "necessary marketplace" for the sale of counterfeit products and exercised "control over the means of infringement and counterfeiting," this "marketplace" allegation is simply a transparent — albeit ineffectual — attempt to bring this case within the scope of cases that have held that the owner of a "swap meet," or an Internet marketplace such as eBay, may be liable for contributory trademark infringement in appropriate circumstances.  These defendants, however, are not alleged to have done anything more than process credit card payments.  Accordingly, it cannot be persuasively argued that these defendants provided anything that remotely can be considered a "marketplace" for the TBA Web site and the allegedly counterfeit and infringing goods offered for sale thereon.  Gucci's "marketplace" allegations and its claim of "direct control" by these defendants should thus be disregarded as nothing but bald and baseless legal conclusions.

The present motion also should be granted as to the contributory trademark infringement claim based on the absence of sufficient factual allegations that defendants knew or had reason to know that the TBA Web site was engaged in the sale of counterfeit Gucci products.  In this regard, the applicable standard for contributory infringement as to notice of infringing activity by the accused *contributory* infringer is *knowledge* of the infringement, not merely *suspicion*. Gucci has not pleaded any such knowledge.

Gucci also asserts a claim for "vicarious" trademark infringement. This claim should be dismissed because the complaint lacks the requisite factual allegations that the defendants and the actual infringers (the Laurette Defendants) had an apparent or actual partnership with the authority to bind one another in transactions with third parties, or that they exercised joint ownership or control over the infringing products. Plainly, no such allegations have been or could be made.

If the actual culpable parties, the Laurette Defendants, were guilty of trademark infringement and/or counterfeiting, their conduct was wrongful, and Gucci had every right to seek redress from the Laurette Defendants for the damages caused by such conduct. It is also wrong, however, for Gucci to attempt to force these defendants to now incur the expense of litigating this case, under circumstances where Gucci has not alleged — and could not allege — culpability by the present defendants under any theory that has been previously recognized by any court, or that is deserving of such recognition. Accordingly, defendants' motion to dismiss should be granted as to all of Gucci's claims.

## II.    **BACKGROUND FACTS**

Gucci sells handbags and other products under various Gucci trademarks. On June 3, 2008, Gucci sued the Laurette Defendants (Internet merchants who operate the TBA Web site) for their marketing and sales of allegedly counterfeit Gucci products. In that action, *Gucci America, Inc. et al. v. Laurette Company, Inc. et al.*, 08cv5065-LAK, the court granted a TRO on June 3, 2008, the defendants consented to a preliminary injunction on June 13, 2008, and then consented to a final judgment on December 15, 2008, in which they agreed to pay $5.2 million in damages. (*See* Compl. ¶ 6.)

The present action has been filed against three financial service companies who did nothing more than settle credits and debits for completed credit and debit card sales on the TBA

Web site. As alleged in the complaint, defendant "Woodforest provides certain credit card processing services to internet merchants." (Compl. ¶ 14). Payment for each of the orders of goods from the Laurette Defendants allegedly "was processed or facilitated by one or more of the defendants," and payments on orders placed on the TBA Web site were allegedly "processed or facilitated by the defendants." (*Id.* ¶ 22(a), (b).) Indeed, the defendants' services for completed transactions by the Laurette Defendants are the very same services that these defendants offer to thousands of other merchants. For example, MCCS, WNB's affiliate that contracts services for processing credit card transactions, has over 35,000 clients; and defendant Frontline represents itself to be a "nationwide provider of credit processing and electronic payment services." (*Id.* ¶ 22(c)).[1]

This case represents an attempt by Gucci to hold payment service providers — Frontline, WNB, and Durango — liable for the trademark infringement and counterfeiting committed by the owners of a Web site. Gucci thus seeks to create new legal precedent holding that companies that provide what Gucci deems an "indispensable" service or support to a business that later turns out to be guilty of infringement, can themselves be held liable for that infringement. Indeed, Gucci seeks to extend liability to such service providers, even though the entities

---

[1] Credit card transactions involve five key players: the customer cardholder, the card issuing bank, the merchant, the merchant's acquiring bank, and the authorization network (*e.g.*, VisaNet for Visa cards). The credit card transaction begins with the card being swiped or keyed into the merchant's terminal. The merchant's terminal transmits an authorization request to the merchant's acquiring bank, which, in turn, sends the request electronically to the network. The network routes the request to the cardholder's issuing bank. The issuing bank approves or declines the transaction, and this response is forwarded by the network to the acquiring bank; which forwards it to the merchant. The merchant completes the transaction. All transactions are kept at the terminal until the merchant sends all transactions, usually at the end of the day, to the acquiring bank. The acquiring bank credits the merchant's account and submits the transactions to the network for settlement. The network pays the acquirer and debits the appropriate issuer accounts. The issuers then post the transactions to their cardholders' accounts. *See, e.g.,* http://usa.visa.com/merchants/new_acceptance/how_it_works.html. Throughout the transaction, the acquiring bank acts only as a conduit to transmit the authorization request to the issuing bank, and transmit the issuing bank's response back to the merchant.

providing the services in question had no direct control over the instrumentality used by the alleged infringer to infringe the plaintiff's mark.

## III.    STATEMENT OF PERTINENT LAW

### A.    The Standard For A Motion To Dismiss

In deciding the sufficiency of a complaint, the court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff.  *Fernandez v. Chertoff,* 471 F.3d 45, 51 (2d Cir. 2006).  However, the court may disregard a plaintiff's "legal conclusions, deductions or opinions couched as factual allegations."  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007), *cert. denied*, 128 S. Ct. 1707 (2008).  The court also is not required to credit conclusory statements that are unsupported by factual allegations.  *See Otor, S.A. v. Credit Lyonnais, S.A.,*  No. 04 Civ. 6978, 2006 WL 2613775, at *2 (S.D.N.Y. Sept. 11, 2006); *see also Davey v. Jones*, No. 06 Civ. 4206, 2007 WL 1378428, at *2 (S.D.N.Y. May 11, 2007)   ("[B]ald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations, and will not suffice to defeat a motion to dismiss.").

As explained in *Harris v. Mills*, 572 F. 3d 66 (2d Cir. 2009):

In accordance with the Supreme Court's decision *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), we apply a "plausibility standard," which is guided by "[t]wo working principles," *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).   First, although "a court must accept as true all of the allegations contained in a complaint," that "tenet" "is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*   "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss" and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

*Id.* at 71-72.

On a motion to dismiss, the complaint is deemed to include the written documents attached as exhibits and "any statements or documents incorporated in it by reference."  *Cortec Indus. Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  If the substance of such

documents contradicts the allegations of the complaint, those allegations need not be accepted as true. *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

### B.    Direct Trademark Infringement And Counterfeiting

The elements of direct trademark infringement and counterfeiting are set forth in Section 32 of the Lanham Act, as follows:

(1) Any person who shall, without the consent of the registrant —

(a) use in commerce of any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive;

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).

As further provided in Section 43 of the Lanham Act:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

Gucci's first and second causes of action purport to state claims for direct trademark infringement and counterfeiting under the above-quoted sections of the statute.    But as

demonstrated below, Gucci's complaint is legally insufficient and should not survive this motion to dismiss.

### C.    Contributory Trademark Infringement And Counterfeiting

Contributory trademark infringement (and counterfeiting) is a judicially created doctrine articulated by the Supreme Court in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 (1982).  As the Supreme Court held:

> [I]f a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit.

*Id.* at 854.   Under *Inwood*, to be liable for contributory infringement, a manufacturer or distributor must continue to supply "its product" to an infringer who it knows or has reason to know is infringing another's rights.   Here, because these defendants are not alleged to have supplied any products to the actual infringers (the Laurette Defendants), or to customers of the TBA Web site, their activities are beyond the reach of the *Inwood* case.

Cases decided since *Inwood* have applied the Supreme Court's test for contributory trademark infringement to cover certain service providers, but only under well-defined circumstances.  In *Hard Rock Café Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143 (7th Cir. 1992), the Seventh Circuit noted that the *Inwood* test for contributory trademark infringement could apply to the owner of a flea market providing a "marketplace" for counterfeiters because of the legal duty owed by a landlord to control illegal activities on his or her premises.  *Id.* at 1149.  And in *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996), the Ninth Circuit held that a flea market could be liable for contributory trademark infringement if it supplied "the necessary marketplace" for the sale of infringing products.  *Id.* at 265.

Relying on *Hard Rock Café* and *Fonovisa*, the Ninth Circuit in *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980 (9th Cir. 1999), articulated the requirements for charging a service organization with contributory trademark infringement under the *Inwood* test:

> *Hard Rock* and *Fonovisa* teach us that when measuring and weighing a fact pattern in the contributory infringement context without the convenient "product" mold dealt with in *Inwood Lab.*, we consider the extent of control exercised by the defendant over the third party's means of infringement. *Hard Rock*, 955 F.2d at 1148-49 (noting the common-law responsibilities of a landlord regarding illegal activity on a rented premises); *see Fonovisa*, 76 F.3d at 265 (adopting *Hard Rock's* analysis). *Direct control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark permits the expansion of Inwood Lab.'s "supplies a product" requirement for contributory infringement.*

*Id.* at 984 (emphasis added).

Significantly, the "direct control" prong of *Inwood* requires direct control "of the instrumentality used by a third party to infringe a plaintiff's mark," not just control over some aspect of the infringer's business. Focusing on the instrumentality of infringement makes sense. It is consistent with the principle that liability for contributory infringement should attach only to those with the right and ability to control the infringing activity. For example, in *Lockheed Martin*, NSI, the registrar of Internet domain names, was held not to be a contributory infringer even though it facilitated registration by third parties of domain names that allegedly infringed the plaintiff's trademark. Agreeing that the infringement did not result from NSI's registration of the name, but instead from the registrant's use, the Ninth Circuit found the direct control and monitoring requirement not met. *Id.* at 985. Here, defendants at most controlled whether merchants could process payments using VISA or MasterCard; they clearly did *not* control the means of those merchants' infringement.

This Court recently embraced the definition of "direct control" from the *Lockheed Martin* case. *See Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 505-06 (S.D.N.Y. 2008) (considering whether the auction Web site eBay could be liable for contributory trademark

infringement by providing the "marketplace" for counterfeiting over the Internet); *see also Gucci Am., Inc. v. Hall & Assocs.*, 135 F. Supp. 2d 409, 416 n.14 (S.D.N.Y. 2001) (citing with approval the "direct control of the instrumentality used to infringe" test from *Lockheed Martin*, 194 F.3d at 984). Even more on point here, credit card companies, affiliated banks, and data processing services that supported a company selling infringing goods over the Internet, recently were found *not* to have exercised the "direct control" over the instrumentality used to infringe, as required to hold them liable for contributory trademark infringement under *Inwood*. Specifically, in *Perfect 10, Inc. v. Visa International Service Ass'n*, 494 F.3d 788 (9th Cir. 2007), *cert. denied,* 128 S. Ct. 2871 (2008), the Ninth Circuit affirmed the dismissal of all causes of action against Visa International, MasterCard International, and several affiliated banks and data processing services, for alleged contributory trademark and copyright infringement. The defendants there (as here) had merely processed credits and debits from completed credit card transactions for Web sites alleged to infringe Perfect 10's intellectual property rights after being notified by Perfect 10 of the suspected infringement.

In affirming the dismissal of all claims, the *Perfect 10* court held that the plaintiff had not alleged facts sufficient to show direct control and monitoring by the defendant credit card service providers of the "instrument" used to infringe the plaintiff's trademarks:

> Perfect 10 has failed to allege facts sufficient to show "[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark." *Lockheed Martin,* 194 F.3d at 984. Perfect 10 claims that the "product" or "instrumentality" at issue here is the credit card payment network through which Defendants process payments for infringing material. . . .As discussed at length above, this network is not the instrument used to infringe Perfect 10's trademarks; that infringement occurs without any involvement of Defendants and their payment systems. *Perfect 10 has not alleged that Defendants have the power to remove infringing material from these websites or directly stop their distribution over the Internet. At most, Perfect 10 alleges that Defendants can choose to stop processing payments to these websites, and that this refusal might have the practical effect of stopping or reducing the infringing activity. This, without more, does not constitute "direct control."* See Lockheed Martin*, 194 F.3d at 985 ("While the landlord of a flea market might reasonably be expected to monitor the merchandise sold on his premises,

[defendant] NSI cannot reasonably be expected to monitor the Internet.") (citation omitted).

*Id.* at 807 (emphasis added). The very same pleading infirmities that mandated dismissal in *Perfect 10* — despite Gucci's efforts to draft around them in its complaint — are present here, and likewise require dismissal of Gucci's complaint.

      **D.**    **Vicarious Trademark Infringement**

      Vicarious liability for trademark infringement requires "a finding that the defendant and the infringer have an apparent or actual partnership, *i.e.,* have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product." *Hard Rock Café*, 955 F.2d at 1150 (citing *David Berg & Co. v. Gatto Int'l Trading Co.,* 884 F.2d 306, 311 (7th Cir. 1989)). Accordingly, in *Perfect 10,* the Ninth Circuit also affirmed the trial court's dismissal of the vicarious trademark infringement claim. There, the plaintiff charged that the defendants and the infringing Web sites had "a symbiotic financial partnership." Rejecting plaintiff's legal conclusion, the court found that the defendants did nothing more than process payments for the Web sites and collected their usual processing fees. *Perfect 10*, 494 F.3d at 807-08

      The Ninth Circuit also rejected the plaintiff's conclusory assertions that the credit card processors were parties to the purchase contracts:

> Perfect 10 further argues that "Defendants' acceptance of a charge binds the Stolen content Website to provide the infringing images to third parties." Appellant's Opening Brief at 40. Even if legally relevant, Perfect 10's allegation is legally incorrect. It is the websites' contracts with the *consumers* that bind the websites to provide the infringing images, not the websites' relationship with Defendants. The websites' contracts with Defendants are merely a means of settling the resulting debits and credits among the websites and the relevant customers. We hold that Perfect 10 fails to state a claim for vicarious trademark infringement.

*Id.* at 808. As a result, the plaintiff's vicarious trademark infringement claim against the credit card servicing companies was dismissed. Here, the same infirmity exists in Gucci's pleading, and Gucci's vicarious infringement claim should be dismissed as well.

IV.    **ARGUMENT**

A.    **Plaintiff Has Not Stated A Cause Of Action For Direct
Trademark Infringement Or Trademark Counterfeiting**

Gucci's first two causes of action allege that the defendants — companies involved only in processing credit payments — are liable for direct trademark infringement and trademark counterfeiting.    However, to state a legally cognizable claim for direct infringement or counterfeiting, it must be alleged that the defendants were directly involved in activities such as reproducing Gucci's trademarks or the actual sale, offering for sale, or advertising of infringing or counterfeit goods.    *See* 15 U.S.C. §§ 1114(1), 1125(a)(1).    No such allegations have been pleaded by Gucci here.

For its first cause of action, Gucci  makes the following unsupported assertion:

93.    *Defendants were knowing and willful participants and co-venturers in the marketing and sale of Counterfeit Products* described above, making them jointly and severally liable for the marketing and sale of such Counterfeit Products.

(Compl. ¶ 93 (emphasis added).)    Noticeably absent from Gucci's complaint, however, are any supporting *factual* allegations that the defendants actually participated in the use in commerce of Gucci's trademarks or the marketing or sale of counterfeit Gucci products.    Rather, the allegedly infringing Gucci products were marketed *entirely* by the TBA Web site *without* the involvement of any defendant.    While it is alleged that these defendants provided the credit card processing services to settle the debits and credits between and among the Web site and its customers, the actual marketing and sale of the goods occurred without the defendants' participation, and was completed prior to the defendants' processing of the transactions.    *Cf. Perfect 10*, 494 F.3d at 807.    Thus, the mere "participation" in sales transactions by credit card companies that do nothing more than process payments cannot, as a matter of law, constitute the "use in commerce" of a counterfeit mark required for a finding of direct trademark infringement.

For its second cause of action, Gucci relies on a conclusory assertion that the defendants "participated in the distribution, advertisement, offering for sale and/or sale" of counterfeit products. (Compl. ¶ 98.) Gucci attempts to bolster this conclusion by alleging that the defendants have "caused reproductions, counterfeits, copies, and colorable imitations of the Gucci marks to be applied to labels and advertisements to be used in commerce in connection with the sale and distribution of Counterfeit Products . . . ." (*Id.* ¶ 99.) These allegations, however, are nothing but bald and unsupported conclusions. Indeed, it is not alleged — nor could it be — that the defendants actually participated in the creation of counterfeits or the application of those counterfeits to labels and advertisements to be used in commerce. Thus, the first and second causes of action should be dismissed for failure to state a claim.

### B.    Plaintiff Has Not Stated A Cause Of Action For Contributory Trademark Infringement

Liability for contributory trademark infringement can be found only if the defendant (1) "intentionally induced" the primary infringer to infringe, or (2) continued to supply infringing products to an infringer knowing that the infringer was mislabeling the particular products supplied by the defendant. *Inwood*, 456 U.S. at 855. Where a service provider is involved, under the second prong of this test, the court must "consider the extent of control exercised by a defendant over the third party's *means of infringement*," and no liability can be found unless there is "[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiffs mark . . . ." *Lockheed Martin*, 194 F.3d at 984 (emphasis added). Here, no such direct control or monitoring exists, has been adequately pleaded, or could have been pleaded.

#### 1.    Plaintiff Has Not Alleged Facts Supporting Intentional Inducement

The complaint does not allege that these defendants — involved only in the processing of credit card transactions for the actual infringer — engaged in any acts of "intentional

inducement" of that infringer.  Nor does the complaint contain any properly pleaded factual allegations to the effect that any defendant encouraged or induced the Laurette Defendants' acts of infringement, as opposed to defendants having merely solicited and provided credit card services to process payments for the completed sales transactions.  Gucci's third cause of action for contributory trademark infringement rests on the bald assertion that "Defendants, by offering credit card services to 'high risk' Internet merchants such as the Laurette Counterfeiters either induce such Internet merchants to infringe upon the Gucci Marks and/or aided, facilitated, participated in, and materially contributed to the sale of the Counterfeit Products . . . "  (Compl. ¶ 107.)  This legal conclusion of inducement, unsupported as it is by any pleaded acts of inducement, is insufficient to state a claim.[2]

2.    **Plaintiff Has Not Alleged Facts That Defendants Exercised Direct Control Over The Instrumentality Used By The Laurette Defendants To Infringe Gucci's Marks**

The "instrumentality" used by the Laurette Defendants to infringe Gucci's trademarks was the TBA Web site, by which they advertised and sold their products.  Significantly, Gucci's complaint does not allege direct control over this instrumentality by any of the defendants.  *See Perfect 10*, 494 F.3d at 807 (holding that "direct control" was dependent on the defendants having "the power to remove infringing material from these Web sites or directly stop their distribution over the Internet").  Here, Gucci contends only that the defendants could have stopped processing payments to the TBA Web site, and this would "effectively" have stopped the infringement.  This is not "direct control" under the law.  *Id.*

---

[2] Without any factual support, Gucci seeks to create the impression that a "high risk" merchant is synonymous with one that engages in illegal activity.  It is well known in the industry, however, that a "high risk" merchant is one that is at "high risk" for "chargebacks" due to the nature of its business.  As defined, for example, by Visa U.S.A., high risk merchants include, *inter alia*, direct marketers, travel services, outbound telemarketers, inbound teleservices, and betting establishments.  *See* http://usa.visa.com/merchants/operations/index.html (click on "Card Acceptance Guide" (PDF), go to page 140 of 151).  *See also* http://www.merchantaccounts. cn/HighRiskMerchant Account/High_Merchants.html, for a listing of other types of businesses considered "high risk" in the credit card industry.

In place of the required factual allegations regarding direct control over the "instrumentality" used to infringe Gucci's trademarks, Gucci has pled at length that defendants' services were an "indispensable" part of the enterprise used to sell counterfeit Gucci products. Indeed, Gucci repeats that contention as its heading for the portion of its complaint that recites the factual allegations against these defendants. (Compl. ¶¶ 17-28.) But as a matter of law, such allegations are insufficient to state a claim for contributory trademark infringement because they would expand the more limited test for contributory infringement in *Inwood* to encompass *all* providers of purportedly "indispensable" services to an infringer. On this score, the *Inwood* test, as construed by later authority for service providers, limits contributory infringement to the intentional inducement of either the supply of infringing product or the supply of services in those cases where the service provider exercises *direct control* and *monitoring* of the instrumentality used by the third party to infringe the plaintiff's mark. The *Inwood* test did not contemplate — and has never been construed to cover — a theory of contributory trademark infringement that would sweep in the providers of *all* services needed by an alleged infringer to operate, such as credit card services, check cashing services, shipping and package delivery services, telephone services, Internet providers, financing, or the myriad other services required — and even "indispensable" — to the operation of a business enterprise.

Throughout its complaint, Gucci pleads that defendants' processing of credit card and debit card services was "indispensable" for the infringer's business. Not surprisingly, however, Gucci carefully avoids pleading that defendants had direct control over the instrumentality used to infringe Gucci's marks. (*See, e.g.*, Compl. ¶¶ 3, 4, 7, 44, 46, 60, 84, 87, 89.) And while these allegations presume that the credit card services of the defendants are in some way important to the business of the infringers, nowhere is it alleged that these defendants had *direct control* over

the *instrumentality* used by the Laurette Defendants to infringe Gucci's marks, *i.e.*, the advertising and sale of infringing products on the Web site. Indeed, it appears Gucci has intentionally avoided making any such allegation, because Gucci knows it has no basis for doing so. Simply stated, Gucci's conclusory assertion that the defendants provided the "marketplace" for the Laurette Defendants' infringing activities does not make it so, or translate into a sufficient *prima facie factual* showing that the defendants *actually* provided a marketplace for Internet sales by processing credit card payments, only *after* the purchase and sale of the infringing products had taken place.

Gurcci's third cause of action for contributory trademark infringement and counterfeiting, rests on additional unsupported assertions and legal conclusions, as summarized in paragraphs 108 and 109. These assertions, however, fall short of the *factual* allegations needed to state a cause of action for contributory trademark infringement. For example, the allegation in paragraph 108 that defendants "supplied the necessary marketplace" for the sale of the counterfeit products is an obvious attempt to bring this case within the reach of decisions such as *Hard Rock Café* and *Fonovisa*, which extended liability to flea markets supplying and controlling the real property "marketplace" for counterfeiters. But this bald assertion that credit card processing services supply the necessary "marketplace" for Internet infringers is unsupported by factual allegations and not sufficient to defeat this motion to dismiss. The "marketplace" for the sales over the TBA Web site was created by the Internet, not by the credit card processing services used by the Web site owner. And while in *Tiffany,* 576 F. Supp.2d at 506, this Court found that eBay provided the marketplace for sales over its Web site, there is nothing there that could be construed to extend the "marketplace" concept to entities such as the defendants here.

The allegation in paragraph 109 that defendants "exercise control over the means of the infringement and counterfeiting described above," also fails to provide the requisite *factual* allegation that these defendants exercised *direct control* over the *instrumentality* used to infringe Gucci's marks, *i.e.*, the TBA Web site. Rather, it is nothing more than a naked legal conclusion, which the Court may disregard. *NYSE Specialists*, 503 F.3d at 95. Indeed, paragraph 109 contains a summary of the allegations in the complaint pertinent to Gucci's contributory infringement claim. Gucci's conspicuous failure to include any allegation in that paragraph that these defendants exercised direct control over the instrumentality used to infringe Gucci's marks demonstrates that Gucci's allegations fail to satisfy controlling law. Accordingly, Gucci's claim for contributory infringement should be dismissed.

### 3.    Plaintiff Has Not Alleged Facts That Defendants Knew TBA Was An Infringer And Continued To Provide Services

Defendants submit that, as in *Perfect 10*, Gucci's failure here to allege the requisite "direct control" over the "instrumentality" used to infringe is sufficient alone for this Court to dismiss Gucci's claim without reaching the issue of defendants' knowledge. And while the defendants here wish to make clear that they do not by any means condone the actions of the Laurette Defendants in selling what apparently was counterfeit Gucci merchandise, if the Court reaches the issue of knowledge, defendants still submit that the complaint does not allege sufficient facts to support a finding that the defendants (1) knew or should have known that the TBA Web site was involved in doing so, and (2) continued to provide services to the Laurette Defendants notwithstanding such knowledge. Instead of factual allegations, the complaint asserts no more than inferences (that often conflict with the cited documents attached to the complaint), which support only that defendants should have had *suspicions* about the products sold on the TBA Web site, not that defendants *knew* the products to be counterfeit. (*See, e.g.,*

Compl. ¶¶ 7, 8.)  Such assertions are insufficient to state a claim for contributory trademark infringement, as they fail to allege *facts* supporting the contention that the defendants were aware that the TBA Web site sold counterfeit goods.  Thus, even if taken as true, Gucci's allegations do not support an inference that the defendants *knew* the TBA Web site was involved in counterfeiting.  At best, such allegations support only an inference that the defendants might reasonably have had *suspicions* as to what products the TBA Web site was selling.

First, Gucci contends that the TBA Web site discloses "the fact that it offered Counterfeit Products," using as support a screen from the Web site.  (Compl. ¶ 32.)  But the screen reproduced in the complaint makes quite a different representation regarding the products:

> Are your handbags authentic?
>
> No, all products sold are exact mirrors
> *and not being sold or represented as original.*

(*Id.* (emphasis added).)  The TBA Web site actually said certain products were *not* represented to be original, so customers would *not* think they were ordering genuine Gucci products, only to receive products labeled as "Gucci," but not from Gucci, *i.e.*, counterfeits.  Moreover, the Web site does not show the products in sufficient detail for one to see whether they contain the Gucci trademarks or are just similar style bags.  In any event, the complaint does not allege that the defendants actually saw this portion of the Web site in the first place.

Second, while the complaint alleges that defendant Durango services "high risk" merchants, including merchants who sell "replica" products (Compl. ¶¶ 45, 48)[3], neither "high risk" accounts nor merchants selling "replica" products are necessarily involved in selling counterfeits or infringing Gucci's trademarks.  In common parlance, the word "replica" does not connote a fraud like a counterfeit.  *See Webster's Third New International Dictionary* (2002):

---

[3] As noted above (at n.2), Gucci's effort to equate "high risk" merchants with those engaged in illegal activity has no basis in fact.

**replica** . . . *n* -*s* . . . **1 :** a reproduction, facsimile, or copy (as of a picture or statue) done by the maker of the original or under his direction **2 :** a facsimile of an original work of art

*Id.* at 1925.

**counterfeit** . . . *n* -*s* . . . **1a** : an imitation or replica markedly close or faithful to an original and typically made to deceive for gain <The $10 bill turned out to be a ~> **b** : a close approximation likely to be confused with reality or with the genuine <that temporary ~ of fame which is publicity —Irwin Edman>

*Id.* at 519. Thus, referring to items as "replicas" would not necessarily convey that the TBA Web site was selling counterfeits, which requires the added element of an intent to deceive.

The complaint also alleges that the knowledge by Nathan Counley, a senior sales manager at Durango, that TBA was a "replica merchant" can be imputed to defendants Frontline and WNB, based on Gucci's unsupported legal conclusion that Mr. Counley was an agent for Frontline, and then for WNB, in their dealings with the Laurette Defendants. (Compl. ¶¶ 52-56, 71-72.) Pleading an agency relationship, however, requires an allegation that the parties (Frontline and WNB) agreed either by contract or conduct that Mr. Counley could act on their behalf, and that Mr. Counley agreed to be subject to the control of Frontline and WNB.[4]

---

[4] Mr. Counley and Durango are located in Colorado, while WNB is located in Texas, and Frontline is located in Montana. Thus, either Colorado, Texas, or Montana law applies to the question of agency. However, the result is essentially the same no matter which state's law is applied. Under Texas law, an agency relationship may be found based on actual or apparent authority. *CNOOC Southeast Asia Ltd. v. Paladin Resources (Sunda) Ltd.,* 222 S.W.3d 889, 899 (Tex. App. Dallas 2007). In either case, written or spoken words or conduct of the principal is required, either to the agent (actual), or to a third party (apparent). *Id.* Any agency relationship requires that the agent must: (1) act for and on behalf of another person, and (2) be subject to that person's control. *Stanford v. Dairy Queen Prods.,* 623 S.W.2d 797, 801 (Tex. App. Austin 1981). The Texas Supreme Court has held that "the right to control remains the 'supreme test' for whether a master-servant relationship exists." *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 542 (Tex. 2002) (citation omitted). Colorado law is comparable and follows the Restatement definition: "Agency is a fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Stortroen v. Beneficial Fin. Co.,* 736 P.2d 391, 395 (Colo. 1987) (quoting Restatement (Second) of Agency § 1(1) (1957)). Colorado law similarly focuses on an examination of "[t]he control a principal exercises over the agent's work performance." *W. Fire Truck, Inc. v. Emergency One, Inc.,* 134 P.3d 570, 575 (Colo. Ct. App. 2006). Montana law also follows the Restatement definition of agency. *Weingart v. C & W Taylor P'ship,* 248 Mont. 76, 80-81, 809 P.2d 576, 579 (1991) (quoting Restatement (Second) of Agency § 1 (1957)). And Montana courts have similarly noted that "[i]ntegral to any agency relationship are the elements of consent and control." *Wolfe v. Schulz Refrigeration*, 188 Mont. 511, 517, 614 P.2d 1015, 1018 (1979).

As support for its allegations that Mr. Counley was first Frontline's and then WNB's agent, the complaint refers to (a) Frontline's Application Checklist where Mr. Counley is listed after "sales agent name" (Compl. Exh 4); (b) Laurette's contract with Frontline where Mr. Counley is listed after "representative name" (*id.* Exh. 5); and (c) WNB's application where Mr. Counley was listed after "rep. name" (*id.* Exh. 6).  These documents, however, do not suggest that Frontline or WNB agreed, by contract or conduct, that Mr. Counley was their agent. At most, they support an inference that he was  authorized to complete and submit the Laurette Defendants' applications to Frontline and WNB.  Indeed, the applications annexed to the complaint show that Frontline and WNB were to contract on their own and could not be bound by Mr. Counley.  (*See id.* Exhs. 5, 6.)  Furthermore, Mr. Counley's notice about the Laurette Defendants being a replica merchant could be imputed only to the principal for whom he was acting when he gained that knowledge.[5]  In short, the knowledge that Mr. Counley gained allegedly as an agent for Frontline could not be imputed to WNB, or vice versa.

Third, Gucci alleges that when Frontline investigated chargebacks, it reviewed documentation regarding the sale, which revealed that the amount charged was a fraction of the retail price, which in turn, should have alerted Frontline that the products were counterfeit. (Compl. ¶¶ 61-64.)  It is not a reasonable inference, however, from the low price of a *replica* product that defendants *must* have known the goods in question offered for sale on its customer's Web site were *counterfeits*.

Fourth, the complaint alleges that defendant WNB had specific knowledge that TBA was selling and intended to sell counterfeit products (*id.* ¶ 74); but the cited document belies this

---

[5] *See Polland & Cook v. Lehman*, 832 S.W.2d 729, 738 (Tex. App. Houston 1st Dist. 1992); *Nielson v. Scott*, 53 P.3d 777, 780 (Colo. App. Ct. 2002); Mont. Code Ann. § 28-10-601.

assertion.  The application that the Laurette Defendants submitted to WNB merely describes the goods as "designer handbags."  (*Id.* ¶ 72, Exh. 6.)  The complaint also alleges that the supplier of the goods was designated in the application as Suijiam Liao Wholesale Bags Company in Guangzhou City, China, not Gucci.  (*Id.* ¶ 73.)  Here again, the document trumps Gucci's conclusion, as it lists this company as the "vendor from which the product is purchased," not the manufacturer of the goods.  (*See* Exh. 6, at 2.)  The fact that the handbags would come from a Chinese vendor would not necessarily make them counterfeits, and does not support any inference that defendants *knew* them to do so.

Fifth, the complaint points out that, when reviewing TBA's application, a WNB employee completed an "Internet Merchant Review Checklist," which included confirming that the Web site included "a complete description of the goods or services offered."  To do so, WNB printed out pages from the Web site, which displayed goods offered, including a number of Gucci products at prices significantly less than the list price.  (Compl. ¶¶ 75-77, Exh. 6.)  These allegations, however, are insufficient to plead specific knowledge by WNB that TBA was involved in selling counterfeit products, or that WNB should have known that TBA would sell counterfeit products.  The pleaded fact that designer handbags acquired from an overseas vendor were being sold at significantly less than the list price does not support a finding that WNB *knew* the handbags were counterfeit.  The complaint also alleges that WNB's checklist required an employee or agent to complete a purchase from the Web site and request a refund, but does not allege that WNB ever conducted such purchases.  (*See* Compl. ¶ 79.)

Finally, the complaint alleges that WNB was responsible for processing chargeback requests from customers who had purchased goods from the TBA Web site, and that the basis for cardholders' requests for the chargebacks suggests that WNB was willfully blind to TBA's sales

of counterfeit items.   (*Id.* ¶¶ 81-82.)   The single factual allegation supporting this legal conclusion is a chargeback request handled by WNB that notes, "the cardholder claims the merchandise received was not as described.  The bag was supposed to be genuine leather but was not." (Compl. Exh. 7.)   Once again, the facts set forth in the supporting document belie the allegations made in the complaint.  The customer was not complaining that the handbag was supposed to be a genuine *Gucci* handbag.  Rather, the customer complained that the material from which the handbag was constructed was not genuine leather.  This had nothing to do with Gucci, and it is not even alleged that the handbag was a Gucci look-alike.

Even if all Gucci's factual allegations are accepted as true, the complaint still lacks sufficient factual support for the legal conclusion that defendants *knew* the Laurette Defendants were selling counterfeit products.  On this alternative and additional ground, Gucci's claim for contributory trademark infringement should be dismissed.

### B.        Plaintiff Has Not Stated A Cause Of Action For Vicarious Trademark Infringement

Vicarious liability for trademark infringement requires that the defendant and the infringer "have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product." *Hard Rock Café*, 955 F.2d at 1150 (quoting *David Berg,* 884 F.2d at 311).  In *Hard Rock Café,* the Seventh Circuit held that vicarious trademark infringement does not include the broader test for copyright infringement, whereby the defendants had the right and ability to supervise the infringing activity and a financial interest in such activities.   And expanding the test for a trademark case would be inconsistent with the Supreme Court's decision in *Sony Corp. of America v. Universal City Studios, Inc.*, 494 U.S. 417, 438 n.19 (1984), that secondary liability for trademark infringement should be more narrowly drawn than secondary liability for copyright infringement.  *Hard Rock Café*, 955 F.2d at 1150.

Gucci's fourth cause of action, for vicarious trademark infringement and counterfeiting, is deficient for the very same reasons as its other claims.  Specifically, in paragraph 119 of the complaint, Gucci states the legal conclusion that defendants are agents and co-participants in the infringement and counterfeiting activities.  That statement, however, is unsupported by any *factual* allegations that these defendants and the Laurette Defendants had an apparent or actual partnership, had authority to bind one another in transactions with third parties, or exercised joint ownership or control over the infringing products.  Rather, the complaint alleges only that the defendants had agreements with the Laurette Defendants solely to provide credit card processing services.  It is not alleged that they had any authority or ability to bind the Laurette Defendants in transactions with other parties.

Gucci may contend that it has alleged facts that defendants' acceptance of a charge would bind the Laurette Defendants to provide the infringing products to customers.  However, when it comes to establishing liability for vicarious trademark infringement, this very contention has been rejected as "legally incorrect."  As explained in *Perfect 10*, the Web site's contracts with the consumer bind it to provide the ordered products, not the Web site's credit card processing companies.  Here, as there, the TBA Web site's contracts with these defendants are merely a means of settling the resulting debits and credits among the Web site and its customers.  *Perfect 10*, 494 F.3d at 807.

### C.    Plaintiff Has Not Stated A Cause of Action For Trademark Infringement And Unfair Competition Under New York Law

The Fifth and Sixth causes of action are for trademark infringement and unfair competition under New York law.  The elements required to prevail on trademark infringement and unfair competition claims under New York common law mirror the Lanham Act claims for trademark infringement and unfair competition.  *Standard & Poor's Corp. v. Commodity Exch.*

*Inc.*, 683 F.2d 704, 708 (2d Cir. 1982). Indeed, to prevail on a claim for unfair competition under New York common law, a plaintiff must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating the defendant's bad faith. *Tiffany*, 576 F. Supp. at 519. For its New York law causes of action, Gucci merely repeats and realleges its prior allegations for the other claims. Thus, the same pleading deficiencies that mandate dismissal of Gucci's other causes of action, warrant dismissal of Gucci's Fifth and Sixth causes of action as well.

## IV.    CONCLUSION

Based on the foregoing, defendants Frontline, WNB, and Durango, respectfully request that the Court dismiss all causes of action asserted in the complaint under Fed. R. Civ. P. 12(b)(6).

Respectfully submitted,

Herbert I. Pierce III
Jeffery J. Oven
Christopher C. Stoneback
G. Trenton Hooper
Crowley Fleck PLLP
490 N 31st  Street, Suite 500 TW2
Billings, MT 59101
Tel:   406-252-3441
E-mail: joven@crowleyfleck.com
        fpierce@crowleyfleck.com
        cstoneback@crowleyfleck.com
        thooper@crowleyfleck.com

Stanley L. Lane, Jr.
OTTERBOURG, STEINDLER,
 HOUSTON & ROSEN, P.C.
230 Park Avenue
New York, NY 10169
*Attorneys for Defendant*
*Frontline Processing Corporation*

By____/s/  Stanley L. Lane, Jr._____
        Stanley L. Lane, Jr. (SL 8400)
        Tel:    212.661.9100
        E-mail: slane@oshr.com

Dated:_____October 30, 2009_____

Law Offices of Todd Wengrovsky, PLLC.
285 Southfield Road, Box 585
Calverton, NY 11933
*Attorneys for Defendant Durango*
*Merchant Services LLC d/b/a National*
*Bankcard Systems of Durango*

By____/s/  Todd Wengrovsky_____
        Todd Wengrovsky (TW 4823)
        Tel:    631.727.3400
        E-mail:Contact@TWlegal.com

LERNER, DAVID, LITTENBERG,
 KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090
*Attorneys for Defendant*
 *Woodforest National Bank*

By____/s/  Charles P. Kennedy_____
        Charles P. Kennedy (CK 9917)
        Tel:    908.654.5000
        E-mail:ckennedy@ldlkm.com
               wmentlik@ldlkm.com
               gparadise@ldlkm.com
               litigation@ldlkm.com