UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                           :

GUCCI AMERICA, INC.                      :
                                           :

           Plaintiff,          :
                                         :

      -against-          :
                                         :           09 Civ. 6925 (HB)

FRONTLINE PROCESSING CORPORATION;  :
WOODFOREST NATIONAL BANK; DURANGO  :
MERCHANT SERVICES LLC d/b/a NATIONAL  :
BANKCARD SYSTEMS OF DURANGO; ABC  :
COMPANIES; and JOHN DOES,          :
                                         :

          Defendants.       :
                                         :
                                         :
                                         :
----------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

Robert L. Weigel (RW 0163)
Howard S. Hogan (HH 7995)
Jennifer C. Halter (JH 7032)
Anne Coyle (AC 3158)
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiff Gucci America, Inc.*

New York, New York
November 16, 2009

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................4

    I.    The Gucci Brand .........................................................................4

    II.    The Laurette Litigation ...............................................................4

    III.    Defendants' Credit Card Processing Services Were Essential to Laurette's
Counterfeiting Operation ...........................................................5

    IV.    Defendants Knew That Laurette Sold Only Counterfeit Goods ............................7

    V.    Defendants' Contacts with New York .................................................8

ARGUMENT .................................................................................................10

    I.    STANDARD OF REVIEW ..........................................................10

        A.    Motion to Dismiss Under Rule 12(b)(2) ....................................11

        B.    Motion to Dismiss Under Rule 12(b)(6) ....................................11

    II.    THIS COURT HAS JURISDICTION OVER DEFENDANTS ...........................12

        A.    New York's Long-Arm Statute Confers Jurisdiction Over Defendants ....12

        B.    This Court Has General Jurisdiction Over Defendants...........................17

    III.    IN THE ALTERNATIVE, JURISDICTIONAL DISCOVERY IS
WARRANTED TO DETERMINE THE NATURE AND EXTENT OF
DEFENDANTS' BUSINESS IN NEW YORK .........................................19

    IV.    NEW YORK IS NOT AN INCONVENIENT FORUM ................................20

    V.    PLAINTIFF HAS STATED CLAIMS FOR DIRECT TRADEMARK
INFRINGEMENT AND COUNTERFEITING ........................................21

        A.    The Gucci Marks Are Valid and Entitled to Protection...........................21

        B.    Defendants Were Directly Involved in the Sale and Offering for Sale
of Counterfeit Gucci Products .............................................22

        C.    Defendants' Use of the Gucci Marks Was Likely to Cause Confusion.....23

**Table of Contents**
**(Continued)**

Page(s)

VI.   PLAINTIFF HAS STATED CLAIMS FOR CONTRIBUTORY AND
VICARIOUS TRADEMARK INFRINGEMENT ................................................25

   A.   Plaintiff Has Established A Claim for Contributory Trademark
Infringement...........................................................................................26

      1.   Defendants Induced Infringement By Knowingly and Actively
Soliciting Business from Merchants of "Replica Products"..........27

   B.   Defendants Had Knowledge of Infringement and Continued to Supply
the Services Necessary for that Infringement to Continue .......................27

      1.   Defendants Had Actual Knowledge of Laurette's Infringing
Activities.....................................................................................28

      2.   Defendants Exerted Direct Control and Monitoring Over Their
Replica Merchant Payment Services Which Provided the
Necessary Marketplace for Infringement.......................................30

   C.   Plaintiff Has Pleaded Facts Establishing a Claim for Vicarious
Trademark Infringement ........................................................................34

CONCLUSION.....................................................................................................35

# TABLE OF AUTHORITIES

Page(s)

## Cases

*American Network, Inc. v. Access America/Connect Atlanta*,
  975 F. Supp. 494 (S.D.N.Y. 1997) .............................................................. 13, 14, 20

*Bluestone Capital Partners v. MGR Funds Ltd.*,
  No. 98 Civ. 3128 (WHP), 1999 WL 322658, *1 (S.D.N.Y. May 20, 1999) ........................... 11

*Burberry Limited v. Euro Moda, Inc.*,
  No. 08 Civ. 5781, 2009 WL 1675080, at * (S.D.N.Y. June 10, 2009) .................................... 21

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ........................................................................................ 20

*Cable News Network L.P. v. GoSMS.com*,
  56 U.S.P.Q.2d 1959 (S.D.N.Y. 2000) .............................................................. 13, 20

*Cartier Int'l B.V. v. Liu*,
  No. 02 Civ. 7926, 2003 WL 1900852, at *3 (S.D.N.Y. Apr. 17, 2003) .................................. 26

*Chanel, Inc. v. Schwartz*,
  No. 06 Civ. 3371, 2007 WL 4180615, at *5 (E.D.N.Y. Nov. 19, 2007) .................................. 24

*Citigroup Inc. v. City Holding Co.*,
  97 F. Supp. 2d 549 (S.D.N.Y. 2000) .............................................................. 11, 13

*Corporate Aviation Concepts, Inc. v. Multiservice Corp.*,
  No. Civ. A. 03-3020, 2003 WL 22794693, at *4 (E.D.P.A. Nov. 13, 2003) ........................... 19

*ESPN, Inc. v. Quiksilver, Inc.*,
  586 F. Supp. 2d 219 (S.D.N.Y. 2008) .............................................................. 11

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
  76 F.3d 259 (9th Cir. 1996) ........................................................................ 25, 30, 32

*Frummer v. Hilton Hotels Int'l*,
  19 N.Y.2d 533, 281 N.Y.S.2d 41 (N.Y. 1967) ........................................................ 18

*Gucci Am., Inc. v. Ashley Reed Trading, Inc.*,
  00 Civ. 6041, 2003 WL 22327162, at *9 (S.D.N.Y. Oct. 10, 2003) ...................................... 21

*Hard Rock Café Licensing Corp. v. Concession Services, Inc.*,
  955 F.2d 1143 (7th Cir. 1992) .................................................................. 25, 28, 29, 32

**Table of Authorities**
**(Continued)**

Page(s)

*Hermès Int'l v. Lederer De Paris Fifth Avenue, Inc.,*
219 F.3d 104 (2d Cir. 2000) ................................................................. 23, 24

*Int'l BV v. Ben-Menachem,*
No. 06 Civ. 3917, 2008 WL 64005 (S.D.N.Y. Jan. 3, 2008)................................. 26

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,*
456 U.S. 844 (1982)............................................................................... 25, 26, 28

*Iqbal v. Ashcroft,*
129 S. Ct. 1937 (2009)........................................................................ 10, 11, 12

*Kernan v. Kurz-Hastings, Inc.,*
175 F.3d 236 (2d Cir. 1999) ............................................................... 14, 16, 17

*Laugh Factory, Inc. v. Basciano,*
608 F. Supp. 2d 549 (S.D.N.Y. 2009) .............................................................. 26

*Law Debenture v. Maverick Tube Corp.,*
No. 06 Civ. 14320(RJS), 2008 WL 4615896, at *6 (S.D.N.Y. Oct. 15, 2008) ....................... 15

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.,*
591 F. Supp. 2d 1098 (N.D. Cal. 2008) ................................................... passim

*Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre*
*Watches, Inc.,*
221 F.2d 464 (2d Cir. 1955) ................................................................. 24

*National Football League v. Miller,*
54 U.S.P.Q.2d (BNA) 1574 (S.D.N.Y. 2000)....................................................... 13

*PDK Labs v. Friedlander,*
103 F.3d 1105 (2d Cir. 1997) ............................................................... 10, 12

*Peregrine Myanmar v. Segal,*
89 F.3d 41 (2d Cir. 1996) ......................................................................... 20

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,*
494 F.3d 788 (9th Cir. 2007), *cert. denied,* 128 S. Ct. 2871 (2008)............................ 25, 32, 33

*Pilates, Inc. v. Pilates Inst.,*
891 F. Supp. 175 (S.D.N.Y. 1995) ......................................................... 11, 13

*Polo Ralph Lauren Corp. v. Chinatown Gift Shop,*
855 F. Supp. 648 (S.D.N.Y. 1994) ............................................................. 26

**Table of Authorities**
**(Continued)**

Page(s)

*Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n.*,
   819 F.2d 434 (3d Cir. 1987) .................................................................................. 19

*R.F.M.A.S., Inc. v. Mimi So.*,
   619 F. Supp. 2d 39 (S.D.N.Y. 2009) ................................................................ 26, 28

*Rolex Watch U.S.A., Inc. v. Jones*,
   No. 99 Civ. 2359, 2000 WL 1528263, at *3, n.1 (S.D.N.Y. Oct. 13, 2000) .......................... 24

*Tese-Milner v. De Beers Centenary A.G.*,
   613 F. Supp. 2d 404 (S.D.N.Y. 2009) ...................................................................... 20

*Texas Int'l Magnetics, Inc. v. BASF Aktiengesellschaft*,
   31 Fed. Appx. 738 (2d Cir. 2002) .......................................................................... 20

*Tiffany v. eBay*,
   576 F. Supp. 2d 463 (S.D.N.Y. 2008) ................................................................. passim

*Tuxedo Network, Inc. v. Hughes Communications Carrier Services, Inc.*,
   753 F. Supp. 514 (S.D.N.Y. 1990) (citation omitted).......................................................... 10

*Varsity Brands, Inc. v. J & M Spirit Wear, Inc.*,
   No. 09 Civ. 1795, 2009 WL 3401182 (S.D.N.Y. Oct. 19, 2009) ........................................ 10, 11

*Westvaco Corp. v. Viva Magnetics Ltd.*,
   2002 WL 1933756, at *4-5 (S.D.N.Y. Aug. 20, 2002).......................................................... 20

*Wiwa v. Royal Dutch Petroleum Co.*,
   226 F.3d 88 (2d Cir. 2000) ............................................................................... 17, 18

**Statutes**

15 U.S.C. § 1114.............................................................................................. 21

Fed. Rules of Civ. Proc. 12(b)(2).............................................................................. 10, 11

Fed. Rules of Civ. Proc. 12(b)(6).............................................................................. 10, 11

New York Civ. Prac. Law & Rules § 301........................................................................ 12, 17

New York Civ. Prac. Law & Rules § 302(a) ..................................................................... 12

New York Civ. Prac. Law & Rules § 302(a)(1) .................................................................. 15

New York Civ. Prac. Law & Rules § 302(a)(2) .................................................................. 13

**Table of Authorities**
**(Continued)**

Page(s)

New York Civ. Prac. Law & Rules § 302(a)(3) .................................................................... 12, 13

Plaintiff Gucci America, Inc. ("Gucci" or "Plaintiff") submits this memorandum of law in opposition to the motions to dismiss this action filed jointly by Defendants Frontline Processing Corporation ("Frontline"), Woodforest National Bank ("Woodforest"), and Durango Merchant Services, LLC ("Durango") (collectively, the "Defendants").

## PRELIMINARY STATEMENT

Each of the Defendants had specific knowledge that its customer, Laurette, was selling counterfeit merchandise through the website TheBagAddiction.com.[1]  Nevertheless, Defendants continued to provide essential financial products and services to the website. Defendants authorized and processed each credit card sale for the counterfeit goods sold from TheBagAddiction.com.  Defendants shared in the proceeds of each sale and had the knowledge and means to shut the transactions down.  Defendants are guilty of trademark infringement and their motion to dismiss should be denied.

Defendants each reviewed the website for their own business purposes.  As the nature of the credit card processing business essentially required Defendants to advance money to the counterfeiters, Defendants needed to know what the website was selling—both to ensure that the counterfeiters would repay any chargebacks and to decide how to price the financial products they were selling to the counterfeiters.  Laurette was a counterfeiter—its website said so explicitly.  Indeed, at Defendants' suggestion, a customer's transaction could not be processed without the customer checking a box acknowledging: "I understand these items being purchased are replicas, not originals."  Nathan Counley, acting as the agent or employee of all three Defendants, suggested adding this language to the website to minimize the number of purchases

---

[1] The operators of TheBagAddiction.com website, Laurette Company, Inc., Jennifer Kirk, and Patrick Kirk, are referred to collectively herein as "Laurette."

that were "charged back" to Defendants.[2]  Frontline reviewed the language of this required

acknowledgment that the goods were "replicas" and made suggestions as to where it should be

placed on the website to further minimize chargebacks.  Woodforest evaluated Laurette's

application for a merchant services account, which listed Laurette's handbag supplier as "Suijian

Lao Wholesale Bags" in China.  Compl. Ex. 6.  As part of the application process, Woodforest

reviewed the website's contents and retained page after page of screenshots showing counterfeit

"Gucci" handbags in its files.  In short, all of the Defendants had direct knowledge of Laurette's

counterfeiting.

Despite Defendants' specific knowledge that the website was selling only counterfeit

merchandise, they continued to supply financial products to Laurette—the approval and

processing of each counterfeit sale by credit card.  Nearly 100% of the website's sales were paid

for by credit card, and Laurette could not have continued to infringe Gucci's trademarks without

Defendants' help.  Defendants had the ability to stop Laurette's sale of counterfeit products

simply by refusing to authorize and process sales for the website, as Woodforest did for websites

depicting "child pornography," "Snuff" films or scenes of bestiality.  Woodforest refused to

approve merchant account applications from such websites simply by asking its employees to

review the contents of applicant's website and check off a series of boxes on Woodforest's

"Internet Merchant Review" intake form.  Just as easily, Defendants could have chosen not to do

business with counterfeiters, but instead they actively sought out such customers.

---

[2]    As defined by Visa, one of the credit cards processed and authorized by Defendants for
TheBagAddiction.com, "a chargeback is a transaction that a card issuer returns to a merchant bank as
a financial liability and which, in turn, a merchant bank may return to a merchant.  In essence, it
reverses a sales transaction."  Declaration of Anne M. Coyle, dated November 16, 2009 ("Coyle
Decl.") Ex. 1.

Under the Supreme Court's decision in *Inwood* and its progeny, by continuing to provide essential products and services to a merchant Defendants specifically knew was selling only counterfeit merchandise, Defendants committed trademark infringement. Their motion to dismiss the Complaint for failure to state a claim is without basis.

Recognizing that their defense on the merits will not hold up, Defendants also move to dismiss the Complaint due to lack of personal jurisdiction. This motion should be denied as well. Defendants attempt to misrepresent the scope of their connections to New York through a series of half-truths and outright falsehoods. However, Defendants' numerous and continuous contacts with New York subject them to the personal jurisdiction of this Court.

Defendants authorized and processed numerous credit card sales from New York residents for Laurette and other merchants. In addition, Woodforest indisputably has an agent in New York, Merchant's Choice Card Services ("MCCS"), that is actively soliciting business and servicing merchants in New York for Woodforest. MCCS—which is "sponsored by Woodforest"—advertises that it has "300 sales offices" "across the nation," including one in Huntington, New York (Coyle Decl. Exs. 2, 3). The sworn statement of Woodforest's general counsel that "MCCS has an office only in the State of Texas, and no office in the State of New York" is, therefore, unexplainable. *See* Docket No. 21, Declaration of Charles Vernon ("Vernon Decl.") ¶ 8. Frontline has an ongoing and continuous partnership with HSBC Bank USA, NA ("HSBC") in Buffalo New York, which is advertised as Frontline's principal bank and is also a party to Frontline's merchant services contract with Laurette. Likewise, one of Durango's principal banks is JP Morgan Chase, which is also based in New York.

Defendants routinely process millions of dollars of credit card transactions through New York. All three Defendants have regular and systematic contact with their New York merchant

customers and their New York-based banks, or, in the case of Woodforest, MasterCard and Visa

in New York.  Defendants are also subject to New York's long-arm statute because of the harm

their actions caused to Gucci, a New York corporation, by confusing customers and damaging its

goodwill and sales in New York.  Accordingly, Defendants' motion to dismiss for lack of

personal jurisdiction should be denied.

## STATEMENT OF FACTS

### I.    The Gucci Brand

Gucci is a leader in the design and sale of high-quality luxury items offered to the public

under the famous Gucci trademarks referenced in the Complaint (the "Gucci Marks").   *See*

Compl. ¶¶ 1, 24-30.  As a result of Gucci's extensive marketing and promotional efforts, as well

as the high quality of its products, Gucci's products have achieved an outstanding reputation

among consumers and the Gucci Marks are among the world's most recognizable trademarks.

*Id.*


### II.    The Laurette Litigation

On June 3, 2008, Gucci filed a trademark infringement action against the operators of

TheBagAddiction.com website, captioned *Gucci Am., Inc. et al. v. Laurette Company, Inc. et al.*,

08 Civ. 5065 (L.A.K.) (S.D.N.Y.).  *Id.* ¶ 5.  TheBagAddiction.com offered for sale at least

twenty different types of counterfeit Gucci products, amounting to hundreds of different

counterfeit Gucci handbags, wallets, and other accessories.  *See id.* ¶ 43.  On December 15,

2008, a Final Order and Judgment on Consent ("Consent Judgment") was entered against the

named defendants in that suit—Laurette Company, Inc., Jennifer Kirk, and Patrick Kirk.  *Id.* ¶ 6.

In the Consent Judgment, the named defendants admitted to liability for their counterfeiting

activities and a monetary judgment of $5.2 million was entered against them.  *Id.*

During the course of the Laurette litigation, Gucci learned about Defendants' extensive involvement in the website's sale of counterfeit goods. *Id.* ¶ 7. From 2006 to 2008, Defendants provided Laurette with the credit card processing services necessary for Laurette to sell counterfeit products through their website. *Id.* Roughly 99% of TheBagAddiction.com's sales were made to customers who paid by credit card. *See* Declaration of Jennifer Kirk, dated November 13, 2009 ("Kirk Decl.), ¶ 1. Defendants authorized and processed each of these credit card transactions. *See* Compl. ¶¶ 22, 87-89.

## III.    Defendants' Credit Card Processing Services Were Essential To Laurette's Counterfeiting Operation

Defendants claim that they did "nothing more than settle credits and debits for *completed* credit and debit card sales." Defs. Br. at 4 (emphasis added). However, Defendants' assertion that they were only involved once these sales transactions were complete is contradicted by their own description of the credit card transaction process: [3]

> Credit card transactions involve five key players: the customer cardholder, the card issuing bank, [Laurette], the [Defendants], and the authorization network (*e.g.*, VisaNet for Visa cards).
> [1]  The credit card transaction begins with the card being swiped or keyed into [Laurette's] terminal.
> [2]  [Laurette's] terminal transmits the authorization request to the [Defendants], which, in turn, sends the request electronically to the network.
> [3]  The network routes the request to the cardholder's issuing bank.
> [4]  The issuing bank approves or declines the transaction, and this response is forwarded by the network to the [Defendants]; which forwards it to [Laurette].
> [5]  The [Laurette Company] completes the transaction.
> [6]  All transactions are kept at the terminal until [Laurette] sends all transactions, usually at the end of the day, to the [Defendants].
> [7]  The [Defendants] credit[] [Laurette] account and submits the transactions to the network for settlement.
> [8]  The network pays the [Defendants] and debits the appropriate issuer accounts.

---

[3]  For purposes of understanding Defendants' role in these transactions as they relate to the operation of TheBagAddiction.com, Plaintiff has replaced "merchant" with "Laurette" and "acquiring bank" with "Defendants."

[9]  The issuers then post the transactions to their cardholders' accounts. *See id*. at 5, n.1.  As Defendants' own description makes clear, they were in the middle of each sale of counterfeit goods.  They authorized the customer's credit card *before the sale was even complete*, then cleared and settled the transaction.  *See* Coyle Decl. Exs. 4, 5.  Laurette could not have processed credit cards without the services of an acquiring bank, like Defendants.  *See* Compl. ¶ 7.  Without Defendants, there was no money and no sale.

Defendants profited from each and every sale of counterfeit goods that they processed for Laurette.  *Id.* ¶¶ 60, 65, 84-85.  As the acquiring banks, Defendants deducted a percentage-based fee from each and every transaction they processed for Laurette, called the "discount fee."  Although discount fees of under 2% are advertised on the internet, Frontline and Woodforest charged Laurette discount fees of  3.95% and 3.75%, respectively.  *Id.* ¶¶ 65, 85.  The high discount rate reflects the Defendants' assessments that doing business with Laurette was highly risky.  *Id.* ¶¶ 65-66, 74, 85.

Establishing a correct discount rate is a necessity to payment processors like Defendants due to the nature of their business.  As the description of the credit card transaction process makes clear, Defendants essentially loan money to the merchant each time they are involved in the authorization and completion of a sales transaction.  *See* Coyle Decl. Exs. 4, 5.  Indeed, if a customer requests and is awarded a chargeback, the customer's bank debits the amount of the transaction from the account of the merchant's *acquiring bank* (*i.e.* Defendants).  *Id.*  Defendants must then recover the funds associated with these chargebacks from their merchants.  *Id.*  That is why Defendants assess the risk of chargebacks when establishing the appropriate discount rate to

use for a merchant.[4]  Thus, for their own business purposes, Defendants needed to—and did—

examine Laurette's counterfeiting business.

## IV.    Defendants Knew That Laurette Sold Only Counterfeit Goods

As alleged in great detail in the Complaint, the constant interaction between Laurette and

Defendants, including e-mails between Laurette and the processors' sales agent at Durango,

telephone conversations, printouts from TheBagAddiction.com website that Woodforest

maintained in its files, and faxes from Frontline, establishes that the Defendants had specific,

actual knowledge—not just reason to know—that Laurette was selling counterfeits.  *See, e.g.*,

Compl., Exs. 2-7.

As an initial matter, Defendants actively courted business from "High Risk" merchants of

"Replica Products,"  like Laurette.  *See id.* ¶¶ 48-49.  Durango's website specifically lists

"Replica Products" as one of the categories of merchants it services.  *Id.*  Further, Durango's

sales representative Nathan Counley acted as a broker between the high risk merchants and

acquiring banks willing to do business with such high risk merchants—here, linking Woodforest

and Frontline with Laurette.  *Id.* ¶ 51.  Indeed, Counley is listed as the sales agent on Laurette's

merchant account applications with both processors.  *Id.* ¶¶ 55, 72.

Nathan Counley's communications with Laurette establish that Counley knew

TheBagAddiction.com was selling replicas—a euphemism for counterfeit.  *Id.* ¶¶ 53-54.

Counley assisted Frontline in establishing a relationship with Laurette in September 2006.

Compl. ¶¶ 35-36, Exs. 4-5.  Further, it was at Counley's suggestion that Laurette added the check

---

[4]    To account for the possibility of chargebacks, Frontline required Laurette to establish a "merchant
reserve account fund," from which Frontline could draw the funds necessary to cover any
chargebacks.  Compl. ¶ 62.  It is not disputed that the funds in this account were generated entirely
from Laurette's sale of counterfeit goods, that each of the sales used to generate these funds was
processed by Frontline, or that Frontline has kept possession of these funds.  *Id.*

box to TheBagAddiction.com's sales-completion process, requiring customers to acknowledge that the "items being purchased are replicas, not originals." *See* Kirk Decl. ¶ 4. A Frontline representative later transmitted handwritten notes to Laurette suggesting modifications to the "replica" disclaimer that would further avoid chargebacks. *Id.* Ex. A. In October 2006 alone, Laurette received over 100 orders for counterfeit Gucci products, all of which were authorized and processed by Frontline. *Id.* ¶ 68. Frontline took a profit from each individual sales transaction it processed. *Id.* ¶ 65.

In November 2006, Counley connected Woodforest with Laurette. *Id.* ¶ 71-72, Ex. 6. Woodforest's files shows that it knew Laurette was selling counterfeits. *Id.* ¶¶ 73-81. As part of its merchant application review process, a Woodforest employee visited the website and printed out page after page of counterfeit Gucci handbags being offered for sale at a fraction of their list price. *Id.* Ex. 6. The fact that Woodforest's representative reviewed the website is dispositive because the website repeatedly states that the handbags offered for sale were "replicas" that were not "authentic" and were "not originals." *Id.* ¶¶ 32, 75, 80. For example, the website's "FAQ" section states: "Are your handbags authentic? No, all products sold are exact mirrors and not being sold or represented as original." *Id.* ¶ 32. Woodforest also required its employee to make a purchase from TheBagAddiction.com and request a refund. *Id.* As previously noted, customers submitting an order on the website were required to check a box acknowledging that "the items being purchased are replicas, not originals." Kirk Decl. Ex. A.

The specific allegations of the Complaint are more than sufficient to establish that all three Defendants actually knew, and certainly had reason to know, that they were providing financial products and services to a company selling counterfeits.

## V.    Defendants' Contacts with New York

Plaintiff specifically alleges, and each of the Defendants admits, that Defendants are currently engaged in business activity in New York and derive substantial revenue from servicing New York merchants. *See, e.g.*, Compl. ¶ 22. Woodforest admits that it contracts for processing services for credit card transactions through MCCS in New York. Vernon Decl. ¶ 8. In a press release announcing its rebranding as "MCPS," MCCS described itself as "a top-ranked merchant services provider *sponsored by Woodforest National Bank*." Coyle Decl. Ex. 2 (emphasis added). In fact, the Chief Executive Officer of Woodforest is the Chairman of MCCS. *Id.* Although Woodforest's General Counsel states that MCCS "has an office only in the State of Texas, and no office in the State of New York" (Vernon Decl. ¶ 9), MCCS has "satellite offices across the nation," including an office "located in the heart of New York City" at 775 Park Avenue, Office #118, Huntington, NY 11743. Coyle Decl. Exs. 3, 6. MCCS is also registered to do business at an address in Queensbury, New York. *Id.* Ex. 7.

Frontline admits that it processes transactions for merchants located in New York. Docket No. 20 (Affidavit of Chris Kittler ("Kittler Aff.")), ¶¶ 12-13. This business requires daily or near daily communication with the merchants to process their daily receipts and then to transmit the funds to them in New York. Additionally, Frontline admits that it has a banking relationship with HSBC in Buffalo, New York (*id. ¶* 13), a fact that is repeated on Frontline's website, which describes HSBC as Frontline's "principle [*sic*] bank." HSBC is a party to Frontline's contract with Laurette, and Frontline authorized and processed Laurette's sale of counterfeits through HSBC in New York. *See* Compl. ¶ 22, Ex. 5 at 1, 4. Frontline could not operate its credit card processing business without access to the ACH system, which facilitates "the clearing of electronic payments for participating depository financial institutions." Coyle

Decl. Ex. 8. Frontline is in constant communication with HSBC and receives regular and systematic payments from HSBC in New York for its customer's accounts.

Durango describes itself on its website as a "world leading consultant group" offering services to merchants nationally and internationally. Durango admits that it has customers in New York—customers that Durango communicates with and services on a regular and systematic basis. *See* Docket No. 22 (Declaration of Shane Kairalla ("Kairalla Decl.")) ¶ 11. Durango's website also states that it is a registered service provider for JP Morgan Chase, which has its principal place of business at 270 Park Avenue, New York, New York 10017-2070.

Defendants also solicit customers in New York through their fully interactive websites, which invite merchants seeking credit card processing services to contact Defendants through their websites, allow for the submission of applications, and offer rate quotes. Compl. ¶ 22; Coyle Decl. Exs. 10-12.

## ARGUMENT

## I.    STANDARD OF REVIEW

Defendants' motions to dismiss this action under Rule 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure should be denied in their entirety. At this stage of the proceeding, all pleadings "must be construed in the light most favorable to plaintiff and all doubts resolved in its favor." *Tuxedo Network, Inc. v. Hughes Commc'ns Carrier Servs., Inc.*, 753 F. Supp. 514, 516-17 (S.D.N.Y. 1990) (citation omitted); *see also PDK Labs v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) ("[W]e construe the pleadings and affidavits in plaintiff's favor at this early stage."); *Varsity Brands, Inc. v. J & M Spirit Wear, Inc.*, No. 09 Civ. 1795, 2009 WL 3401182, at *1-2 (S.D.N.Y. Oct. 19, 2009) (denying motion to dismiss where "[t]he arguments would be more properly made in a motion for summary judgment at the conclusion of fact discovery"), (citing *Iqbal v. Ashcroft*, 129 S. Ct. 1937, 1949-50 (2009)). Defendants have

failed to meet the standard required for dismissal under either Rule 12(b)(2) or 12(b)(6), and

Defendants' assertions in support of their motions are contradicted by their own admissions and

Plaintiff's well-pleaded allegations.

### A.    Motion to Dismiss Under Rule 12(b)(2)

The burden of establishing that jurisdiction is proper is "easiest to fulfill" at the outset of

the case, before discovery, when a plaintiff "need persuade the court only that its factual

allegations constitute a *prima facie* showing of jurisdiction." *Pilates, Inc. v. Pilates Inst.*, 891 F.

Supp. 175, 178 (S.D.N.Y. 1995). The *prima facie* standard is satisfied "even when the moving

party makes contrary allegations that place in dispute the factual basis of plaintiff's prima facie

case." *Bluestone Capital Partners v. MGR Funds Ltd.*, No. 98 Civ. 3128(WHP), 1999 WL

322658, at *1 (S.D.N.Y. May 20, 1999). Plaintiff's allegations establish a *prima facie* basis for

jurisdiction and, therefore, Defendants' motion to dismiss for lack of personal jurisdiction should

be denied. *See PDK Labs*, 103 F.3d at 1108 (plaintiff opposing a motion to dismiss made before

discovery "need only allege facts constituting a *prima facie* showing of personal jurisdiction.");

*Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549 (S.D.N.Y. 2000) (same).

### B.    Motion to Dismiss Under Rule 12(b)(6)

The standard of review on a motion to dismiss for failure to state a claim "is heavily

weighted in favor of the plaintiff." *ESPN, Inc. v. Quiksilver, Inc.*, 586 F. Supp. 2d 219 (S.D.N.Y.

2008) (denying motion Rule 12(b)(6) motion to dismiss claims for trademark infringement). The

Court construes the complaint's factual allegations as true, drawing all reasonable inferences in

plaintiff's favor. *See Varsity Brands*, 2009 WL 3401182, at *1-2. The Court then considers

whether the complaint "states a plausible claim for relief," which is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Id.* at *2,

(quoting *Iqbal*, 129 S. Ct. at 1949); *see also ESPN*, 586 F. Supp. 2d at 224-25 ("The issue [on a

motion to dismiss] is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."). Plaintiff has pleaded facts sufficient to establish the existence of trademark infringement claims against Defendants, and Defendants' motion to dismiss should be denied. *See Iqbal*, 129 S. Ct. at 1949 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.")

## II.    THIS COURT HAS JURISDICTION OVER DEFENDANTS

In a federal question case, the Court applies the personal jurisdiction rules of the forum state unless the federal statute specifically provides for national service of process. *PDK Labs*, 103 F.3d at 1108. Because the Lanham Act does not provide for nationwide service of process, the Court looks to New York law to determine whether it has personal jurisdiction over a non-domiciliary defendant. *Id.* at 1108. The Complaint alleges facts sufficient to support both specific and general jurisdiction over Defendants under New York law.

### A.    New York's Long-Arm Statute Confers Jurisdiction Over Defendants

Plaintiff has alleged facts that confer jurisdiction over all Defendants pursuant to Sections 301 and 302(a) of the New York Civil Practice Law & Rules ("CPLR"). Section 302(a)(3) provides for personal jurisdiction over any out-of-state resident who commits a tortious act outside of New York, causing injury to property within New York, if the defendant "(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." CPLR. § 302(a)(3).

Defendants were essential participants in Laurette's sale of counterfeits and thereby infringed on Plaintiff's trademarks. Gucci is a New York corporation with its principal place of

business located at 685 Fifth Avenue, New York, New York 10022.  Infringement on the

trademark rights of parties in New York repeatedly has been held to constitute an out-of-state

tort that triggers CPLR § 302(a)(3).  *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d at 568

(S.D.N.Y. 2000) ("Injury within the state includes harm to a business in the New York market in

the form of lost sales or customers.") (citations omitted); *accord National Football League v.

Miller*, 54 U.S.P.Q.2d (BNA) 1574, 1576 (S.D.N.Y. 2000); *American Network, Inc. v. Access

America/Connect Atlanta*, 975 F. Supp. 494, 497 (S.D.N.Y. 1997).  Plaintiff alleges that

Defendants' infringement on the Gucci Marks caused confusion to its customers in New York

and damaged Plaintiff's reputation, goodwill, and sales.  *See, e.g.*, Compl. ¶¶ 94-96.  The

threshold requirement of Section 302(a)(3) is therefore satisfied.

Section 302(a)(3)(ii) also is satisfied because Defendants reasonably should have

expected their acts to have consequences in New York and derived substantial revenue from

interstate commerce.[5]  Each of the Defendants holds itself out as a national service provider.

Coyle Decl. Exs. 10-12.  None of the Defendants dispute that they derive substantial revenue

from interstate commerce. [6]  Further, "[c]ommerce involving banking institutions constitutes

interstate commerce."  *Citigroup*, 97 F. Supp. 2d at 568.  Defendants' conclusory argument that

---

[5]  Jurisdiction also exists under CPLR § 302(a)(2), which is triggered when an out-of-state actor, who
    solicits business nationally, commits the tort of trademark infringement in New York by
    disseminating infringing material into the state.  *See Pilates*, 891 F. Supp. at 180 ("It is the well-
    established law of the Second Circuit that offering one copy of an infringing work for sale in New
    York . . . constitutes commission of a tortious act within the state sufficient to imbue this Court with
    personal jurisdiction over the infringers") (internal citation and quotation marks omitted).  In
    facilitating the sale of the counterfeit products to New York customers, Defendants committed a tort
    within the state.

[6]  Although Defendants admit that they derive revenue from New York (jurisdictional discovery may be
    required to determine whether it is "substantial"), Section 302(a)(3)(ii) is satisfied even if the
    interstate revenue does not derive from New York.  *See, e.g., Cable News Network L.P. v.
    GoSMS.com*, 56 U.S.P.Q.2d 1959, 1963 (S.D.N.Y. 2000) ("revenue from its operations in Europe and
    Israel" sufficient to support jurisdiction in New York).

they could not reasonably have foreseen their acts to have consequences in New York seeks to obscure Defendants' deliberate offering of replica merchant credit card processing services and their specific knowledge of the nature of the business run by Laurette.

Defendants made a business decision—knowing that Laurette was selling counterfeit Gucci products through TheBagAddiction.com, Defendants chose to process the sales of those counterfeit products. Compl. ¶¶ 53-85. During the time that Defendants provided credit card processing services to Laurette, TheBagAddiction.com received over 15,000 orders for counterfeit goods. *Id.* ¶ 22. At least 1,500 of these orders—a substantial number of which were counterfeit Gucci products—were shipped to New York. *Id.* In total, Defendants authorized and processed more than $2 million in sales of counterfeit products, approximately $500,000 of which was derived from the sale of the counterfeit Gucci products. *Id.*

Defendants could reasonably foresee that TheBagAddiction.com would make sales to New York residents since internet commerce is not confined to the state in which the website is maintained. The test of reasonable foreseeability under New York law does not require that the defendant specifically *targeted* New York. *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 241-42 (2d Cir. 1999) (upholding jurisdiction of New York court over defendant Japanese manufacturer on the basis of an exclusive agreement with plaintiff, a Pennsylvania corporation, for plaintiff to distribute defendant's products in the United States, among other places); *American Network*, 975 F. Supp. at 499 (foreseeability requirement satisfied where defendant website claimed it could offer services across the United States. and had signed up six subscribers in New York). Moreover, Woodforest and Frontline learned that Laurette shipped merchandise to customers in New York during the course of their investigation of chargebacks, and therefore had actual

14

knowledge that they were facilitating the sale of counterfeit Gucci products in New York.

Compl. ¶¶ 61-64, 81-82; *see* Kirk Decl. ¶ 5.

Alternatively, Defendants' role in selling the counterfeit products in New York fulfills

the test for jurisdiction under Section 302(a)(1) of the long-arm statute, which applies to a

foreign defendant who "transacts any business within the state or contracts anywhere to supply

goods or services in the state."  In addition:

> The New York State Court of Appeals has held that, under § 302(a)(1), proof of
> one transaction in New York is sufficient to invoke jurisdiction, even though the
> defendant never enters New York, so long as the defendant's activities here were
> purposeful and there is a substantial relationship between the transaction and the
> claim asserted.  Further, *commercial actors may be subject to long-arm
> jurisdiction even when they have only used electronic and telephonic means to
> project themselves into New York to conduct business transactions.*

*Law Debenture v. Maverick Tube Corp.*, No. 06 Civ. 14320 (RJS), 2008 WL 4615896, at *6

(S.D.N.Y. Oct. 15, 2008) (internal quotations and citations omitted) (emphasis added).

Defendants transacted business in New York through processing the sales of the

counterfeit Gucci products in New York.  Defendants are involved in the authorization of the

customer's credit card before the sale is complete, as well as the clearing and settlement of the

transaction.  *See* Defs. Br. at 5, n.1.  Accordingly, Defendants actively participated by electronic

means in each sale by TheBagAdditction.com to a New York customer, and derived revenue

from each such sale.  These transactions also involved New York financial institutions.  Frontline

used HSBC Bank in New York—which was itself a party to the contract between Frontline and

Laurette—to clear transactions enabling the sale of the Counterfeit Products.  *See* Compl., Ex. 5

at 1, 4.  Frontline and Woodforest processed credit card purchases made by Laurette's customers

through Visa and MasterCard, which have their principal places of business in New York.[7]  *Id.*

¶ 22.  Defendants transmitted and received authorization for the purchases through MasterCard

and Visa and received payment for the transactions from those New York-based companies.

These transactions bear a substantial relationship to the claims asserted by Plaintiff, as

Defendants' intentional facilitation of the sale of the counterfeit Gucci products itself constitutes

the infringing activity.

The exercise of personal jurisdiction over a foreign defendant is consistent with due

process where the defendant "has certain minimum contacts . . . such that the maintenance of the

suit does not offend traditional notions of fair play and substantial justice.  In determining

whether minimum contacts exist, the court considers the relationship among the defendant, the

forum, and the litigation."  *Kernan*, 175 F.3d at 242 (internal quotations and citations omitted).

To establish the minimum contacts necessary to justify "specific" jurisdiction, plaintiff must

show that the claim arises out of or relates to defendant's contacts with forum, that the defendant

"purposefully availed" itself of the privilege of doing business in the forum, and that the

defendant could foresee being "haled into court" there.  *Id.* (internal citations omitted).  This test

is easily met based on Defendants' infringement of the Gucci Marks in New York.  Defendants

knew that when they entered into contracts with Laurette that they would be providing replica

merchant credit card processing services for sales transactions throughout the U.S., and gained

actual knowledge that Laurette shipped products to New York customers through the chargeback

investigation process.  Compl. ¶¶ 61-64, 81-82; Kirk Decl. ¶ 5.  In addition, the actual

transactions involving the counterfeit Gucci products were processed by Frontline through

---

[7] Frontline is an Independent Service Organization with Visa USA Inc.("Visa") and a Merchant
Service Provider with MasterCard International, Inc. ("MasterCard").  Compl. ¶ 58.  Visa lists
Woodforest National Bank as an acquirer (merchant bank) in all states.  Coyle Decl. Ex. 9.

HSBC in New York and by Woodforest through MasterCard and Visa directly.  Durango

arranged all of this and profited from the resulting transactions.  Accordingly, Defendants

purposely availed themselves of the privileges and benefits of conducting business in New York

and could have expected to be haled into a New York court.  *See Kernan*, 175 F.3d at 241-42.

### B.    This Court Has General Jurisdiction Over Defendants

It is well-established that a corporation is subject to general personal jurisdiction in New

York if it is "doing business" in the state.  *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95

(2d Cir. 2000) (citing CPLR. § 301).  The "doing business" test is met where defendant has

engaged in "continuous, permanent, and substantial activity in New York."  *Id.* (citation

omitted).  Further, jurisdiction may be asserted "over a foreign corporation when it affiliates

itself with a New York representative entity and that New York representative renders services

on behalf of the foreign corporation that go beyond mere solicitation and are sufficiently

important to the foreign entity that the corporation itself would perform equivalent services if no

agent were available."  *Id.* (collecting cases).  Each Defendant engages in substantial, systematic

and continuous activity in New York based on their in-state solicitation of customers and sales

activity, the continuous nature of the transactions they process in New York, and their

relationships with New York banks.  The assertion of general jurisdiction over defendants is

therefore proper.

Woodforest uses MCCS to sell its services to merchants.  *See* Vernon Decl. ¶ 8.  MCCS

is "sponsored by Woodforest National Bank," and Woodforest's Chief Executive Officer is the

Chairman of MCCS.  *See* Coyle Decl. Ex. 2.  Although Woodforest claims that MCCS "has an

office only in the State of Texas, and no office in the State of New York" (Vernon Decl. ¶ 9),

MCCS's own press release states that it has "*over 300 sales offices* providing electronic payment

solutions to merchants."  Coyle Decl., Ex. 2 (emphasis added).  At least one of those sales offices

is in New York. *See id.*, Ex. 3. Accordingly, Woodforest has an agent doing business for it in New York and general jurisdiction may be obtained over it on that basis. *See Wiwa,* 226 F.3d at 95 (upholding general jurisdiction over foreign defendants based on New York presence of investor relations office acting as their agent in New York); *Frummer v. Hilton Hotels Int'l*, 19 N.Y.2d 533, 281 N.Y.S.2d 41 (N.Y. 1967) (holding foreign defendant hotel present in New York based on reservation service acting as its agent in New York).

MCCS is not the only connection between Woodforest and New York. Despite the careful wording of the Vernon Declaration, Woodforest does not dispute that it regularly and systematically processes billions of dollars of credit card transactions through MasterCard and Visa—both of which are located in New York. *See* Compl. ¶ 22. These transactions occur on a daily basis and result in billions of dollars of transactions flowing from Woodforest to Visa and MasterCard and back to Woodforest. Woodforest claims that it only derives .046% of its revenue from New York merchants, but it cannot dispute that it processes billions of dollars of transactions in New York through MasterCard and Visa. Moreover, Woodforest's own .046% figure represents tens of millions of dollars in New York sales that Woodforest processed. Woodforest's contacts with its New York customers are not one-time sales; they are regular, systematic and continuous. On a daily or near-daily basis, Woodforest processes credit card transactions for its New York merchants.

Frontline is also engaged in regular, systematic and continuous servicing of its New York customers. Frontline also does continuous business with HSBC in Buffalo New York, which Frontline uses to process credit card transactions. *Id.* ¶ 13. As such, Frontline's use of the ACH system through HSBC to process credit card transactions causes it to engage in regular, systematic and continuous transactions in New York.

Durango also acknowledges that it is engaged in servicing merchants in New York. Kairalla Decl. ¶ 11. Defendants attempt to dismiss their business in New York on the basis of the percentage of their revenue supposedly generated from New York. However, it is not the total amount of revenue that is relevant but the nature of Defendants' business, which involves systematic and continuous contact with merchants and banks located in New York. Where transactions with the forum state constitute a daily and central part of a defendant's business, jurisdiction may be asserted on this basis even though the percentage of dollars involved is relatively small. *See Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n.*, 819 F.2d 434, 439 (3d Cir. 1987) (upholding general personal jurisdiction on basis of foreign bank defendant's "zero balance account" arrangement with forum bank); *Corporate Aviation Concepts, Inc. v. Multiservice Corp.*, No. Civ. A. 03-3020, 2003 WL 22794693, at *4 (E.D. Pa. Nov. 13, 2003) (upholding general personal jurisdiction over defendant credit card processor where "[t]he daily process by which [defendant] reimburses [merchant] is therefore central to [defendant's] business . . . therefore constituting the type of 'continuous and systematic contacts' which give rise to general personal jurisdiction").[8]

### III.    IN THE ALTERNATIVE, JURISDICTIONAL DISCOVERY IS WARRANTED TO DETERMINE THE NATURE AND EXTENT OF DEFENDANTS' BUSINESS IN NEW YORK

Although Plaintiff has made out a *prima facie* showing of jurisdiction over Defendants, if this Court concludes that Plaintiff's jurisdictional allegations are not sufficiently developed at

---

[8] At the very least, discovery is warranted to determine the value and frequency of credit card transactions processed on behalf of Woodforest and Frontline in New York (and in the case of Woodforest, revenue generated as a percentage of its credit-card processing businesses as opposed to other banking services). Frontline claims that it is not aware of any direct business transacted with MasterCard in New York, but is silent as to its relationship with Visa. Jurisdictional discovery is warranted where plaintiff makes specific allegations which require further factual development to support jurisdiction. *See, e.g.*, *Tese-Milner v. De Beers Centenary A.G.*, 613 F. Supp. 2d 404, 417-18 (S.D.N.Y. 2009).

this time then jurisdictional discovery into Defendants' marketing and sales of credit card

processing services and banking relationships in New York is appropriate. *See Tese-Milner v.*

*De Beers Centenary A.G.*, 613 F. Supp. 2d 404, 417-18 (S.D.N.Y. 2009) ("Without jurisdictional

discovery, the Second Circuit has stated that it may be extremely difficult for plaintiffs . . . to

make a *prima facie* showing of jurisdiction over a foreign corporation that they seek to sue in the

federal courts in New York."); *see also Texas Int'l Magnetics, Inc. v. BASF Aktiengesellschaft*,

31 Fed. Appx. 738, 739 (2d Cir. 2002); *Westvaco Corp. v. Viva Magnetics Ltd.*, 2002 WL

1933756, at *4-5 (S.D.N.Y. Aug. 20, 2002) (allowing jurisdictional discovery to determine

nature and extent of defendants' sales and marketing activities with respect to infringing product

as well as  Defendants' international and/or interstate sales revenues).

## IV.     NEW YORK IS NOT AN INCONVENIENT FORUM

A plaintiff's choice of venue is entitled to great deference and a defendant has a "heavy

burden" to displace a plaintiff's choice of its home forum. *Peregrine Myanmar v. Segal*, 89 F.3d

41, 46 (2d Cir. 1996).  Because Defendants have sufficient minimum contacts with New York,

they can avoid jurisdiction only by presenting a "compelling case that the presence of some other

considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471

U.S. 462, 477 (1985).  Where, as here, the defendants are sophisticated business entities with

operations that are national in scope, the alleged inconvenience for Defendants in litigating in

this district falls far short of satisfying that heavy burden. *See, e.g., American Network*, 975 F.

Supp. at 500 ("While the inconvenience to defendant of litigating in this forum may be

substantial, it is not shown to rise to such a level as to render the exercise of jurisdiction over it

unconstitutional"); *GoSMS.com*, 56 U.S.P.Q.2d at 1964 ( "New York has a clear interest in

adjudicating a dispute involving harm to its residents") (internal quotation marks and citation

omitted).

Gucci is a New York corporation.  MasterCard, Visa, MCCS and HSBC—all potential deponents in this action—are located in New York as well.  Defendants all claim to do business across the country.  There is no other single forum that is more convenient than New York, and there is nothing unfair about requiring Defendants to answer for their conduct in New York when they all do business here.

## V.    PLAINTIFF HAS STATED CLAIMS FOR DIRECT TRADEMARK INFRINGEMENT AND COUNTERFEITING

Section 1114 of the Lanham Act creates liability for the unauthorized "use in commerce" of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114.  To prevail on a claim for trademark infringement and counterfeiting, a plaintiff must establish that it:  1) has "a valid mark entitled to protection under the Lanham Act"; and 2) "Defendants used a similar mark in a way that would likely cause confusion among the relevant consuming public."  *Burberry Limited v. Euro Moda, Inc.*, No. 08 Civ. 5781, 2009 WL 1675080, at *5 (S.D.N.Y. June 10, 2009).  Plaintiff has sufficiently pleaded a claim for direct trademark infringement and counterfeiting against Defendants.

### A.    The Gucci Marks Are Valid and Entitled to Protection

Defendants do not dispute the validity of Plaintiff's trademarks.  *See* Compl. ¶¶ 1, 24-30. It is alleged and well established that the Gucci Marks are famous, distinctive, and strong.  *See, e.g.*, *Gucci Am., Inc. v. Ashley Reed Trading, Inc.*, 00 Civ. 6041, 2003 WL 22327162, at *9 (S.D.N.Y. Oct. 10, 2003) (determining as established facts under Fed. R. Civ. P. 56(d) that "Gucci owns the trademarks at issue" and "the trademarks are valid").  As a result, the first element of Plaintiff's trademark claim is not at issue.

### B. Defendants Were Directly Involved in the Sale and Offering for Sale of Counterfeit Gucci Products

Defendants' motion, then, is based on their argument that they were not "directly involved in activities such as . . . the actual sale, offering for sale, or advertising of infringing or counterfeit goods" because the "sale of the goods occurred without the defendants' participation, and was completed prior to the defendants' processing of the transaction." *See* Defs. Br. at 12. But the Complaint here specifically alleged that Defendants were indispensible participants in Laurette's sales of counterfeit Gucci products—providing the services necessary for Laurette to accept and complete customer orders paid for by credit card. Compl. ¶¶ 4-8, 44-90.

Contrary to Defendants' assertions, the sale of counterfeit products from TheBagAddiction.com did not "occur[] without defendants' participation," nor were their sales "completed prior to the defendants' processing of the transactions." *See* Defs. Br. at 12. Defendants were involved in the sales process from start to finish, and the sales could not have been completed without them. *See id.* at 5, n.1. Defendants' *own description* of the credit card transaction process shows that they are involved in the initial authorization of the customer's credit card—"[t]he merchant's terminal transmits the authorization request to the [Defendants]." *See id.* Once Defendants send the authorization request to the customer's bank, any approval or rejection of the request "is forwarded by the network to the Defendants" who then "forward [the approval or denial] to the merchant." *Id.* As Defendants admit, it is only after they have transmitted the request and forwarded the issuing bank's rejection or approval of the transaction that "[t]he merchant completes the transaction." *Id.* Without Defendants' involvement, the sales cannot be authorized, the goods cannot be shipped, and the counterfeiter cannot get paid. As Ms. Kirk attests to in her declaration, she would not ship the counterfeit goods to a customer unless

the credit card charge had been approved.  Kirk Decl. ¶ 4.  Shipment of the counterfeits would

not occur without Defendants' direct involvement in the sale.

### C.    Defendants' Use of the Gucci Marks Was Likely to Cause Confusion

Defendants also appear to assert that the sale of counterfeit Gucci products on

TheBagAddiction.com did not result in confusion and the products sold were not "counterfeit"

due to the website explicit disclaimer as to the authenticity of the products being sold.  *See* Defs.

Br. at 18. [9]  These assertions are unsupported by the law and are contradicted by Plaintiff's

allegations as well as publicly available documents describing the nature of Defendants'

business.

The counterfeit Gucci products offered for sale on TheBagAddiction.com, though they

were of inferior quality and workmanship, were designed to appear nearly identical to authentic

versions of Plaintiff's products.  Compl. ¶¶ 31-41.  Indeed, Laurette's website described its

counterfeit as "mirror image[s]" of the authentic products.  *Id.* ¶ 32.  The Second Circuit has long

held that "the practice of selling a knockoff . . . at a cheaper price than the original create[s] an

actionable harm despite the fact that customers knew they were buying the knockoff."  *Hermès*

*Int'l v. Lederer De Paris Fifth Avenue, Inc.*, 219 F.3d 104, 108 (2d Cir. 2000), (citing

*Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc.*, 221 F.2d

---

[9] Defendants' statement that "the Web site does not show the products in sufficient detail for one to see whether they contain the Gucci trademarks or are just similar style bags" is simply not true.  *See* Defs. Br. at 18.  The Complaint provided detailed images of several counterfeit Gucci products (along with images showing the authentic versions of those products) that were available for sale on the website as well as the specific marks infringed.  *See* Compl. ¶¶ 25, 33-37.  The Complaint also contained specific allegations regarding the "superficially identical" nature of the counterfeit Gucci products being offered for sale on the website.  *See id.* ¶¶ 37-43.  Further, Laurette's Woodforest account application (obtained directly from Woodforest) contains a printout of various items offered for sale on TheBagAddiction.com.  *See id.*, Ex. 6.  Included in this printout are 20 items described as "Gucci," many of which are further described using names specifically attributed to Plaintiff's handbags—*e.g.*, "Guccissima," "Horsebit," and "Princy." *Id.*

464, 466 (2d Cir. 1955)); *Rolex Watch U.S.A., Inc. v. Jones*, No. 99 Civ. 2359, 2000 WL

1528263, at *3, n.1 (S.D.N.Y. Oct. 13, 2000) ("[l]ikelihood of confusion does not focus solely on

the party purchasing a product from the defendant"). In *Hermès*, the Second Circuit held that the

district court erred in finding no harm to the public in the continued sale of "knockoff goods,"

stating:

> Although the district court found no evidence of point-of-sale confusion, it failed
> to properly consider the issue of post-sale confusion. We have previously held
> that post-sale confusion can occur when a manufacturer of knockoff goods offers
> consumers a cheap knockoff copy of the original manufacturer's more expensive
> product, thus allowing a buyer to acquire the prestige of owning what appears to
> be the more expensive product.

219 F.3d at 108.

The presence of an authenticity disclaimer on a website selling "Replica Products" in no

way precludes a trademark holder's claim for infringement. *See, e.g.*, *Rolex*, 2000 WL 1528263,

at *3, n.1 (a disclaimer that all items were "replicas" did not "diminish the likelihood of

confusion"); *Chanel, Inc. v. Schwartz*, No. 06 Civ. 3371, 2007 WL 4180615, at *5 (E.D.N.Y.

Nov. 19, 2007) (a disclaimer that all items were "replicas" did not "absolve [the defendant] from

liability for the otherwise unlawful sale of counterfeit goods").

In fact, in *Chanel*, the defendant's website contained a disclaimer nearly identical to the

ones that appeared on TheBagAddiction.com, in which the defendant stated: "All products are

replicas and are not being represented as the originals." 2007 WL 4180615, at *5. Contrary to

barring a claim for infringement, the court found that "the disclaimer is essentially an

acknowledgment of [the defendant's] counterfeiting and suggests that defendant is knowingly

and intentionally capitalizing on plaintiff's name, reputation and goodwill and that there is

indeed a strong likelihood of consumer confusion." *Id.* (internal quotations omitted). Similarly,

in *Rolex*, the Court found that the disclaimer present on defendant's website was "not evidence

of good faith, as [the defendant] clearly sought to capitalize on the value and renown of the

plaintiffs' marks." 2000 WL 1528263, at *3, n.1. The fact that Laurette plainly stated on its

website that its products were "replicas" proves that Defendants knew or were willfully blind to

the counterfeiting. It does not absolve them.

## VI.    PLAINTIFF HAS STATED CLAIMS FOR CONTRIBUTORY AND VICARIOUS TRADEMARK INFRINGEMENT

Plaintiff asserts two causes of action against Defendants based upon principles of

secondary liability—contributory trademark infringement and vicarious trademark infringement.

Compl. ¶¶ 103-124.[10]

Defendants self-servingly mischaracterize these causes of action as an attempt "to extend

liability into territory where no court has previously ventured." *See* Defs. Br. at 1. To the

contrary, "[i]t is well established that liability for trademark infringement can extend beyond

those who actually mislabel goods with the mark of another." *Tiffany (NJ) Inc. v. eBay, Inc.*,

576 F. Supp. 2d 463, 501 (S.D.N.Y. 2008) (internal quotations omitted), (citing *Inwood*

*Laboratories, Inc. v. Ives Laboratories, Inc.*, 46 U.S. 844, 853 (1982)); *see also Fonovisa, Inc. v.*

*Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) ("our law recognizes liability for conduct

that assists in direct trademark infringement"). Moreover, courts in this District have addressed

---

[10] As a threshold matter, a claim alleging secondary liability for trademark infringement "require[s] some underlying direct infringement by a third party." *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 591 F. Supp. 2d 1098, 1104 (N.D. Cal. 2008) (denying defendant's motion for summary judgment on plaintiff's claim for contributory trademark infringement), (citing *Perfect 10 v. Visa Int'l Serv. Assoc.*, 494 F.3d 788, 795, 807 (9th Cir. 2007)). The Consent Judgment entered against Laurette conclusively establishes direct infringement of Plaintiff's trademarks (*see* Compl. ¶ 6), and that infringement is not disputed by Defendants.

and upheld numerous claims based on theories of secondary liability for trademark

infringement.[11]

### A.    Plaintiff Has Established A Claim for Contributory Trademark Infringement

A cause of action for contributory trademark infringement arises from the doctrine

articulated by the Supreme Court in *Inwood*.  456 U.S. 844.  There, the Supreme Court held:

> If a manufacturer or distributor intentionally induces another to infringe a
> trademark, or if it continues to supply its product to one whom it knows or has
> reason to know is engaging in trademark infringement, the manufacturer or
> distributor is contributorily liable for any harm done as a result of the deceit.

*Id.* at 854.  The holding in *Inwood* has been interpreted to impose secondary liability to providers

of "services" as well as "products."  *R.F.M.A.S.,* 619 F. Supp. 2d. at 84-85 ("*Inwood* has been

interpreted in this District to impose liability for contributory trademark infringement beyond

manufacturers and distributors of products.").  Where a defendant offers a service instead of a

product, "a plaintiff can base its contributory trademark infringement claim on the 'extent of

control' theory or the 'intentional inducement' theory." *Akanoc*, 591 F. Supp. 2d at 1111.  The

averments of Gucci's Complaint satisfy either test.

---

[11] *See, e.g., R.F.M.A.S., Inc. v. Mimi So.*, 619 F. Supp. 2d 39, 84-85 (S.D.N.Y. 2009) (denying
defendant's motion for summary judgment on plaintiff's claim for contributory trademark
infringement);  *Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 563-64 (S.D.N.Y. 2009)
(finding that landlord who rented or leased premises to tenant who infringed another's trademark
could be contributorily liable for infringing acts of tenant if landlord knowingly, or with reason to
know, contributed to that infringing conduct); *Int'l BV v. Ben-Menachem*, No. 06 Civ. 3917, 2008
WL 64005 (S.D.N.Y. Jan. 3, 2008) (imposing contributory liability on owners and resident of home
in which counterfeit operations occurred openly, who were direct financial beneficiaries of
counterfeiting operations); *Cartier Int'l B.V. v. Liu*, No. 02 Civ. 7926, 2003 WL 1900852, at *3
(S.D.N.Y. Apr. 17, 2003) (finding an indirect actor liable for trademark counterfeiting when the party
knew or had reason to know it was engaging in trademark infringement); *Polo Ralph Lauren Corp. v.
Chinatown Gift Shop*, 855 F. Supp. 648 (S.D.N.Y. 1994) (sustaining claim for contributory liability
for landlords who allowed trademark infringers to use their property).

### 1. Defendants Induced Infringement By Knowingly and Actively Soliciting Business from Merchants of "Replica Products"

Defendants intentionally induced infringement by actively soliciting and providing their credit card processing services to merchants of so-called "Replica Products,"even though "Replica Products" is easily synonymous with "Counterfeit Products" or "Knockoff Products." *See, e.g.*, *Tiffany*, 576 F. Supp. 2d at 477. Indeed, Durango's website specifically lists "Replica Products" as one of the categories of "High Risk" merchants that it links with credit card processors like Woodforest and Frontline. *Id.* ¶ 48.

Defendants actively facilitated the sale of counterfeit Gucci products not only by providing their credit card processing services to replica merchants, but also by providing personal service to Laurette to assist them in avoiding chargebacks. Nathan Counley, acting on behalf of Durango, explicitly advised Laurette to include a check box on TheBagAddiction.com that required customers to acknowledge that the "items being purchased are replicas, not originals" before their order could be authorized or processed by Defendants. *See* Kirk Decl. ¶ 4. As evidenced by the e-mail correspondence between Laurette and representatives from Frontline and Durango, Frontline's representative not only reviewed the terms of conditions present on TheBagAddiction.com, but also made handwritten notations as to where Laurette should include its disclaimer that the "items being purchased are replicas, not originals." *See id.*, Ex. A.

### B. Defendants Had Knowledge of Infringement and Continued to Supply the Services Necessary for that Infringement to Continue

As an alternative, Gucci can establish liability by showing the "extent of control" Defendants had over Laurette's infringement because Defendants had: 1) knowledge; and 2) direct control and monitoring of the instrumentality used by the third party to infringe the plaintiff's mark. *See Akanoc*, 591 F. Supp. 2d at 1111. Defendants' assertion that Gucci has failed to adequately plead "knowledge" is at odds with the detailed allegations contained in the

Complaint along with the documents attached as exhibits thereto. Although Federal Rule of Civil Procedure 9(b) allows a plaintiff to plead knowledge generally, Gucci has gone far beyond that in its allegations against Defendants. The Complaint sets forth specific details concerning communications and documents establishing Defendants' knowledge.

### 1. Defendants Had Actual Knowledge of Laurette's Infringing Activities

Defendants' naked assertions that they were unaware that the "Replica Products" merchants—whose business they actively solicited—sold counterfeit goods (*see* Defs. Br. at 17-21) are insufficient to defeat the clear allegations of the Complaint. *First*, the factual allegations contained in the Complaint, and the exhibits attached thereto, establish that Defendants had actual knowledge of Laurette's infringing activity. *See* Compl. ¶¶ 4, 7-10, 44-90, Exs. 3-7.

*Second*, even if the Defendants were somehow able to ignore the allegations of the Complaint establishing their actual knowledge, the allegations also support a finding that Defendants were willfully blind to Laurette's illegal acts. *See R.F.M.A.S.*, 619 F. Supp. 2d at 84-85 ("[A]s *Inwood* requires a plaintiff to demonstrate that the defendant knows or has reason to know of a third party's trademark infringement, RFMAS can satisfy the 'reason to know' standard . . . by showing that the [defendants were] willfully blind to the infringing activity."); *see also Hard Rock*, 955 F.2d at 1149 ("we have held that willful blindness is equivalent to actual knowledge for purposes of the Lanham Act").

Plaintiff has put forth the following facts sufficient to establish Defendants' knowledge of Laurette's infringement:

- Defendants actively solicited credit card processing business from merchants of "Replica Products" (Compl. ¶¶ 45-49, 57, 72, 74);

- Nathan Counley, the Durango sale representative, is listed as the sales agent on Laurette's merchant account applications with Woodforest and Frontline,

and Laurette informed Counley in writing that they "were selling replicas" (*id.* ¶¶ 52-55, 72, Ex. 3);

- TheBagAddiction.com website stated explicitly that the items offered for sale were "replicas, not originals" (*see* Compl. ¶ 32; Kirk Decl. Ex. A);

- TheBagAddiction.com's checkout process also included a disclaimer stating: "Please note as stated on our site all of our items are replicas.  By purchasing you are acknowledging the fact that they are replicas and not presented as originals" (Kirk Decl. ¶ 4, Ex. A);

- Frontline knew about the above-referenced language and suggested modifications as to where the language appeared in order to further protect against chargebacks (*id.*);

- Woodforest retained printouts from TheBagAddiction.com showing several pages of counterfeit Gucci handbags and Rolex watches being offered for sale at a fraction of their list price, and Laurette's account application stated that these products came from a supplier in China (*id.* Ex. 6);

- Frontline and Woodforest charged a high discount rate to Laurette in exchange for doing business with them (*id.* ¶¶ 65, 85).

These well-pleaded allegations, supported by documentation and declarations, are more than sufficient to establish Defendants' knowledge of Laurette's infringement or, at the very least, that the Defendants were willfully blind to such infringement.  In response, Defendants offer two conclusory excuses.  Neither can withstand scrutiny.

*First*, Defendants aver that these allegations "support only that defendants should have had *suspicions* about the products sold" by Laurette does not absolve them of knowledge.  *See* Defs. Br. at 17.  But "suspicion" of wrongdoing is precisely what is required to give rise to a willful blindness claim.  *See, e.g., Hard Rock*, 955 F.2d at 1149 ("To be willfully blind, a person must *suspect* wrongdoing and deliberately fail to investigate.") (emphasis added).

*Second*, Defendants feign confusion over the words "counterfeit" and "replica."  *See, e.g.,* Defs. Br. at 18-19.  A reasonably prudent person would certainly understand the word "counterfeit" is interchangeable with words like "replica" as well as "knock-off."   For example,

in *Tiffany*, one of the cases relied upon by Defendants, the Court described steps taken by eBay to remove listings that "explicitly offered counterfeit items," which included monitoring and removing listings "that expressly offered 'knock-off,' 'counterfeit,' '*replica*', or 'pirated' merchandise, and listings in which the seller stated he 'cannot guarantee the authenticity' of the items being offered." 576 F. Supp. 2d at 477 (emphasis added). As previously noted, TheBagAddiction.com contained explicit statements on various pages that all of the products being sold were "replicas," "not presented as originals," "exact mirrors," and "not being sold or represented as original." Compl. ¶ 32; Kirk Decl. Ex.A.

> ### 2.    Defendants Exerted Direct Control and Monitoring Over Their Replica Merchant Payment Services Which Provided the Necessary Marketplace for Infringement

The Complaint also more than establishes that Defendants monitored and had direct control of the infringing activity. The ability to accept credit cards is a necessity for merchants of "Replica Products." *See* Kirk Decl. ¶ 1. As Durango advertises, "[c]redit card processing analysts estimate that 9 out of 10 people use a credit card for their online orders." Compl. ¶¶ 3, 89. During the course of their counterfeiting operations, Laurette sold more than $500,000 worth of counterfeit Gucci products through TheBagAddiction.com. *Id.* ¶ 44. Such massive infringement would not have been possible without the credit card processing services provided to them by Defendants. *Id.* at 44. Defendants knowingly and purposefully provided their services to merchants of "Replica Products"—a category of merchants that the Defendants actively and purposefully solicited. Essentially, Defendants determined that it would be a worthwhile business risk to provide credit card payment services to counterfeiters. This is directly analogous to other defendants who have similarly been held contributorily liable for trademark infringement. *See, e.g., Fonovisa*, 76 F.3d at 264 (holding that "a swap meet can not disregard its vendors' blatant trademark infringement with impunity").

In *Tiffany*, the Court pointed to eBay's "substantial investments in anti-counterfeiting activities" as support for its finding that eBay was not "willfully blind" to the counterfeiting that occurred as a result of the auction services it provided.  *See Tiffany*, 576 F. Supp. 2d at 477. Unlike eBay, Defendants here do not claim to have put in place any procedures to "identify blatant instances of potentially infringing . . . activity" or "to ferret[] out illegal listings, including counterfeit listings."  *Id.*  Tellingly, the measures put in place by eBay, as described in *Tiffany*, would have stopped the counterfeiting here as eBay prohibited the sale of goods described as "replicas."  *Id.*

The Court in *Tiffany* also found that eBay, as a service provider, "retains significant control over the transactions conducted" and "supplies the necessary marketplace for the sale of counterfeit goods."  *Id.* at 506.  As previously noted, Laurette could not complete a sale without Defendants' involvement in authorizing the credit card.  *See id.* ("eBay . . . actively facilitates transaction between [buyers and sellers]").  Further support for the Court's finding that eBay retained control over the use of its services came from the fact that "[c]ertain categories of items are entirely banned from the website."  *Id.*  Similarly, Woodforest's Internet Merchant Review Checklist designates a list of internet merchants with whom it will not do business, including whose websites depict illegalities, such as "child pornography," "bestiality," and "Snuff" films, as well as websites that contain legal, but offensive content, such as depictions of "urination or defecation" and "sadistic or masochistic abuse."  Compl. Ex. 6.  Defendants reviewed each applicant's business before taking them on as a customer, both to price Defendants' products and to confirm that they would get repaid if they advanced money to the merchant.  Defendants had the ability to refuse to provide their services to counterfeiters at the outset either by not soliciting

business from counterfeiters or by screening them out during the application review process. Defendants did neither.

The necessity of the services provided by Defendants and their ability to accept or reject certain merchants is sufficient to establish that they exercised control over the provision of their services and could have halted infringement if they chose to do so.  *See Akonoc*, 591 F. Supp. 2d at 1112 (looking at "Defendants' ability to directly control infringing uses of its services by terminating websites" in evaluating "the issue of control").  As the Court concluded in *Tiffany*, service providers like Defendants "are analogous to a flea market like those in *Hard Rock Café* and *Fonovisa*."  576 F. Supp. 2d at 507; *see also Akonoc*, 591 F. Supp. 2d at 1112 ("As with the flea market operators in *Fonovisa*, Defendants cannot remain 'willfully blind' to trademark infringement taking place on their servers.").

Defendants assert that this case is similar to *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 2871 (2008), and this Court should find, as the Ninth Circuit did, that Defendants are not liable for contributory or vicarious trademark infringement.  Neither the facts nor the law support such a conclusion.

*First*, the defendants in *Perfect 10* provided payment services to "adult entertainment" websites.  These websites, while questionable, are not illegal and do not raise a suspicion of illegality.  Defendants here solicited and targeted merchants of "Replica Products," which, as the court noted in *Tiffany*, are synonymous with "Counterfeit Products."  Defendants knowingly chose—and actively sought—to provide their credit card processing services to merchants who were selling illegal counterfeit products.

*Second*, *Perfect 10* was primarily a copyright infringement action.  *Id.*  It was not easy to tell which of the infringing images on the so-called "Stolen Content Websites" belonged to the

plaintiff and which did not.  Here, in contrast, Laurette openly boasted that they sold replica Gucci products.  Compl. ¶ 41.

Third, in *Perfect* 10, the court found that the plaintiff's claim for contributory trademark infringement failed because "the infringement occurs without any involvement of Defendants and their payment systems."  494 F.3d at 808.  Because the cost of allowing one more customer to view the pornographic images was slight, the Ninth Circuit noted that an infringing website could be supported by advertising revenue and did not need defendants' payment processing services to operate.  *Id.*  That is not *this* case, however.  Here, actual, physical counterfeit goods are being made in China and shipped to the United States.  No one is going to ship counterfeit products from China to a customer in the United States without payment.  Thus, Defendants— who provide the payment mechanisms—are essential to the continuing trademark infringement. If Gucci were suing Defendants based on Laurette's display of images bearing counterfeit Gucci Marks, then *Perfect 10* would be analogous.  However, Gucci's claims are based not on the display of Gucci's trademarks, which could be viewed for free on TheBagAddiction.com, but on the sale and shipment of counterfeit goods.  Unlike *Perfect 10*, where the infringement could occur regardless of the defendants' involvement, Laurette could not have completed the sales transactions for the counterfeit goods without Defendants' services.  Since 99% of TheBagAddiction.com's sales were paid for by credit card (Kirk Decl. ¶ 1), Defendants necessarily provided the "marketplace" for this infringement.  Indeed, Defendants operated the cash register.  Actual labor and material costs are incurred in manufacturing counterfeit handbags and in shipping the counterfeit handbags across the world.  Unlike in *Perfect 10*, where the infringement was cost-free to the counterfeiters, rendering payment non-essential, the real costs

of manufacturing and shipping the counterfeit products requires payment. Without payment, the manufacture and transport of the counterfeit products will end.

### C.    Plaintiff Has Pleaded Facts Establishing a Claim for Vicarious Trademark Infringement

A claim for vicarious trademark infringement requires a plaintiff to establish that the defendant and the direct infringer either:  1) "have an apparent or actual partnership"; 2) "have authority to bind one another in transactions with third parties"; or 3) "exercise joint ownership or control over the infringing product." *Akanoc*, 591 F. Supp. 2d at 1113 (internal quotations omitted).  Plaintiff's allegations are sufficient to satisfy any of the three elements

*First*, all of the Defendants self-describe their relationships with their merchants as partnerships.  Coyle Decl. Ex. 10, 12, 13; *see also* Compl. ¶¶ 49, 55-56, 72, .  *Second*, by the very nature of the credit card processing services provided to Laurette, Defendants were bound in transactions with third parties.  As described previously, once a sales transaction was completed, there was always the chance that a customer would request and receive a chargeback for the transactions.  When that chargeback is granted by the issuing bank, the funds are *automatically debited* from Defendants' accounts.  Defendants would then look to the merchant for reimbursement of those funds.  Again, this arrangement highlights why Defendants must investigate the type of business their merchants are involved in and who their merchants actually are.  Laurette could oblige Defendants to refund charges to third party purchasers.

*Third*, the level of control that Defendants exercised in providing their services, *see Tiffany*, 576 F. Supp. 2d at 507, indicates that they had control over the sale of the infringing products being offered by Laurette.  For example, Woodforest reviewed the content of TheBagAddiction.com website, which stated explicitly that the items it sells are "replicas," and Woodforest chose to authorize and process credit cards for the sales of those replicas.  Just as

34

Woodforest refused to provide its services to websites offensive content, the Defendants similarly could have refused to service replica merchants illegally selling counterfeit products.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant's motions to dismiss.

Dated: New York, New York
      November 16, 2009

                Respectfully submitted,

                GIBSON, DUNN & CRUTCHER, LLP

                By:      s/ Robert L. Weigel
                      Robert L. Weigel (RW 0163)
                      Howard S. Hogan (HH 7995)
                      Jennifer C. Halter (JH 7032)
                      Anne Coyle (AC 3158)
                      200 Park Avenue
                      New York, New York 10166
                      (212) 351-4000

                *Attorneys for Plaintiff Gucci America, Inc.*