UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------------x
GUCCI AMERICA, INC.                          :
                                             :
                          Plaintiff,         :
                                             :     09 Civ. 6925 (HB)
              - against -                     :
                                             :     OPINION &
FRONTLINE PROCESSING CORP., WOODFOREST :            ORDER
NATIONAL BANK, DURANGO MERCHANT              :
SERVICES LLC, d/b/a NATIONAL BANKCARD        :
SYSTEMS OF DURANGO, "ABC COMPANIES," and :
"JOHN DOES,"                                 :
                                             :
                          Defendants.        :
-----------------------------------------------------------------------x
```

**Hon. Harold Baer, Jr., District Judge:**

Gucci America, Inc. is a well-known manufacturer of luxury goods. The company holds a variety of trademarks in its products and designs, and invests substantial capital in ensuring that the marks maintain a reputation for quality. Seeking to capitalize on the popularity of Gucci products, certain internet merchants have sold "replica," counterfeit Gucci products that infringe Gucci marks at significantly lower prices and of lower quality. Gucci recently concluded a successful litigation against one such merchant that operated a website called TheBagAddiction.com. The owners of the website admitted that they sold counterfeit Gucci products to customers across the country through the website. In its continuing effort to root out and prevent infringement of its trademarks, Gucci now brings suit against three entities, which while a step down in the "food chain," allegedly ensured that TheBagAddiction.com was able to sell these counterfeit products. These defendants allegedly established the credit card processing services used to complete the online sales of fake Gucci items. The three defendants have jointly moved to dismiss the case for lack of personal jurisdiction and for failure to state a claim. For the reasons that follow, the defendants' motion to dismiss is DENIED.

## I.    BACKGROUND

Gucci America, Inc. ("Plaintiff" or "Gucci") is a New York company, with its principal place of business in New York City. Compl. ¶ 11. It is the sole, exclusive distributor in the United States of items labeled with the "Gucci Marks," including leather goods, jewelry, home

products, and clothing.  *Id.*  The Gucci Marks are a series of marks –the Gucci name, the Gucci crest, the "non-interlocking GG monogram," the "repeating GG design," etc.– registered by Gucci with the United States Patent and Trademark Office.  *See* Compl. ¶¶ 24-25 (reproduction of marks), Ex. 1 (Patent Office registration certificates).  According to Plaintiff, the marks are well-known and recognizable in the United States and around the world.  Gucci promotes the marks widely, and relies on "strict quality control standards" for its products, and as a result has achieved and retains a reputation for quality.  *Id.* ¶ 28.  The company spends hundreds of millions of dollars to advertise and promote its products and marks, and enjoys billions in sales of the Gucci products.  "Based on the extensive sales of the Gucci [p]roducts and such products' wide popularity," claims Plaintiff, "the Gucci Marks have developed a secondary meaning and significance in the minds of the purchasing public, and the services and products utilizing and/or bearing such marks and names are immediately indentified by the purchasing public with Plaintiff."  *Id.* ¶ 30.

This case arises out of Plaintiff's attempts to eliminate online sales of counterfeit products and the unauthorized use of the Gucci Marks.  In *Gucci America, Inc., et al. v. Laurette Company, Inc., et al.*, No. 08 Civ. 5065(LAK), Gucci brought suit in this District against certain defendants, collectively known as the "Laurette Counterfeiters" or "Laurette," for the sale of counterfeit Gucci products on a website called "TheBagAddiction.com."[1]  Through this website, the Laurette Counterfeiters sold a variety of "replica" luxury products, and, in particular, sold replica Gucci products under the Gucci name, with the various Gucci registered trademarks, and at fractions of the retail price for an authentic version.  *See* Compl. ¶¶ 33-36 (describing and providing images of counterfeit Gucci products sold on TheBagAddiction.com).  The website itself was replete with the use of the Gucci name and trademarks.  *See id.* ¶ 41 (image of TheBagAddiction.com website).  According to Plaintiff, the Laurette Counterfeiters "openly boasted" about the sale of counterfeit products, because the website expressly noted that the products were not authentic but rather "mirror images" of Gucci products.  *See id.* ¶ 32.  Though they are inferior in quality and workmanship, they appear to the naked eye to be similar if not identical to Gucci products.  Gucci claims that, as a result of the sale of these counterfeit products, customers were deceived and misled "into believing that the products sold by the

---

[1] *See* TheBagAddiction.com, http://www.TheBagAddiction.com.  This site can longer be accessed because it was shut down following Gucci's lawsuit, but archived versions of the website can be browsed at The Internet Archive Wayback Machine.  *See* http://web.archive.org/web/*/http://thebagaddiction.com (last visted May 23, 2010).

Laurette Counterfeiters on TheBagAddiction.com were authorized or sponsored by the Plaintiff." *Id.* ¶ 40. Eventually, Laurette consented to the entry of judgment and admitted liability for counterfeiting activities. According to Plaintiff, "the Laurette [c]ounterfeiters admitted … that, without authorization or license … they willfully and intentionally used, reproduced and/or copied the Gucci [m]arks in connection with their manufacturing, distributing, exporting, importing, advertising, marketing, selling and/or offering to sell their [c]ounterfeit [p]roducts." *Id.* ¶ 31.

Plaintiff now seeks to bring the present action against three companies, Durango Merchant Services, Frontline Processing Corporation, and Woodforest National Bank[2], who allegedly assisted the Laurette Counterfeiters and other similar website operators. Durango Merchant Services ("Durango") is a Wyoming corporation with its business address in Durango, Colorado. According to Defendants, Durango has only five employees, and has no offices, no employees, and no property located in New York. Durango's business is predicated on assisting merchants in setting up credit card processing services with institutions that provide credit card merchant accounts. Durango does business with New York-based companies, but maintains that this accounts for less than one percent of its revenue. Frontline Processing Corporation ("Frontline") is a Nevada corporation with its principal place of business in Bozeman, Montana. Frontline is a "nationwide provider of credit card processing and electronic payment services for merchants, banks, and sales agents," and is an "Independent Service Organization" and "Merchant Service Provider" with Visa and Mastercard, respectively. Compl. ¶ 58. Similar to Durango, Defendants claim that Frontline has no office, no employees, and no property in New York. A small minority of the businesses it has worked with maintain addresses in New York. Finally, Woodforest National Bank ("Woodforest") is a bank organized under the laws of the United States, with its business address in The Woodlands, Texas. Similar to Frontline, Woodforest also "provides certain credit card processing services." *Id.* ¶ 14. Like the other two defendants, Woodforest claims to have no New York offices or property in New York, while a small percentage of its business comes from New York-based clients. Gucci alleges that Woodforest provides some of its services through an affiliate with an office in New York,

---

[2] Gucci also brings suit against certain other "ABC Companies," unknown companies who engaged with the known defendants "in the manufacture, distribution, sale, and advertisement of [c]ounterfeit p]roducts," Compl. ¶17, and "John Does," unknown individuals who also participated with the named defendants in the infringement and counterfeiting of Gucci products. *Id.* ¶ 18.

Merchants' Choice Card Services Corporation ("MCCS"), though Woodforest disputes the nature of the relationship.

To understand the roles of the three defendants and their alleged liability, a summary explanation of the credit card transaction process is necessary. A customer will initiate the process when he or she purchases a product from the merchant with a credit card. Once the credit card information is "swiped" on a terminal, or entered on a website, the merchant terminal transmits an authorization request to the merchant's "acquiring bank," who in this case was Frontline and Woodforest. The acquiring bank sends the credit card request through an electronic network to the cardholder's issuing bank. Based on the cardholder's credit limit or other factors, the issuing bank will send a message back through the network to the acquiring bank, who forwards it back to the merchant, which states that the merchant should either approve or decline the transaction. If approved, the merchant will complete the transaction and the acquiring bank will credit the merchant's account with the appropriate amount of funds. This entire process typically takes a matter of seconds. Some days to months after the sale is completed, the acquiring bank will submit the transaction information to the issuing bank, which will seek payment from the cardholder and settle with the acquiring bank.

Gucci's overarching theory of the case is that Durango arranged for web companies that sold counterfeit Gucci products to establish credit card processing services with companies like Woodforest and Frontline. These processors then provided the credit card services necessary for the sale of the faux Gucci items. The complaint focuses largely on the allegedly representative conduct of Defendants with the Laurette Counterfeiters. According to Plaintiff, Durango acted as an agent for the defendant credit card processing companies[3] to locate potential customers, including the Laurette Counterfeiters and other similar infringing online operations. Durango collected a referral fee for bringing together these online merchants with banks and companies like Frontline and Woodforest. Durango's website billed the company as specializing in services for "High Risk Merchant Accounts," including those who sell "Replica Products." Compl. ¶ 48. Gucci alleges that the Laurette Counterfeiters entered into a "Merchant Service Agreement" with Durango through one of its sales representatives, Nathan Counley and, through this relationship, "procur[ed] merchant accounts with credit card processing agencies, including Defendants

---

[3] Neither party has provided sufficiently clear terminology to describe Woodforest or Frontline. For the purposes of this opinion, terms like "acquiring bank" and "credit card processors" are intended to have the same meaning and do not imply anything about their services beyond what is alleged in the complaint.

Frontline and Woodforest." *Id.* ¶ 51.  Gucci asserts that, through email and other documents, Durango was aware that TheBagAddiction.com sold counterfeit "replica" Gucci products and nevertheless chose to do business with them.

Frontline began to provide credit card processing services to TheBagAddiction.com in September 2006.  The relationship was precipitated by an application completed by the Laurette Counterfeiters through the assistance of Durango; Counley was listed as a sales agent for Frontline on the application.  *See* Compl. ¶ 55.  Once the service was established, Frontline processed Visa, MasterCard, Discover, and American Express credit card transactions for goods sold by the Laurette Counterfeiters.  Frontline deducted a fee, or discount rate, based on the transactions it processed.  As part of its services, Frontline would investigate "chargebacks" –a credit card charge that is disputed by a customer– made in connection with orders from the website.  When faced with a chargeback, Laurette allegedly gave detailed documentation to Frontline, including a description of the item purchased and the price that was paid.  Since Frontline credited Laurette's account after a credit card transaction was authorized, but before it received any final payment from the issuing bank, it required Laurette to keep a "reserve account" for chargebacks.  The account allegedly totaled in excess $40,000 by the time it was shut down in June 2008.  Allegedly funded "solely through the proceeds from counterfeit goods sold on" the website, Frontline supposedly took possession of these funds when TheBagAddiction.com was shut down.  Gucci also alleges that Frontline charged a higher transaction fee, or discount rate, for processing credit cards for high risk merchants, such as "replica" merchants like the Laurette Counterfeiters.  Frontline was the only credit card processor used by the Laurette Counterfeiters for TheBagAddiction.com from September 2006 to November 2006, and Laurette continued to use Frontline until they were shut down in June 2008.  According to Plaintiff, Laurette's sales of counterfeit Gucci products from September 2006 to June 2008 totaled in excess of $500,000.

Laurette allegedly sought to do business with Woodforest because of the high discount rate it was charged by Frontline.  The Laurette Counterfeiters applied for an account with Woodforest in November 2006; again Counley from Durango was listed on the application, this time as Woodforest's sales agent.  *See* Compl. ¶ 72.  As part of the process, Woodforest employees reviewed the application and completed an "Internet Merchant Review Checklist."  The checklist required the employee to review the website and confirm that it contained a

"complete description" of the goods offered, and pages of the website were printed in support of this review.  Gucci alleges that Woodforest, through its employee, printed a number of pages from TheBagAddiction.com that displayed the Gucci Marks and counterfeit Gucci products.  A second-level review of the website was allegedly performed after Woodforest accepted the application.  An employee or agent would complete a purchase on the website and request a refund; this process was repeated regularly over the relationship with the online merchant. Woodforest began processing credit card transactions –Visa, MasterCard and American Express– for the Laurette Counterfeiters in November 2006, and continued to provide these services until June 2008 when the website was shut down.  Like Frontline, Woodforest also investigated chargebacks and received relevant documentation from Laurette, though Gucci claims that MCCS was responsible for processing the chargeback requests.  Also akin to Frontline, Woodforest charged a higher discount rate for replica merchants like Laurette. Woodforest allegedly processed over $1 million in transactions for counterfeit items, and made over $30,000 from the fees on these transactions.

Gucci maintains that the credit card processing services established by these three defendants was essential to the Laurette Counterfeiters' sale of counterfeit Gucci products. These services "facilitated the Laurette Counterfeiters ability to quickly and efficiently transact sales for [c]ounterfeit [p]roducts through their website by enabling customers to use personal credit cards to pay for purchases on TheBagAddiction.com."  Compl. ¶87.  Without credit card processing, Plaintiff claims, websites like TheBagAddiction.com could not operate or functionally exist.  As such, Gucci believes that Durango, Frontline, and Woodforest are equally responsible for the infringement and counterfeiting engaged in by Laurette through their website. Based on these allegations, Plaintiff brings causes of action for (1) trademark infringement and counterfeiting under the Lanham Act, 15 U.S.C. §§ 1114, 1125, 1116, 1117; (2) contributory trademark infringement and counterfeiting pursuant to the Lanham Act; (3) vicarious liability for trademark infringement and counterfeiting under the Lanham Act; and (4) trademark infringement and unfair competition under New York state law, *see* N.Y. Gen. Bus. Law §§ 360-k, 360-o.  Defendants jointly moved to dismiss these claims based on a purported lack of personal jurisdiction, and because Plaintiff has failed to state a claim, pursuant to Rule 12(b)(2) and (6) of the Federal Rules of Civil Procedure.

## II.   DISCUSSION

### A.  Personal Jurisdiction

#### 1.  Legal Standard

On a motion to dismiss for lack of personal jurisdiction, pursuant to Rule 12(b)(2), the plaintiff bears the burden of showing that the court has jurisdiction over the defendants.  *See Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005); *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999).  "Where, as here, a court relies on pleadings and affidavits, rather than conducting a 'full-blown evidentiary hearing,' the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant."  *DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001); *see also PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) ("Moreover, we construe the pleadings and affidavits in plaintiff's favor at this early stage.").  Personal jurisdiction is necessarily a fact-sensitive inquiry dependent on the particulars of the case before the court.  *See PDK Labs*, 103 F.3d at 1108.

Pursuant to the Federal Rules of Civil Procedure, "[a] court may exercise jurisdiction over any defendant who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located."  *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 94 (2d Cir. 2000) (internal quotations omitted); Fed.R.Civ.P. 4(k)(1)(a).  "Where a defendant resides outside the forum state, a federal court applies the forum state's personal jurisdiction rules if the federal statute does not specifically provide for national service of process."  *PDK Labs*, 103 F.3d at 1108; *see also Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004).  The jurisdictional analysis is a two-step inquiry.  First, the court must determine whether the plaintiff has shown that the defendants are amenable to service of process under the forum state's laws.  Second, the court must assess whether the assertion of jurisdiction comports with the requirements of constitutional due process.  *See, e.g., Kernan*, 175 F.3d at 240; *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).

#### 2.  The Defendants Are Amenable To Jurisdiction Under New York Law

New York's long-arm jurisdiction statute provides for service of process for defendants based on both general and specific jurisdictional grounds.  The jurisdictional facts presently before this Court indicate that jurisdiction is most clearly available pursuant to §302(a)(3)(ii), for a tortious act committed outside the state that causes injury within the state.  Jurisdiction

pursuant to § 302(a)(3)(ii) is predicated on five elements: "(1) [t]he defendant committed a tortious act outside the state; (2) the cause of action arose from that act; (3) the act caused injury to a person or property within the state; (4) the defendant expected or should reasonably have expected the act to have consequences in the state; (5) the defendant derives substantial revenue from interstate or international commerce." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt.*, LLC, 450 F.3d 100, 106 (2d Cir. 2006) (citing *LaMarca v. Pak-Mor Mfg. Co.,* 95 N.Y.2d 210, 214 (2000)); *see also Kernan*, 175 F.3d at 241.  Most of these elements are easily met in this case, based on the limited burden required at this stage.  Gucci alleges that each of the defendants is liable, either directly, as a contributor, or vicariously, for the trademark infringement and counterfeiting committed by the Laurette Counterfeiters and other similar online enterprises.  A plaintiff "need not actually prove that defendant committed a tort" to satisfy the first element of § 302(a)(3)(ii), "but rather need only state a colorable cause of action." *Sole Resort*, 450 F.3d at 106 (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 125 (2d Cir. 2002)).  Trademark infringement is a tort for jurisdictional purposes, and the situs of this tort is considered to be where the website, or servers which maintain the website, are located.  *See Parker Waichman Alonso LLP v. Orlando Firm, P.C.*, No. 09 Civ. 7401 (CM), 2010 WL 1956871, at *9 (S.D.N.Y. May 14, 2010) (citing, *inter alia*, *Energy Brands, Inc. v. Spiritual Brands, Inc.,* 571 F. Supp. 2d 458, 470-71 (S.D.N.Y. 2008)); *see also Cable News Network, L.P. v. GoSMS.com, Inc.*, No. 00 Civ. 4812 (LMM), 2000 WL 1678039, at *3 (S.D.N.Y. Nov. 6, 2000).  The present factual allegations indicate that TheBagAddiction.com website was operated from outside of New York, specifically in California.  Since I find that Gucci has stated a plausible claim for contributory liability for trademark infringement, *see infra*, the first and second elements have been satisfied.

The pleadings are sufficient to demonstrate injury to a person or property within New York.  Gucci is a New York corporation with its principal place of business in New York City.  It claims injury based on the confusion and lost sales created in the market by the counterfeits, as well as the harm from the diminished reputation for the marks due to the inferior quality of the counterfeits.  Gucci specifically alleges sales of counterfeit goods to New York-based consumers.  Injury within a state "includes harm to a business in the New York market in the form of lost sales or customers." *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 568 (S.D.N.Y. 2000); *see also GoSMS.com*, 2000 WL 1678039, at *4.  Moreover, courts in this

district have specifically held that an allegation of trademark infringement by a New York-based corporate plaintiff that alleges harm in New York is sufficient to satisfy this element. *See American Network, Inc. v. Access America/Connect Atlanta*, 975 F.Supp. 494, 497 (S.D.N.Y. 1997); *Parker Waichman*, 2010 WL 1956871, at *9. Plaintiff's allegations support the third element for specific jurisdiction under § 302(a)(3)(ii).

Fourth, it is clear that each of the three defendants derive substantial revenue from interstate or international commerce. The requirement for interstate commerce is intended to exclude foreign businesses that "are of a local character." *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 29 (2d Cir. 1997) (quoting legislative history for statute). No specific dollar threshold is required for the revenue to be deemed substantial, and the main concern is the "overall nature of the defendant's business and the extent to which he can fairly be expected to defend lawsuits in foreign forums." *Parker Waichman*, 2010 WL 1956871, at *11. Revenue from interstate and international commerce may be analyzed as a percentage of total revenues, or as an absolute number, but neither approach is binding and each case should be decided on its own facts. *See Palace Exploration Co. v. Petroleum Dev. Co.*, 41 F. Supp. 2d 427, 436 (S.D.N.Y. 1998); *Parker Waichman*, 2010 WL 1956871, at *11. In this case, Gucci generally alleges that Durango, Woodforest, and Nationwide hold themselves out as national, if not international, companies that derive substantial revenue from interstate or international commerce. Using the Defendants' relationship with Laurette as an example, they note that over 15,000 orders totaling more than $2 million was processed during the period in which they were serviced by Frontline and Woodforest, as established by Durango. Each of the defendants earned revenue from this relationship, and the relationship appears to be fairly representative of the sort of commerce that each normally engage in as a regular course of business. Taken together, the allegations, with no real dispute offered by Defendants, suffice to show that none of these businesses operate on a purely local basis and derive sufficient revenue in interstate commerce to satisfy jurisdiction. *See GoSMS.com*, 2000 WL 1678039, at *5 ("The important fact in this analysis is that GoSMS.com's operations are international and in no way limited to California.").

The trickiest element, and primary source of contention with regard to jurisdiction, is whether or not each or any of the defendants expected or reasonably should have expected consequences in New York. The test for whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective one. *Kernan*, 175 F.3d at

241; *see also Capitol Records, LLC v. VideoEgg, Inc.,* 611 F. Supp. 2d 349, 363 (S.D.N.Y. 2009).  This forseeability requirement "relates to the forum consequences generally and not to the specific event which produced injury within the state."  *Am. Network*, 975 F. Supp. at 497; *see also LaMarca*, 95 N.Y.2d at 215.  In other words, it "requires that a defendant foresee that its tortious act will have some consequences in New York, although not necessarily the exact consequences that occurred."  *Capital Records*, 611 F. Supp. 2d at 363.  The purpose of this element is to "ensure some link between a defendant and New York State to make it reasonable to require a defendant to come to New York to answer for tortious conduct committed elsewhere."  *LaMarca*, 95 N.Y.2d at 215.[4]

Gucci has pled sufficient facts to demonstrate that each of the three defendants expected or should have expected that their business relationships with companies like Luarette, who sold counterfeit goods over the internet without restriction to any particular state, would have consequences in New York.  Durango bills itself as a nationwide and international service that connects merchants, particularly high-risk online merchants, to credit card processing entities like Woodforest and Frontline.  Moreover, Durango concededly has clients in New York, albeit a small number of them.  It is allegedly a service provider for JP Morgan Chase Bank, who Gucci claims has its principal place of business in New York.  At oral argument, counsel for Plaintiff proffered that Durango took on an additional business relationship with a "fake handbag company" that is located in New York.  *See* Oral Argument Transcript ("Tr") at 41 (Mar. 3, 2010).  These are "tangible manifestations" of Durango's attempts to reach the New York market.  *See Parker Waichman*, 2010 WL 1956871, at *10.  Further, Durango was generally aware that the internet businesses it established relationships with, like Laurette and TheBagAddiction.com, were unrestricted by geography and available through the internet to consumers in all of the states, including New York.  When a product is involved, forseeability can be met through "concrete facts known to the nondomiciliary that should have alerted it that

---

[4] There is some confusion as to the precise contours of the forseeability requirement.  In *Kernan*, the Second Circuit, citing a variety of New York cases, determined: "that a defendant's product will find its way into New York does not satisfy this element, and that purposeful availment of the benefits of the laws of New York such that the defendant may reasonably anticipate being haled into New York court is required."  *Kernan*, 175 F.3d at 241.  After this decision, the New York Court of Appeals in 2000 decided *LaMarca*, which made no mention of purposeful availament for purposes of statutory personal jurisdiction.  *See* 95 N.Y.2d at 215.  The Second Circuit subsequently noted this omission, but declined to decide whether or not purposeful availment is a necessary component of the New York statute.  *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002). I need not resolve this issue.  The due process analysis for jurisdiction likewise requires "purposeful availment" and I find that it exists in this case for all defendants.

its product would enter the New York market." *Am. Network*, 975 F. Supp. at 497.  Similarly, Gucci has pled sufficient concrete facts to indicate that Durango knew that its services were utilized in New York.  In a similar situation that involved jurisdiction over a foreign defendant for contributory copyright infringement, the court noted that "a foreign defendant's vicarious or contributory liability for the infringing acts of another within the United States may give rise to a long-arm jurisdiction under New York law." *Armstrong v. Virgin Records, Ltd.*, 91 F. Supp. 2d 628, 639 (S.D.N.Y. 2000) (citing *Stewart v. Adidas A.G.,* No. 96 Civ. 6670(DLC), 1997 WL 218431, at *3 (S.D.N.Y. Apr.30, 1997)).  Here, Durango, as a national service that works with companies that transact goods over the internet to states including New York, should have been aware that it could be hauled into court in this forum based on their alleged contributory liability for their clients' infringing conduct.

Gucci's allegations with regard to Woodforest and Frontline likewise establish that these two entities expected or should have expected consequences in this forum.  Both companies hold themselves out as nationwide operations and both have clients in New York (although they stress that these clients are few in number).  In addition, both maintain relationships with New York-based organizations as part of their credit card processing businesses.  According to Gucci, Frontline's website indicates that its "principal bank is HSBC Bank NA (Buffalo, New York)" while Woodforest allegedly has a subsidiary organization involved in its business, MCCS, that has an office in New York.[5]  *See* Compl. ¶¶ 14, 22.  Most significantly, Gucci claims that both Woodforest and Frontline established credit card processing services for TheBagAddiction.com, as well as similar websites, which sold counterfeit Gucci products nationwide, and in particular to New York customers.  An agreement that permits sales in New York, even if it does not specifically enumerate the state, is an indication of an "attempt to serve the New York market, even if it did so indirectly."  *Kernan*, 175 F.3d at 242.  Put simply, these allegations indicate that Woodforest and Frontline both knew that their services would be used by customers from any state who accessed the Laurette website, and should have known that "any state" would include New York.  *See, e.g., GoSMS.com*, 2000 WL 1678039, at *4 (alleged infringer "reasonably should have expected the transmittal of trademark and copyright infringing content via the GoSMS.com service to have consequences in New York for the purposes of CPLR

---

[5] Woodforest strongly disputes that it has any relevant relationship with MCCS.  Even after considering their arguments, however, Woodforest and MCCS's business relationship is at best nebulous. Regardless, Gucci's factual pleadings as a whole are sufficiently persuasive to support jurisdiction at this stage of proceedings.

302(a)(3)(ii)"); *Cartier v. Seah, LLC*, 598 F. Supp. 2d 422, 425 (S.D.N.Y. 2009) (alleged trademark infringer of Cartier watches subject to personal jurisdiction because it placed advertisements in national catalog, and foreseeable that it would be distributed at New York airports).

### 3. *Jurisdiction Satisfies Constitutional Due Process*

In addition to satisfying the statutory elements for personal jurisdiction, Plaintiff must also demonstrate that the jurisdictional reach satisfies constitutional due process. The due process inquiry contains two parts: the minimum contacts inquiry, and the reasonableness inquiry. *See Parker Waichman*, 2010 WL 1956871, at *6; *see also Kernan*, 175 F.3d at 242 ("The due process clause of the Fourteenth Amendment permits a state to exercise personal jurisdiction over a non-resident defendant with whom it has certain minimum contacts … such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.") (internal quotations omitted). This protection "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Metro. Life*, 84 F.3d at 567 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471-72 (1985)). A court must balance the strengths of weaknesses of the two due process requirements: "depending upon the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry." *Metro. Life*, 84 F.3d at 568.

      (a) <u>Minimum Contacts & Purposeful Availment</u>

"Specific jurisdiction is determined by first asking if the claim arises out of or relates to defendants' contacts with the state, and then showing defendants purposefully availed itself of the privilege of doing business in the forum so that defendant could reasonably foresee being haled into the forum's courts." *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 37-38 (2d Cir. 2001) (citing *Kernan*, 175 F.3d at 242-43). Gucci's allegations are sufficient to demonstrate that all defendants have both minimum contacts with New York and purposefully availed themselves of the privileges of doing business in this state. As noted above, Durango has a number of contacts with New York. The company considers itself to be a nationwide service provider, operates a website that can be viewed in New York, does business with internet merchants like Laurette who sell goods into New York, and even

have some New York-based clients who they earn revenue from (however insubstantial).  It is clear from these contacts that Durango purposefully availed itself of the benefits of this forum and should have foreseen that it could be haled into court in New York.  Durango's website is relatively interactive, and provides the opportunity for anyone, including New York residents, to apply for services and call or email the company.  "Many courts have permitted the exercise of personal jurisdiction based on a defendant's interactive website in combination with other relevant forum contacts."  *Chloe v. Queen Bee of Beverly Hills, LLC,* 571 F. Supp. 2d 518, 524-25 (S.D.N.Y.2008) (collecting cases); *see also Thomas Publ'g Co. v. Indus. Quick Search, Inc.*, 237 F. Supp. 2d 489, 492 (S.D.N.Y. 2002) ("If IQS wishes to operate an interactive website accessible in New York, there is no inequity in subjecting IQS to personal jurisdiction here."). Durango took advantage of the New York market because it advertises in New York through its website, has some New York-based clients, and operates a business that helps allow other companies to sell goods in New York.  That one of those was sued for counterfeiting, which ultimately led to the present suit in this forum, should not have come as any real surprise.

Woodforest and Frontline likewise availed themselves of the benefits of this forum, and maintain sufficient contacts to support jurisdiction.  Like Durango, they operated interactive websites available in New York, billed themselves as available for nationwide business, and have a small number of clients in New York.  Woodforest and Frontline availed themselves of the benefits of New York as part of a "nationwide market to serve clients," *see Parker Waichman*, 2010 WL 1956871, at *11, and some of those clients allegedly counterfeited Gucci products.  Moreover, it was their credit card processing systems, according to Gucci, that actually allowed for the purchase of counterfeit products in the New York market.  Gucci also alleges that Woodforest and Frontline performed due diligence on TheBagAddiction.com, and therefore knew about the "replica" Gucci products that were being sold.  Just as a company "cannot disclaim knowledge of" a subsidiaries use of infringing marks in New York, *see Citigroup*, 97 F.Supp.2d at 568, a company also cannot disclaim its knowledge of the potential locations for the sale of products by websites it chooses to do business with.  Woodforest and Frontline allegedly operated a service that allowed customers from anywhere in the United States, including New York, to purchase goods from websites like TheBagAddiction.com, and therefore have purposefully availed themselves of this forum.

(b) <u>Reasonableness</u>

13

To satisfy due process, Gucci must also demonstrate that the assertion of jurisdiction "comports with traditional notions of fair play and substantial justice – that is, whether it is reasonable under the circumstances of the case." *Kernan*, 175 F.3d at 243 (quoting *Metro. Life*, 84 F.3d at 568). Five factors are considered to determine the reasonableness of jurisdiction: (1) the burden of jurisdiction on the defendant; (2) the interest of the forum in adjudicating the case; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in obtaining the most efficient resolution of the dispute; and (5) the shared interests of the states in furthering "social substantive policies." *See Kernan*, 175 F.3d at 243; *see also Parker Waichman*, 2010 WL 1956871, at *7. Where the other elements for jurisdiction have been met, dismissals on reasonableness grounds should be "few and far between." *See Metro. Life*, 84 F.3d at 575. The facts as alleged here indicate that jurisdiction would be reasonable in this case.

### B. Trademark Infringement Liability

#### 1. Standard of review

To survive a motion to dismiss, a plaintiff must "plead enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Where the court finds well-pleaded factual allegations, it should assume their veracity and determine whether they "plausibly give rise to an entitlement to relief." *Id.* at 1950. To decide the motion to dismiss, a court may consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (internal citations omitted); *see also NewMarkets Partners LLC v. Oppenheim*, 638 F. Supp. 2d 394, 404 (S.D.N.Y. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," however, dismissal is appropriate. *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Iqbal*, 129 S.Ct. at 1950.).

Pursuant to Section 32 of the Lanham Act, "the owner of a mark registered with the Patent and Trademark Office can bring a civil action against a person alleged to have used the mark without the owner's consent." *Tiffany, Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010)

(quoting *ITC Ltd. v. Punchgini, Inc.,* 482 F.3d 135, 145-46 (2d Cir.)); *see also* 15 U.S.C. §
1114(1)(a).  Gucci offers three theories of liability to hold Defendants accountable for the
infringing sales of counterfeit products by others: direct, vicarious, and contributory liability.[6]

### 2.  Direct and Vicarious Liability

Gucci has not put forth sufficient factual allegations to support trademark infringement
claims based on either direct or vicarious theories of liability.  Direct liability for trademark
infringement requires a valid mark entitled to protection under the Lanham Act, and that the
defendant used the mark in commerce in connection with the sale or advertising of goods or
services, without the plaintiff's consent.  *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d
400, 406-07 (2d Cir. 2005) (internal quotations and citations omitted).  In addition, Plaintiff must
show that the Defendant's use of the mark is likely to cause confusion.  *Id.*  The problem for
Gucci is that there is no indication that any of the defendants actually "used the mark in
commerce."  Knowledge alone of another party's sale of counterfeit or infringing items is
insufficient to support direct liability, *see eBay*, 600 F.3d at 103, and there are otherwise no
factual allegations that Durango, Woodforest, or Frontline themselves advertised or sold
infringing goods.

Gucci's allegations are also unable to support a claim for vicarious liability.  Vicarious
trademark infringement, a theory of liability considered elsewhere but not yet the subject of a
decision by this Circuit, "requires a finding that the defendant and the infringer have an apparent
or actual partnership, have authority to bind one another in transactions with third parties or
exercise joint ownership or control over the infringing product."  *Hard Rock Cafe Licensing
Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1150 (7th Cir. 1992); *Perfect 10, Inc. v. Visa
Intern. Serv. Ass'n*  494 F.3d 788, 807 (9th Cir. 2007); *see also Banff Ltd. v. Limited, Inc.*, 869 F.
Supp. 1103, 1111 (S.D.N.Y. 1994) (noting lack of consideration in Second Circuit).  Though
Gucci has raised a number of factual allegations that indicate that Defendants' services were
crucial to a website like TheBagAddiction.com's sale of infringing goods, there is insufficient
evidence to plausibly infer an actual or apparent partnership.  The vague, puffery-like references
to a "partnership" between these companies and website merchants are not enough to support
vicarious liability.  *See Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 591 F. Supp. 2d

---

[6] Federal law and state common law infringement claims are analyzed identically.  *See, e.g., eBay*, 600 F.3d at 102
n.6.

1098, 1113 (N.D. Cal. 2008) ("off-hand references to customers as 'partners' is insufficient to exhibit the type of behavior and relationship that can be considered an actual or apparent partnership.").  While Defendants may have sufficient control over the sale of counterfeit goods to support contributory liability, *see infra*, the facts alleged do not support an inference that they had the type of control over a company like Laurette as a whole, i.e. akin to joint ownership, necessary for vicarious liability.

### 3. Contributory Liability

Gucci's only plausible theory of liability here is contributory trademark infringement. The Supreme Court has determined that liability can extend "beyond those who actually mislabel goods with the mark of another."  *Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844, 853 (1982). There, a drug manufacturer sold generic versions of a certain brand-name drug in identically colored pill capsules, with the knowledge that pharmacists would place the pills in brand-name packaging.  In this context, the Court held: "if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit."  *Id.* at 853-54; *see also eBay*, 600 F.3d at 104.  As the Seventh Circuit noted, however, the Supreme Court's test for contributory liability is not as easily applied to service providers as it is to a manufacturer.  *See Hard Rock*, 955 F.2d at 1148 ("it is not clear how the doctrine applies to people who do not actually manufacture or distribute the good that is ultimately palmed off as made by someone else"); *see also Tiffany Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 504 (S.D.N.Y. 2008) (reversed on other grounds).  While the "intentional inducement" prong of the *Inwood* test still applies, *see eBay*, 600 F.3d at 106, courts have crafted a slightly different test for service providers that "continue[] to supply its [services] to one whom it knows or has reason to know is engaging in trademark infringement."  *Inwood*, 456 U.S. at 853.  To avoid imputing liability on truly ancillary figures like a "temporary help service" that may set up a flea market stand for a counterfeiting merchant, *see Hard Rock*, 955 F.2d at 1148, courts in other circuits have determined that a plaintiff must also show "direct control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark."  *See, e.g., Perfect 10*, 494 F.3d at 807; *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999).  While the Second Circuit has yet to directly contemplate the validity of this modified part of the *Inwood*

test, I concur with Judge Sullivan that this is a "persuasive synthesis." *See eBay*, 576 F. Supp. 2d at 505-06. As such, Gucci can proceed with its action against Defendants if it can show that they (1) intentionally induced the website to infringe through the sale of counterfeit goods or (2) knowingly supplied services to websites and had sufficient control over infringing activity to merit liability.

(a) <u>Intentional Inducement</u>

A party can be held liable for trademark infringement if it intentionally induces another to engage in trademark infringement. With regards to the role played by Durango, Plaintiff's inducement theory is supported by sufficient factual allegations. Durango's website reaches out to "high risk merchant accounts," including those who sell "replica products." *Id.* ¶ 48. The website further boasts that 95% of merchant accounts are approved and that Durango "specialize[s] in hard to acquire accounts." *See* Coyle Decl., Ex. 10 (printed copies of Durango website pages). Similar to the companies that promise the extension of credit or loans to those who are rejected by traditional lending institutions for having bad credit, Gucci's complaint suggests that Durango bills itself as a company that sets up a certain quality of business with credit card processing services that accept these "high risk" clients. These allegations can fairly be construed as Durango's attempt to induce less savory businesses, like those who sell counterfeit "replicas" of luxury goods. Moreover, Gucci alleges that Durango's sales representative, Nathan Counley, specifically discussed Laurette's difficulty in finding a credit card processor because they were "replica" merchants, which Gucci argues was synonymous on the internet for a counterfeiter.[7] Durango "communicated an inducing message to [its] … users," and while there is of yet no evidence that they expressly sought out counterfeiters, Gucci has pled sufficient facts to infer that Durango crafted "advertisement[s] or solicitation[s] that broadcast[] a message designed to stimulate others to commit violations." *Perfect 10*, 494 F.3d at 801 (discussing contributory copyright infringement, but suggesting later that the analysis

---

[7] Defendants challenge the meaning of both "replica" and "high risk," and claim that both are much more innocuous terms than Gucci suggests. First, "replica" is in fact often used in conjunction, or interchangeably, with the term "counterfeit" in case law on trademark infringement. *See, e.g., Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 106 (2d Cir. 2000) ("Appellees Lederer and Artbag sell replicas of various Hermès products"); *eBay*, 600 F.3d at 100 (Defendant internet auction house has disclaimer that it "does not tolerate" replicas); *Akanoc*, 591 F. Supp. 2d at 1103 ("Plaintiff believes that each of them is a counterfeit replica of Plaintiff's products which infringe Plaintiff's copyrights and trademarks."). Second, the precise meaning of the term is a fact-specific issue that can be dealt with through discovery, and I may rely on Gucci's pleadings at this stage of the litigation.

applies to trademark infringement as well).  Finally, Gucci alleges that Counley and Durango helped the Laurette Counterfeiters set up a system to avoid chargebacks, which required customers to check a box that said "I understand these are replicas."  This suggests "affirmative steps taken to foster infringement" or "that Defendants promoted their payment system as a means to infringe."  *Id.* at 800-01.

On the other hand, Gucci has failed to plausibly support a claim that either Woodforest or Frontline intentionally induced Laurette to sell counterfeit products.  Durango, not Woodforest or Frontline, helped set up the Laurette Counterfeiters with credit card processing services.  Though both companies allegedly advertised for high risk merchants, they did not bring Laurette to the table the way Durango allegedly did.  Gucci notes that they both charged higher fees for processing high risk merchants, and that Frontline reviewed the language of the aforementioned acknowledgement of receipt of a replica product.  These claims, however, are not enough to suggest that either Woodforest or Frontline took the affirmative steps necessary to foster infringement.  *See Perfect 10*, 494 F.3d at 801.

> (b) <u>Control and knowledge</u>

Even if a defendant does not seek out and intentionally induce a third-party to commit trademark infringement, it may still be held liable for the infringement if it supplied services with knowledge or by willfully shutting its eyes to the infringing conduct, while it had sufficient control over the instrumentality used to infringe.  *See eBay*, 576 F. Supp. 2d at 505-06; *Perfect 10*, 494 F.3d at 807.  Knowledge in this context means that "a service provider must have more than a general knowledge or reason to know that its service is being used to sell counterfeit goods … [s]ome contemporary knowledge of which particular listings are infringing or will infringe in the future is necessary."  *eBay*, 600 F.3d at 107.  A showing of willful blindness to this information is also sufficient.  *Id.* at 109-10 ("When [a service provider] has reason to suspect that users of its service are infringing a protected mark, it may not shield itself from learning of the particular infringing transactions by looking the other way.").

Here, Gucci has made substantial factual allegations about the knowledge of all three defendants.  These allegations at the very least provide a strong inference that each knew that Laurette traded in counterfeit products, or were willfully blind to that fact.  As described previously, Durango allegedly held itself out to high risk replica merchants.  Its sales agent, Counley, traded emails with the Laurette Counterfeiters who expressly told him that they were

unable to get credit card services because they sold "replica" items.  Counley later wrote back to say he had found a U.S. bank that "can do replica accounts now."  Compl. ¶ 54.  Surely, a connection between an inability to get the services needed to transact goods online and the sale of replicas should have attracted Durango's attention.

Frontline likewise is alleged to have sufficient knowledge of trademark infringement by the Laurette Counterfeiters.  According to Gucci, Laurette completed an application to obtain Frontline's services, and Nathan Counley, though a Durango employee, is listed as Frontline's sales agent.   Counley "acted as Frontline's agent in soliciting and directing credit card processing business from replica merchants like the Laurette Counterfeiters" and therefore Frontline may be charged with his knowledge, including his understanding of Laurette's difficulty to obtain services for selling replicas.  Compl. ¶ 56.  Gucci alleges that the "replica acknowledgment" described above that was created for the Laurette website with Counley's assistance was also reviewed by Frontline, who made suggestions as to where they should place this warning on the website.  Even more significantly, Frontline allegedly performed its own investigation of products sold through TheBagAddiction.com as part of Frontline's chargeback reviews.  When faced with a chargeback, Gucci claims that Frontline received supporting documentation from Laurette that included information about the specific item ordered, including a description of the item purchased.  Not only did Frontline allegedly review the specific item description, Plaintiff also claims that the relatively small price tag for the item, as well as specific complaints from customers who made chargebacks about not receiving what the website purported to sell, e.g. a product made of genuine leather, should have alerted Frontline that these were infringing products.  These fact-specific claims are enough to at least infer that Frontline knew or consciously avoided knowing that the counterfeit products were sold on TheBagAddiction.com

Gucci claims that Woodforest's situation is similar to Frontline.  As was the case with Frontline, Counley represented himself on Laurette's application as Woodforest's sales agent.  *See* Compl. ¶ 72.  The application itself said that Laurette was a "wholesale/retail designer [of] handbags," and listed the supplier as a Chinese bag manufacturer rather than Gucci.  *See* Compl., Ex. 6.  Gucci also claims that Woodforest specifically reviewed the website and the products listed on it as part of its initial decision to do business with Laurette.  A Woodforest employee allegedly completed an "Internet Merchant Review Checklist," which required him or her to

19

review the website and confirm whether it contained a complete description of the goods offered. *See* Compl. ¶ 75.  Based on these claims and the website images provided by Plaintiff, even a cursory review of the TheBagAddiction.com would indicate that they claimed to sell replica Gucci products.  Indeed, Plaintiff alleges that Woodforest printed out a number of pages that displayed goods that were for sale, including counterfeit Gucci products, and maintained these pages as part of their business records.  Woodforest would also perform a second-level review, performed repeatedly after it accepted the business, where an employee would complete a purchase and request a refund.  Finally, like Frontline, Woodforest investigated chargeback disputes and received supporting documentation that allegedly should have tipped them off to the infringing conduct.  These claims are more than sufficient to suggest, at this stage of the litigation, that Woodforest knew or shielded themselves from the knowledge that Laurette was selling counterfeit Gucci products with their credit card processing system.

The most significant dispute between the parties with regard to contributory liability is whether any or all of the Defendants had sufficient control over Laurette and TheBagAddiction.com website to render them liable for the web merchant's counterfeiting practices.  As noted above, the control element was incorporated by the Seventh Circuit to establish a limiting principle that would exclude those service providers that do not really contribute to the infringing conduct; this Circuit has yet to directly consider the merits or contours of this modified form of the *Inwood* test.  *See eBay*, 600 F.3d at 105-06 (noting control element but "assum[ing] without deciding that *Inwood*'s test for contributory trademark infringement governs").  Although the concept of control arose out of the flea market context and is based on common law landlord-tenant tort principles, *see Hard Rock*, 955 F.2d at 1149-50, the concept of control is not limited to that context.  *Inwood* "laid down no limiting principle that would require defendant to be a manufacturer or distributor," and "whether the venue is online or in brick and mortar is immaterial."  *eBay*, 576 F. Supp. 2d at 505; *see also Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 265 (9th Cir. 1996); *Lockheed Martin*, 194 F.3d at 984.  The only relevant inquiry is the "extent of control … over the third party's means of infringement," *eBay*, 576 F. Supp. 2d at 505; *Lockheed Martin*, 194 F.3d at 984, and courts have found sufficient control in an array of service contexts.  *See, e.g., eBay*, 576 F. Supp. 2d at 505 (online auction house); *Cartier Intern. B.V. v. Liu*, No. 02 Civ. 7926, 2003 WL 1900852, at *3

(S.D.N.Y. 2003) (company that shipped goods for counterfeiter); *Akanoc*, 591 F. Supp. 2d at 1112 (internet service provider).

Here, Plaintiff provides sufficient factual allegations to establish a claim that Woodforest and Frontline had some control over the directly infringing third-party, but fails to provide enough facts to show control on the part of Durango.  Though Gucci has made an adequate showing of intentional inducement by Durango, there is little indication that they had much control over the website's sales process.  Durango appears to be the veritable middleman in this case.  Though there allegedly was an ongoing relationship between Durango and the Laurette Counterfeiters, Gucci provides little indication that once Laurette received services from Frontline and Woodforest, Durango had any particular ability to stop or prohibit sales.  Plaintiff's allegations suggest both inducement and knowledge, but "procuring merchant accounts with credit card processing agencies," Compl. ¶ 51, does not demonstrate that Durango could thereafter prevent the sale of any or all of the counterfeit products.

In contrast, Gucci's complaint indicates that Frontline and Woodforest's credit card processing services are a necessary element for the transaction of counterfeit goods online, and were essential to sales from TheBagAddiction.com.  Although other methods of online payment exist, such as online escrow-type services like PayPal,[8] generally speaking "credit cards serve as the primary engine of electronic commerce."  *Perfect 10*, 494 F.3d at 794.  Indeed, Gucci points out that Durango's website claims that "9 out of 10 people use a credit card for their online orders." Compl. ¶ 3.  As such, without the credit card processing operation set up by these two defendants, Gucci alleges that TheBagAddiction.com would largely have been unable to sell its counterfeit Gucci products.  They further support this claim with an affidavit by one of the website owners, who states that "[a]pproximately 99% of payments from my customers were made using credit cards." Kirk Decl. ¶ 1.  Both Frontline and Woodforest processed transactions for cardholders with major credit card institutions –Visa, MasterCard, and so forth– and, according to Gucci, Laurette sold over $500,000 in counterfeit products "during the time they utilized Defendants' merchant bankcard services."  Compl. ¶ 44.  By processing these transactions, both companies allegedly earned significant revenue from the transaction fees they charged.  Put another way, "[t]hey knowingly provide a financial bridge between buyers and sellers of [counterfeit products], enabling them to consummate infringing transactions, while

---

[8] *See* PayPal, https://www.paypal.com (last visited May 26, 2010).

making a profit on every sale." *Perfect 10*, 494 F.3d at 810-11 (Kozinski, J., dissenting).[9]
Though both Frontline and Woodforest insist they are middlemen with no ability to prevent a
transaction, they do not dispute that they could have simply refused to do business with "replica"
internet merchants, just like the flea market purveyor who refuses to provide a booth to a
counterfeiter.  *See* Compl.  ¶¶ 87-89 (Woodforest and Frontline "facilitated the Laurette
Counterfeiters ability to quickly and efficiently transact sales for Counterfeit Products through
their website by enabling customers to use personal credit cards to pay for purchases on
TheBagAddiction.com").  According to one of the website operators, "[i]f I did not receive an
approval for a credit card charge, I would not ship the customer's order."  Kirk Decl. ¶ 2.  These
allegations indicate that the infringing products "are delivered to the buyer only after defendants
approve the transaction … This is not just an economic incentive for infringement; it's an
essential step in the infringement process."  *Perfect 10*, 494 F.3d at 811-12 (Kozinski, J.,
dissenting).

      Frontline and Woodforest insist that these allegations are insufficient because they do not
allege direct or complete control over the website itself.  However, the ability to literally shut
down the website is not needed given the facts of this case.  The circuits that have considered
this issue look for control and monitoring over the "instrumentality used … to infringe the
plaintiff's mark."  *Perfect 10*, 494 F.3d at 807.  Based on Gucci's claims, the instrumentality in
this case is the combination of the website and the credit card network, since both are allegedly
necessary elements for the infringing act – the sale and distribution of the counterfeit good.[10]
Defendants' rely on the fact that, in *Perfect 10*, the Ninth Circuit declined to hold certain credit
card processors liable for a website's trademark infringement.  There, however, the infringing
conduct was the publication *on the website* of trademarked images of nude models, and the
distribution occurred via individuals viewing and taking the image directly from the website.
*See Perfect 10*, 494 F.3d at 796 ("the infringement rests on the reproduction, alteration, display
and distribution of Perfect 10's images over the internet"); *Perfect 10, Inc. v. Visa Inter. Serv.
Assoc.*, No. C 04-00371, 2004 WL 3217732 (N.D. Cal. Dec. 3, 2004) ("Plaintiff alleges that a
number of websites routinely and illicitly publish Plaintiff's images-and thereby infringe.").

---

[9] Judge Kozinski's analysis, like that of the majority in *Perfect 10*, is largely set in the context of copyright
infringement.  However, he later states that his dissent on trademark infringement is based on "precisely the same
reasons."  *Perfect 10*, 494 F.3d at 822.

[10] Indeed, Frontline and Woodforest's credit card processing system were likely integrated to some degree, since
some sort of credit card "portal" necessarily had to be embedded in the website for a customer to make a purchase.

Plaintiff in that case failed or perhaps was unable to allege that the credit card service providers had the "power to remove infringing material" or "directly stop their distribution" because the infringement occurred on the website itself and a credit card transaction was not needed for the website to continue to infringe. *See Perfect 10*, 494 F.3d at 807. This is not the case here.

Rather, Gucci's allegations indicate that they are concerned primarily with the sale of tangible counterfeit goods to customers around the country, which allegedly could not be accomplished without Woodforest and Frontline's ability to process the credit card-based purchases. In the words of the Supreme Court, these defendants "furnish[ed] the means of consummating" the trademark infringement. *See eBay*, 600 F.3d at 104 (quoting *William R. Warner & Co. v. Eli Lilly & Co.,* 265 U.S. 526, 530 (1924)). While in *Perfect 10* the credit card services may not have been needed for a website to display infringing photographs, the infringement here occurred through the sale of the counterfeit products. "It's not possible to distribute by sale without receiving compensation, so payment is in fact part of the infringement process." *Perfect 10*, 494 F.3d at 814 (Kozinski, J., dissenting). This action resembles cases with defendants who helped consummate infringing transactions by delivering the counterfeit or infringing goods to the customer. In *Getty Petroleum Corp. v. Aris Getty, Inc.*, the First Circuit found a defendant common carrier contributorily liable because it delivered unbranded gasoline to gas stations it knew would re-sell the gasoline under the Getty brand name. *See* 55 F.3d 718, 719 (1st Cir. 1995). Lack of title to the gasoline did not matter; the defendant "supplied[] an essential factor-physical possession of the property to which the trademark was to be attached." *Id.* at 720. Similarly, these defendants allegedly provided an "essential factor" to the infringement because the goods could not be sold and shipped without their credit card services. "[I]t makes no difference that defendants control only the means of payment, not the mechanics of transferring the material … In a commercial environment, distribution and payment are … like love and marriage-you can't have one without the other. If cards don't process payments, pirates don't deliver booty." *Perfect 10*, 494 F.3d at 818 (Kozinski, J., dissenting). If, as Gucci alleges, the Laurette website was functionally dependent upon Woodforest and Frontline's credit card processing services to sell counterfeit Gucci products, it would be sufficient to demonstrate the control needed for liability.

*               *               *

Gucci has sufficiently alleged facts to support personal jurisdiction and its trademark claims against Durango, Woodforest, and Frontline. Although Plaintiff has not sufficiently pled facts to support either direct or vicarious theories of liability, claims against all three defendants may proceed based on a contributory liability theory. The factual allegations are sufficient to infer that Durango intentionally induced trademark infringement, and that Woodforest and Frontline exerted sufficient control over the infringing transactions and knowingly provided its services to a counterfeiter.

### III.  CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is DENIED.

**SO ORDERED**
**June 23 , 2010**
**New York, New York**

**Hon. Harold Baer, Jr.**
**U.S.D.J.**

24